Exhibit A

---

**PRIUM ORCHARD HILLS, L.L.C.**

---

AMENDED AND RESTATED

OPERATING AGREEMENT

Dated as of November 6, 2006

PRIUM ORCHARD HILLS, L.L.C.

TABLE OF CONTENTS

Page

ARTICLE I -- Preliminary Statement ................................................................................ 1
ARTICLE II -- Continuation; Name; and Purpose ........................................................... 1
Section 2.1  Continuation ............................................................................................. 1
Section 2.2  Name and Office ...................................................................................... 1
Section 2.3  Purpose ..................................................................................................... 1
Section 2.4  Authorized Acts ....................................................................................... 2
Section 2.5  Term and Dissolution .............................................................................. 2
ARTICLE III -- Members; Capital .................................................................................... 3
Section 3.1  Managing Members .................................................................................. 3
Section 3.2  Investor Members ..................................................................................... 3
Section 3.3  Company Capital ...................................................................................... 3
Section 3.4  Withdrawal of Capital ............................................................................. 4
Section 3.5  Liability of Investor Members ................................................................. 4
Section 3.6  Additional Investor Members .................................................................. 4
ARTICLE IV – Investor Member Capital Contributions .................................................. 5
Section 4.1  Payments ................................................................................................... 5
Section 4.2  Special Adjustments ................................................................................. 7
Section 4.3  Repurchase Obligation of the Managing Members .................................. 9
ARTICLE V -- Profits, Losses and Distributions ........................................................... 11
Section 5.1  Profits, Losses and Tax Credits ............................................................. 11
Section 5.2  Distributions Prior to Dissolution ......................................................... 12
Section 5.3  Distributions Upon Dissolution ............................................................. 14
Section 5.4  Special Provisions .................................................................................. 14
ARTICLE VI – Managing Member Rights, Powers and Duties ..................................... 17
Section 6.1  Restrictions on Authority ....................................................................... 17
Section 6.2  Personal Services .................................................................................... 18
Section 6.3  Business Management and Control; Tax Matters Partner ....................... 18
Section 6.4  Authority of General Partners ................................................................ 19
Section 6.5  Duties and Obligations ........................................................................... 20
Section 6.6  Representations and Warranties .............................................................. 27
Section 6.7  Liability ................................................................................................... 31
Section 6.8  Indemnification ....................................................................................... 32
Section 6.9  Development Completion Obligation ..................................................... 32
Section 6.10  Operating Expense Obligation ............................................................. 33
Section 6.11  Development Services ........................................................................... 33
Section 6.12  Property Management ............................................................................ 34
Section 6.13  Borrowings ............................................................................................ 36
Section 6.14  Reserves ................................................................................................ 37
ARTICLE VII -- Books and Records, Accounting and Reports ..................................... 38
Section 7.1  Books and Records ................................................................................. 38
Section 7.2  Bank Accounts ........................................................................................ 38

i

Section 7.3  Fiscal Year and Accounting Method ................................................................. 38
Section 7.4  Annual Financial Statements, Tax Returns........................................................ 38
Section 7.5  Other Financial Statements, Reports and Information...................................... 39
Section 7.6  Site Visits .......................................................................................................... 41
Section 7.7  Tenant File Review ........................................................................................... 42
Section 7.8  Tax Elections ..................................................................................................... 42
Section 7.9  Asset Manager, Asset Management Fee and Reimbursement........................... 43
Section 7.10 General Contractor ........................................................................................... 45
ARTICLE VIII -- Retirement of a Managing Member ........................................................... 45
Section 8.1  Retirement .......................................................................................................... 45
Section 8.2  Obligation to Continue ...................................................................................... 45
Section 8.3  Retirement of a Sole Managing Member ........................................................... 46
Section 8.4  Interest of Retired Managing Member............................................................... 46
Section 8.5  Designation of New Managing Members ........................................................... 47
Section 8.6  Additional and Substitute Managing Members ................................................. 47
Section 8.7  Amendment of Certificate ................................................................................. 49
ARTICLE IX – Investor Member Transfers ........................................................................... 49
Section 9.1  Assignments ....................................................................................................... 49
Section 9.2  Substitute Investor Members ............................................................................. 50
Section 9.3  Restrictions ........................................................................................................ 50
Section 9.4  Other Investor Members .................................................................................... 50
ARTICLE X -- General Provisions .......................................................................................... 50
Section 10.1  Amendments to Certificate .............................................................................. 50
Section 10.2  Notices .............................................................................................................. 51
Section 10.3  Word Meanings................................................................................................. 51
Section 10.4  Binding Provisions ........................................................................................... 51
Section 10.5  Applicable Law ................................................................................................. 51
Section 10.6  Counterparts ..................................................................................................... 52
Section 10.7  Separability of Provisions ................................................................................ 52
Section 10.8  Paragraph Titles ............................................................................................... 52
Section 10.9  Amendments ..................................................................................................... 52
Section 10.10 Time of Admission .......................................................................................... 52
ARTICLE XI -- Defined Terms ................................................................................................ 52

Exhibit 1 -- Legal Description of Property ...........................................................................
Exhibit 2 -- Financial Forecast..............................................................................................
Exhibit 3 -- Project Summary ...............................................................................................
Schedule A -- Schedule of Partners .....................................................................................

PRIUM ORCHARD HILLS, L.L.C.

AMENDED AND RESTATED
OPERATING AGREEMENT

ARTICLE I -- <u>Preliminary Statement</u>

PRIUM ORCHARD HILLS, L.L.C. (the "Company") was formed as a limited liability company under the laws of the State of Washington pursuant to an Operating Agreement dated December 13, 2005 (the "Original Agreement").  The Articles of Organization was filed with the Filing Office on December 13, 2005.

The purposes of this amendment to and restatement of said Agreement are to (i) admit Provident Tax Credit Fund IX, LLC, an Ohio limited liability company, as the Company Investor Member and to admit SCDC, LLC, an Ohio limited liability company, as the Special Investor Member; and (ii) set out more fully the rights, obligations and duties of the Managing Members and the Investor Members and to restate the Original Agreement in its entirety.

It is hereby agreed that the Original Agreement is hereby amended and fully restated as provided herein.  Capitalized terms not defined in the text hereof shall have the meanings set forth in Article XI.

ARTICLE II -- <u>Continuation; Name; and Purpose</u>

Section 2.1  <u>Continuation</u>

The parties hereto hereby agree to continue the limited liability company known as Prium Orchard Hills, L.L.C., formed pursuant to the provisions of the Uniform Act.

Section 2.2  <u>Name and Office</u>

The Company shall continue to be conducted under the name of Prium Orchard Hills, L.L.C..  The principal office of the Company shall be at 820 A Street, Suite 300, Tacoma, WA 98402, and the Company may also maintain offices at the Property.  The resident agent for service of process on the Company shall be CT Corporation System, 520 Pike Street, Seattle, Washington 98101.  The Managing Members may at any time change the location of a Company office (but not the identity or address of its resident agent) in the State and shall give due notice of any such change to the Investor Members.

Section 2.3  <u>Purpose</u>

The purpose of the Company is to acquire, construct, rehabilitate, develop, improve, own, maintain, operate, manage, lease, sell, and otherwise deal with the Property.  The Company and the Managing Members shall operate the Property in accordance with the Property Documents and any applicable governmental regulations.  The Company shall not engage in any other business or activity.

1

Section 2.4   <u>Authorized Acts</u>

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VI, the Company is hereby authorized, and the Managing Members shall have full power, authority and discretion to cause the Company:

(i)      To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company.

(ii)     To construct, rehabilitate, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Company.

(iii)    To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and to secure the same by mortgage, pledge or other lien on the Property or any other assets of the Company.

(iv)     To employ a Management Agent, which Management Agent may be an Affiliate, to manage the Property, and to pay reasonable compensation for such services.

(v)      To enter into, perform and carry out contracts of any kind, including contracts with Affiliates, necessary to, in connection with or incidental to, the accomplishment of the purposes of the Company, specifically including, but not limited to, the execution and delivery of the Property Documents, and all other agreements, certificates, instruments or documents required by the Lenders in connection with the Property Documents and the acquisition, construction, development, improvement, maintenance and operation of the Property or otherwise required by the Lenders in connection with the Property.

(vi)     To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activities and contracts may be lawfully carried on or performed by a limited liability company under the laws of the State.

Section 2.5   <u>Term and Dissolution</u>

The Company shall continue in full force and effect until December 31, 2056, except that the Company shall be dissolved prior to such date upon the happening of any of the following events:

A.      The sale or other disposition of all or substantially all the assets of the Company; or

B.      The Retirement of a Managing Member if no Managing Member remains and the Company is not reconstituted with a successor Managing Member pursuant to Section 8.3; or

C.      The occurrence of any event which would cause the dissolution of the Company under the Uniform Act notwithstanding the agreement of the Members or the election of the Managing Members to continue the business of the Company.  The Members agree, and the Managing Members agree to elect, to continue the business of the Company under all circumstances permitted by the Uniform Act.

Upon dissolution of the Company, unless the Company is reconstituted pursuant to Section 8.3, the Managing Members (or their trustees, receivers, successors, or legal representatives) shall cause the cancellation of the Company's Articles of Organization as then in force, and shall liquidate the Company assets and apply and distribute the proceeds thereof in accordance with Section 5.3.  Notwithstanding the foregoing, in the event such liquidating Managing Members shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Members, the liquidating Managing Members may, with the prior Consent of the Special Investor Member, in order to avoid such loss, either (i) delay liquidation of, and withhold from distribution for a reasonable time, any assets of the Company except those necessary to satisfy Company debts and obligations other than debts provided for in Section 5.2.B, Clauses Two and following, or (ii) distribute the assets to the Members in kind.

ARTICLE III -- Members; Capital

Section 3.1  Managing Members

The sole Managing Member of the Company as of the date hereof is P&U Capital Partners I, L.L.C., a Washington limited liability company, at the address set forth on the Schedule.  At all times when there is only one Managing Member of the Company, the term "Managing Members" shall refer to such sole Managing Member alone.  The Managing Members have made a Capital Contribution to the Company in the total amount set forth on Schedule A.  The Managing Members shall not be obligated or permitted to make additional Capital Contributions to the Company, except that the Managing Members shall be obligated to make such additional Capital Contributions (a) in an amount sufficient to enable the Company to pay any outstanding balance of the Deferred Development Cost Payment in full on the date set forth in Section 6.9.C, and (b) to pay the Adjustment Amount as provided in Section 4.2B.

Section 3.2  Investor Members

On the Admission Date, SCDC, LLC, an Ohio limited liability company, shall be admitted to the Company as the Special Investor Member, Provident Tax Credit Fund IX, LLC, an Ohio limited liability company, shall be admitted to the Company as the Company Investor Member, and thenceforth the Investor Members shall be those Investor Members shown on the Schedule.  The addresses of each of the Investor Members shall be as set forth on the Schedule.

Section 3.3  Company Capital

A.      The capital of the Company shall be the aggregate amount of the cash and the agreed value of property contributed by the Managing Members, and the aggregate amount of the cash contributed by the Investor Members, which amounts are hereby agreed to be those set forth in the Schedule.  The Schedule shall be amended from time to time to reflect the withdrawal or admission of Members, any changes in the Company interests held by a Member arising from the transfer of a Company interest to or by such Member and any change in the amounts to be contributed or agreed to be contributed by any Member; provided that no funds provided by a Member shall be deemed to be additional Capital Contributions unless payment thereof is pursuant to a specific provision of this Agreement requiring or permitting the making of additional Capital Contributions.

B.  An individual Capital Account shall be established and maintained for each Member, including any additional or substituted Member who shall hereafter receive an interest in the Company.  The Capital Account of each Member shall consist of (a) the amount of cash such

Member contributes to the Company, plus (b) the fair market value of any property such Member contributes to the Company net of any liabilities assumed by the Company or to which such property is subject, plus (c) the amount of profits and gain and tax exempt income allocated to such Member, minus (d) the amount of losses and deductions allocated to such Member, minus (e) the amount of all cash distributed to such Member, minus (f) the fair market value of any property distributed to such Member net of any liabilities assumed by such Member or to which such property is subject, minus (g) the amount of any other expenditures which are not deductible by the Company for Federal income tax purposes or which are not allowable as additions to the basis of Company property and which are allocated to such Member.  Each Capital Account shall also be subject to such other adjustments as may be required under the Code and Treasury Regulations.  The Capital Account of a Member shall not be affected by any adjustments to basis made pursuant to Section 743 of the Code.

C.     The original Capital Account established for any substituted Member shall be in the same amount as, and shall replace, the Capital Account of the Member which such substituted Member succeeds, and, for the purposes of this Agreement, such substituted Member shall be deemed to have made the Capital Contribution, to the extent actually paid in, of the Member which such substituted Member succeeds.  The term "substituted Member", as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the profits, losses and distributions of the Company by reason of such Person succeeding to the interest in the Company of a Member by assignment of all or any part of a Member's interest in the Company.  To the extent a substituted Member receives less than 100% of the interest in the Company of a Member he succeeds, the original Capital Account of such substituted Member and his Capital Contribution shall be in proportion to the interest he receives and the Capital Account of the Member who retains a partial interest in the Company and his Capital Contribution shall continue, and not be replaced, in proportion to the interest he retains.  Nothing in this Section 3.3 shall affect the limitations on transferability of Company interests set forth in this Agreement.

Section 3.4   Withdrawal of Capital

Except as may be specifically provided in Article V hereof, no Member shall have the right to withdraw from the Company all or any part of his Capital Contribution.  No Member shall have any right to demand and receive property or cash of the Company in return of his Capital Contribution except as may be specifically provided in this Agreement.

Section 3.5   Liability of Investor Members

No Investor Member shall be liable for any debts, liabilities, contracts or obligations of the Company except to the extent such Investor Member shall undertake such liability pursuant to a separate written instrument.  An Investor Member shall be liable to the Company only to make payments of his Capital Contribution as and when due hereunder, and, after his Capital Contribution shall be fully paid, no Investor Member shall, except as otherwise required by the Uniform Act, be required to make any further Capital Contributions or lend any funds to the Company.

Section 3.6   Additional Investor Members

A.     Except as may be expressly provided elsewhere in this Agreement, the Managing Members shall have no right or authority to admit Investor Members other than those being admitted pursuant to Section 3.2 unless such admission shall have received the Consent of the Special Investor Member.

4

B.    Any incoming Investor Member shall, as a condition of receiving any interest in Company property, agree to be bound by the Property Documents to the same extent and on the same terms as all other Members of the same class.  Any incoming Investor Member shall also agree to be bound by the provisions of this Agreement.

C.    Upon the admission of any additional Investor Members, the Schedule shall be amended to reflect the names, addresses and Capital Contributions of such additional Investor Members, and the date each Investor Member is admitted to the Company.

ARTICLE IV -- Investor Member Capital Contributions

Section 4.1  Payments

A.    The Special Investor Member shall pay its entire Capital Contribution of $100.00 to the Company in cash on the Admission Date.  The Company Investor Member shall make its Capital Contributions in the total amount of $4,761,136 ($4,761,236 minus the $100 Capital Contribution made by the Special Investor Member), which shall be paid in Installments (subject to the provision of Section 4.2.B) as set forth in the following payment schedule (the "Payment Schedule") and upon satisfaction of the conditions set forth in Section 4.1.B:

(1)    The first installment in the amount of $1,190,209 (the "First Installment") shall be paid on the latest of (a) the Admission Date, (b) Construction Mortgage Closing and closing and full funding of the General Partner Equity, (c) acceptance by the Company of a commitment for the Permanent Mortgage Loan acceptable to the Special Investor Member, (d) the date on which the Special Investor Member has approved a draw request setting forth the construction expenditures to be paid from the First Installment and (e) all conditions in 4.1B have been satisfied.

(2)    The second installment in the amount of $1,190,309 (the "Second Installment") shall be paid within 30 days following the latest of (a) 50% Completion of Construction, (b) all conditions in 4.1B have been satisfied and (d) satisfaction of all of the conditions to the payment of the First Installment have been satisfied.  Provided, however, this Second Installment shall be paid no sooner than December 31, 2006.  Upon the satisfaction of the conditions herein, the Second Installment shall be paid directly to the Indenture Trustee or as otherwise instructed by the Permanent Mortgage Lender on behalf of the Company to be held in accordance with the Trust Indenture.  The Company Investor Member shall comply with the instructions of the Permanent Mortgage Lender.

(3)    The third installment in the amount of $1,428,371 (the "Third Installment") shall be paid within 30 days following the latest of (a) Full Completion, (b) Basis Certification (c) all conditions in 4.1B have been satisfied and (d) satisfaction of all of the conditions to the payment of the First Installment and Second Installment have been satisfied.  Provided, however, this installment shall be paid no sooner than May 1, 2007.  Upon the satisfaction of the conditions herein, the Third Installment shall be paid directly to the Indenture Trustee or as otherwise instructed by the Permanent Mortgage Lender on behalf of the Company to be held in accordance with the Trust Indenture.  The Company Investor Member shall comply with the instructions of the Permanent Mortgage Lender.

(4)    The fourth installment in the amount of $476,124 (the "Fourth Installment") shall be paid within 30 days following the latest of (a) achievement of the Initial Qualified Occupancy Date, (b) Stabilized Occupancy, (c) 8609 Issuance, (d) all conditions in 4.1B have been satisfied

5

and (e) satisfaction of all of the conditions to the payment of the First Installment, Second Installment and Third Installment have been satisfied.  Provided, however, this installment shall be paid no sooner than August 1, 2007.

(5)     The fifth installment in the amount of $476,124 (the "Fifth Installment") shall be paid within 30 days of the latest of (a) three months following payment of the Fourth Installment and (b) all conditions in 4.1B have been satisfied and (c) satisfaction of all of the conditions to the payment of the First Installment, Second Installment, Third Installment and Fourth Installment have been satisfied.  Provided, however, this installment shall be paid no sooner than October 1, 2007.

All Capital Contributions received by the Company shall be used only for Company purposes permitted by this Agreement.

B.     The obligation of the Company Investor Member to pay to the Company each Installment (and each portion of any Installment payable in portions) is subject to the conditions that (i) each of the preceding Installments shall have become due and payable, (ii) no Adjustment Amount shall be due from the Managing Members pursuant to Section 4.2, and (iii) the Managing Members shall have delivered to the Special Investor Member their written certificate (the "Certificate"), which shall be addressed to the Special Investor Member and the Company Investor Member and which shall state that, as of the date of execution of such Certificate, (a) the Installment in question is due and payable to the Company (except with regard to the mere passage of time to any certain date set forth in the Payment Schedule), (b) all preconditions (except with regard to the mere passage of time to any certain date set forth in the Payment Schedule), representations, warranties and agreements applicable to such Installment set forth in Sections 4.1 and 6.6 and elsewhere in this Agreement have been satisfied, or are true and correct, as the case may be; and (c) the representations, warranties, disclosures and certifications contained in the Managing Member Closing Certificate dated as of the date hereof (the "Managing Member Closing Certificate") remain true and correct on the date of the Certificate.  The Certificate shall include as exhibits thereto (a) a copy of the title insurance policy (or, in connection with the Certificate with respect to the First Installment, a title insurance commitment) for the Property including all endorsements (the most recent of which must be dated within 15 days of the date of the Certificate) evidencing the accuracy of the representation set forth in Section 6.6(10), and (b) in connection with the Certificate with respect to the Third Installment, an "as built" survey of the Property following Full Completion in form and substance reasonably satisfactory to the Special Investor Member and prepared and certified as of a date within thirty (30) days of the Second Installment due date by a surveyor licensed to practice in the state in which the Property is located.  The Certificate delivered with respect to the First Installment shall be dated as of the Admission Date, and the Certificate delivered with respect to each subsequent Installment shall be dated no earlier than 15 days prior to the date of payment of such Installment.  By acceptance of such Installment on behalf of the Company, the Managing Members shall be deemed to have reaffirmed and ratified the Certificate as of the date such Installment is paid to the Company.

C.     If as of the date when any Installment or portion thereof would otherwise be payable to the Company pursuant to the Payment Schedule, the Certificate required under Section 4.1.B cannot truthfully be given, then the Installment shall not be payable to the Company unless and until (a) the Managing Members shall resolve the circumstances which prevent delivery of such Certificate, (b) such resolution shall have been effected in a manner and under circumstances such that the Company Investor Member shall not have irrevocably lost any substantial part of the benefits of this Agreement, (c) the Managing Members shall not otherwise be in default hereunder and (d) the Certificate shall be delivered in compliance with the

6

provisions of Section 4.1.B; provided, however, that, if the foregoing prerequisites to payment of such Installment shall not be met on or before December 31, 2009, then the Company shall forever waive all right to receive any portion of such Installment.

Section 4.2  Special Adjustments

Upon occurrence of the events set forth in the following paragraphs, the following adjustments shall be made:

A.    Low Income Housing Credit Adjustment.

(1)    If the Annual Reported Credit which will apply to each year of the Credit Period (as determined from time to time pursuant to Section 4.2.A(7) below) is less than $480,933, then the Capital Contribution obligation of the Company Investor Member shall be reduced by an amount (an "Adjustment Amount") equal to 99% of the excess of (a) the sum of the Projected Credit for all years included in the table in the definition of "Projected Credit" over (b) the sum of the Low Income Housing Credit which will be allocated to the Company Investor Member for all such years based on the Annual Reported Credit.

(2)    In the event that the Actual Credit for 2007 and/or 2008 is less than the Projected Credit for such years, respectively (after the Projected Credit has been revised by any adjustment made pursuant to Section 4.2.A(1) above) and the shortfall will be deferred pursuant to Section 42(f)(2)(B) of the Code, then the Capital Contribution obligation of the Company Investor Member shall be reduced by an amount (an "Adjustment Amount") equal to 75% of the total shortfall in Projected Credit, and the Projected Credit for 2017 and/or for 2018 shall be correspondingly increased.

(3)    If for any reason the amount of Actual Credit for any year is less than the Projected Credit for such year (after the Projected Credit has been revised by any adjustments made pursuant to Sections 4.2.A(1) or 4.2.A(2) above), then the Capital Contribution obligation of the Company Investor Member shall be reduced by an amount (an "Adjustment Amount") equal to the sum of (a) the shortfall in Projected Credit for such year and the total of the present value of the corresponding shortfall for each future year which will also occur due to the circumstances in question (such present value shall be determined by discounting, at an annual rate of 6%, such shortfall from the end of the year in which it occurs back to the date such circumstances occur), plus (b) the amount of any Low Income Housing Credit recapture amount (as defined in Code Section 42(j), including any interest and/or penalties due to the Internal Revenue Service) and an amount sufficient to pay the tax liability owed by the Investor Members resulting from receipt of the foregoing amounts (calculated at an assumed tax rate of 40%).

(4)    In the event that it is determined upon 8609 Issuance that the Company will receive an additional amount of annual Actual Credit with respect to the Property which is in excess of the Projected Credit (such additional amount, aggregated over all years in the Credit Period, is referred to hereinafter as the "Additional Credit"), the Company Investor Member agrees that it will make additional Capital Contributions to the Company in an amount equal to 99% of the Additional Credit, with any such additional Capital Contributions being paid on the same terms and conditions as are applicable to the rest of the investment being made by the Company Investor Member pursuant to this Agreement; provided, however, that in no event will the Company Investor Member be obligated to make additional Capital Contributions as aforesaid in an amount in excess of 10.0% of the total agreed-to Capital Contributions of the Company Investor Member set forth on Schedule A as of the Effective Date.  Any additional Capital Contributions determined as aforesaid pursuant to this Section 4.2A(4) shall be applied to

7

increase the Fifth Installment; provided, however, that if no further Installment remains to be paid, then the entire amount of such additional Capital Contributions shall be made by the Company Investor Member to the Company within thirty (30) days after the determination of the amount thereof by the Special Investor Member as aforesaid.  Notwithstanding the foregoing, however, there shall be no additional Capital Contributions due under this Section 4.2A(4) unless (i) the determination of the Additional Credit shall be supported by a certification of the Accountant's in form and substance reasonably acceptable to the Special Investor Member to the effect that the Property will have sufficient Eligible Basis, given its applicable percentage, so as to enable the Company to claim the entire Additional Credit, (ii) the determination of the amount of the Additional Credit and the Accountant's certification thereof shall have been finally determined no later than December 31, 2008, and (iii) a written amendment to this Agreement, properly reflecting the effect of this Section 4.2A(4), shall have been executed by the Managing Members and delivered to the Special Investor Member.  Any third party costs incurred in updating the financial forecasts with respect to such upward adjuster shall be paid by the Company up to an amount not to exceed $1,500.

      (5)    "Projected Credit" shall mean the amount for each year expected to be allocated to the Company Investor Member as set forth in the table below:

| Year | Projected Credit |
|------|------------------|
| 2006 | $15,940 | |
| 2007 | $383,243 | |
| 2008 and each year thereafter through 2015 | $480,933 |
| 2016 | $484,933 |
| 2017 | $97,689 |

When any adjustment is made pursuant to this Section 4.2.A, the "Projected Credit" for purposes of any future adjustment shall be revised to equal the Actual Credit on which such adjustment was computed.

      (6)    "Actual Credit" means, with respect to any tax year, the total amount of Low Income Housing Credit actually reported by the Company on its tax return for that tax year and allocated to the Company Investor Member (or, if less, such total amount determined after an audit by the Internal Revenue Service), as subsequently adjusted (if applicable) by any Low Income Housing Credit recapture amounts (as defined in Section 42(j)(2) of the Code).

      (7)    "Annual Reported Credit" means the annual amount of Low Income Housing Credit which is expected to be allocated by the Company to the Company Investor Member on the Company tax return for each year of the Credit Period (subject only to timing adjustments such as placed in service, occupancy and Member admission dates), as determined and reflected in a statement to be prepared by the Accountants after Full Completion and again upon 8609 Issuance and which (a) shall assume that 100% of the apartment units in the Property will be Low Income Units, (b) shall be based on an audit by the Accountants of Development Costs, (c) shall include supporting documentation and/or certifications from the Managing Members and the Accountants indicating the date when each building comprising the Property was placed in service and indicating the number and percentage of tenants occupying units in the Property who are Qualified Tenants, and (d) on which the Accountants shall express a favorable opinion as to fair presentation.  In no event shall the amount of the Development Services Fee which is taken into account in computing the Annual Reported Credit exceed the lesser of (i) the

8

amount of such fee actually paid or to be paid pursuant to Section 6.11 and (ii) the amount allowable by the Credit Agency.

      B.      <u>Adjustment Procedure</u>.

Any Adjustment Amount determined pursuant to Section 4.2A.(1), (2), or (3) shall be applied to the Installment next due to be paid by the Company Investor Member, with any portion of such Adjustment Amount in excess of the amount of such Installment then being applied to the next succeeding Installment or Installments, provided that if no further Installments remain to be paid or if the Adjustment Amount shall exceed the sum of the amounts of the remaining Installments, then the Managing Member shall within five (5) days after such Adjustment Amount has been determined, make a Capital Contribution to the Company in the amount of the entire Adjustment Amount or the balance of the Adjustment Amount, as the case may be (a "Credit Adjuster Advance"), and the entire Credit Adjuster Advance shall be immediately distributed to the Company Investor Member and shall neither constitute nor be limited by Cash Flow or Capital Transaction Proceeds.  In the alternative, if the Accountants determine that the Capital Contribution and distribution contemplated by the immediately preceding sentence would prevent the Company Investor Member from being allocated 99.99% of losses and tax credits, then the Managing Member shall pay the entire Credit Adjuster Advance directly to the Company Investor Member.  Any Adjuster Amount which is not paid by the Managing Member within five (5) days after such Adjustment Amount has been determined, shall bear interest at 10% per annum from the date that the last Low-Income Housing Tax Credit which resulted in the Adjustment Amount would have been available to the Company Investor Member or the maximum interest rate allowed by law, whichever is less.

      C.      <u>Special Provisions</u>.

Notwithstanding the provisions of this Section 4.2, no Adjustment Amount shall be payable pursuant to Section 4.2.A for any difference in Actual Credit compared to Projected Credit or for any difference in Annual Reported Credit compared to Projected Credit, to the extent such difference results solely from (a) any change in the Code occurring after the Admission Date, (b) any action taken by the Investor Members in violation of this Agreement, or (c) any sale, transfer, assignment or disposition of all or a portion of the Company interest of either Investor Member (or of any interest in an Investor Member).

      Section 4.3  <u>Repurchase Obligation of the Managing Members</u>

      A.      Upon the occurrence of any of the Repurchase Events set forth below, each Investor Member shall have the right to elect to sell its interest in the Company by sending written notice (the "Election Notice") thereof to the Managing Members at any time (provided that such notice must be sent within 90 days after receipt by such Investor Member of notice of the occurrence of a Repurchase Event from the Managing Members, and the Managing Members shall be obligated to promptly give notice of the occurrence of a Repurchase Event to each Investor Member).  The purchase shall be made by the Managing Members within thirty (30) days after the receipt of the Election Notice.

      B.      "Repurchase Events" shall mean any of the following:

      (1)      The failure of the Company to ach ieve Full Completion by Dece mber 1, 2007, or the occurrence of a default under, or demand for payment of any loan secured by any Mortgage which is not cured within any applicable grace or cure period; or

(2)　Either:  (a ) the f ailure of Basis Certification to occur by Decem ber 31, 2007 (or any later date fixed by the Managing   Member with the Consent of the Special Investor  Member); or (b) (i  )  the failure of  8609 Issuance and recording of a valid extended  use  agreement  as required   pursuant  to Section 42 of the Code to occur by December 31, 2008 (or any later date fixed by Managing Member with the Consent of the Special  Investor Mem ber), or (ii) the a llocation to the Company on Form  s(s) 8609 of Low  Income Housing Credit in an am   ount  less  than 80.0% of the m   aximum  annual Projected Credits, or (iii) the failure to ach ieve the Initia l Qualified Occupancy Date by December 31, 2008; or

(3)　Closing and full funding of the Perm anent Mortgage Loan shall not have occurred prior to the ear lier of maturity of the Construction Mortgage Loan or expiration of the commitment letter for the Permanent Mortgage Loan; or

(4)　The  Company  shall f ail  to m eet  the Minim um Set-Aside or the Re nt Restriction Test by the close of  the first year of the Credit Period and/or fails to continue to meet either of those tests at any time during the Compliance Period; or

(5)　Prior  to closing and full funding of the Pe      rmanent  Mortgage  Loan, (a) foreclosure  proceedings  shall h ave  commenced  under the Construction Mortgage Loan and such proceedings  shall not have been  dismissed within thirty (30) days, (b) any of the commitments of any Lender or Credit Agency to provide the Perm anent Mortgage Loan  shall be term inated  or withd rawn and not  reinstated or replaced  within sixty (60) days with terms which shall  have received the Consent of  the Special Investor Member and  (if required) the approval of any Agency      or other Lender, or (c)  the Construction Lender  shall have irrevocably refused to     make any further    advances  under the Construction  Mortgage Loan, and such deci   sion  shall not have been reversed or the Construction Lender replaced within thirty (30) days; or

C.　The purchase price for the interest of an Investor Member purchased pursuant to Section 4.3 shall be an amount in cash equal to the Outstanding Capital of each selling Investor Member plus interest at the annual rate of ten percent (10%) from the occurrence of the Repurchase Event through the date the purchase price is paid.  If at the time of such repurchase, the payment of the purchase price plus interest to the selling Investor Members constitutes a violation of the Uniform Act, the Managing Members shall (i) contribute sufficient additional Capital to the Company to permit such repurchase without constituting such a violation, and (ii) shall indemnify and hold harmless each selling Investor Member against all loss and damage by reason of such repurchase being in violation of the Uniform Act.

D.　Upon the purchase of such interest the Managing Members shall become Substitute Company Investor Members to the extent of the Investor Member interest acquired by them, and the interest as an Investor Member of each selling Investor Member shall terminate; provided that the Managing Members shall remain liable to indemnify each of the Investor Members against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by such Investor Member (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Company or its affairs.  Upon the occurrence of any event which requires the Managing Members to give notice of the obligation of the Managing Members to purchase the interest of the Investor Members, as herein described, the Company Investor Member shall have no further obligation to pay any subsequent Installment of its Capital Contribution unless the Company Investor Member fails to elect, within the time described above, to have its interest repurchased.

10

ARTICLE V -- Profits, Losses and Distributions

Section 5.1  Profits, Losses and Tax Credits

A.      Except as otherwise provided in this Article V, for each fiscal year or portion thereof, all profits, tax-exempt income, gains, losses, nondeductible expenditures and tax credits incurred and/or accrued by the Company, other than those arising from a Capital Transaction, shall be allocated 0.01% to the Managing Members, and 99.99% to the Investor Members.

B.      Except as otherwise provided in this Article V, all profits and losses arising from a Capital Transaction shall be shared by the Members, as of the end of the fiscal year in which such Capital Transaction occurs, as follows:

As to profits:

First, an amount of profit equal to the aggregate negative balances (if any) in the Capital Accounts of all Members having negative Capital Accounts shall be allocated to such Members in proportion to the negative Capital Account balances until all such Capital Accounts shall have a zero balance; and

Second, an amount of profits shall be allocated to each of the Members until the positive balance in the Capital Account of each Member equals the amount of cash which would be distributed to such Member in accordance with the provisions of Clauses (4), (12), (13) and (14) of Section 5.2.B if the aggregate amount of such Capital Accounts balances were cash available for distribution.

As to losses:

First, an amount of losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Members having positive balance Capital Accounts shall be allocated to such Members in proportion to their positive Capital Account balances until all such Capital Accounts shall have zero balances; provided, however, that if the amount of losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Members having positive balances in their Capital Accounts, then such losses shall be allocated to the Members in such proportions and in such amounts so that the Capital Account balances of each Member shall equal, as nearly as possible, the amount such Member would receive if an amount equal to the excess of (a) the sum of all Members' balances in their Capital Accounts computed prior to the allocation of losses under this clause First over (b) the aggregate amount of losses to be allocated to the Members pursuant to this clause First were distributed to the Members in accordance with the provisions of Clauses (4), (12), (13) and (14) of Section 5.2.B; and

Second, the balance, if any of such losses, to those Members and in those percentage shares set forth in Section 5.1.A.

C.      Notwithstanding the foregoing provisions of Sections 5.1.A and 5.1.B, in no event shall any losses be allocated to an Investor Member if and to the extent that such allocation would cause, as of the end of the Company taxable year, the negative balance in such Investor Member's Capital Account to exceed such Investor Member's obligation, if any, to restore deficits in his Capital Account pursuant to Section 5.3.A or deemed under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) plus such Investor Member's share of Partnership Minimum Gain plus such Investor Member's share of Partner Non-Recourse Debt Minimum Gain.  Any losses which are not allocated to the Investor Members by virtue of the application of this Section 5.1.C

11

shall be allocated to the Managing Members.  For purposes of this Section, a Member's Capital Account shall be treated as reduced by Qualified Income Offset Items.

D.    The terms "profits" and "losses" used in this Agreement shall mean income and losses, and each item of income, gain, loss, deduction or credit entering into the computation thereof, as determined in accordance with the accounting methods followed by the Company computed in a manner consistent with Treasury Regulation Section 1.704-1(b)(2)(iv).  Profits and losses for federal income tax purposes shall be allocated in the same manner as profits and losses in this Section 5.1 subject to Section 5.4.A.

Section 5.2   Distributions Prior to Dissolution

A.    Distributions of Cash Flow.  Cash Flow for each fiscal year (or fractional portion thereof) following the Admission Date shall be applied as follows:

(1)    to the payment of any unpaid Asset Management Fees;

(2)    to the Company Investor Member in payment of any Adjustment Amount due to the Investor plus interest as required thereon for which payment has not been made as required pursuant to Section 4.2 (payments made pursuant to this Section 5.2A(2) shall be considered as payments made by the Company in satisfaction of amounts owed to the Managing Member under Sections 5.2A(5), (8), (9), (10), (11) and (12)(a) and (b), in such order, and then shall be considered as payments made by the Managing Member to the Company Investor Member in satisfaction of an Adjustment Amount owed pursuant to Section 4.2);

(3)    to the repayment of any outstanding Investor Member Loans;

(4)    to replenishment of the Operating Reserve to the extent required pursuant to Section 6.14.B;

(5)    to the payment of any unpaid Base Management Fee from prior years in accordan        ce with section 6.12C;

(6)    to the payment of any unpaid Compliance Fee;

(7)    to payment of the Deferred Development Cost Payment until paid in full;

(8)    to the payment of any unpaid Company Management Fee;

(9)    to the repayment of the Managing Member Completion Loan;

(10)    to the repayment of any outstanding Managing Member Loans;

(11)    to the repayment of outstanding Operating Deficit Loans;

(12)    ninety percent (90%) of remaining Cash Flow shall be applied in the following priority:

(a)    to the payment of the Incentive Management Fee; and then

(b)    to a distribution to the Managing Members; and

(13)   all remaining Cash Flow shall be distributed 0.01% to the Managing Members and 99.99% to the Investor Members.

The distribution of Cash Flow to the Members with respect to each Company fiscal year, and payment of any fee the amount of which is determined based on the amount of Cash Flow for such fiscal year, shall be made following the end of such fiscal year and only if supported by the financial statements for such fiscal year provided for in Section 7.4.A.

B.    <u>Distributions of Capital Transaction Proceeds</u>.  Prior to dissolution, if the Managing Members shall determine from time to time that there are cash proceeds available for distribution from a Capital Transaction, such cash proceeds shall be applied or distributed, as the case may be, as follows:

(1)    to the discharge, to the extent required by any lender or creditor, of debts and obligations of the Company, but excluding debts and obligations provided for below in this Section 5.2.B;

(2)    to fund reserves for contingent liabilities to the extent deemed reasonable by the Managing Members, the Special Investor Member  and the Accountants;

(3)    to the payment of any unpaid Asset Management Fees;

(4)    to the Company Investor Member in payment of any Adjustment Amount due to the Company Investor Member for which payment has not been made as required pursuant to Section 4.2 (payments made pursuant to this Section 5.2.B(4) shall be considered as payments made by the Company in satisfaction of amounts owed to the Managing Member under Sections 5.2.B (6), (9), (10), (11) and (14), in such order, and then shall be considered as payments made by the Managing Member to the Company Investor Member in satisfaction of an Adjustment Amount owed pursuant to Section 4.2);

(5)    to the repayment of any outstanding Investor Member Loans;

(6)    to pay any unpaid Base Management Fees;

(7)    to pay any unpaid Compliance Fees;

(8)    to the payment in full of any outstanding Deferred Development Cost Payment;

(9)    to pay any unpaid Company Management Fees;

(10)   to the repayment of any outstanding Managing Member Loans;

(11)   to the payment of outstanding Operating Deficit Loans;

(12)   to distribute to the Company Investor Member an amount equal to the Exit Taxes arising from such Capital Transaction;

(13)   to the Special Investor Member in an amount not to exceed $10,000; and

13

(14)    any balance thereof, eighty percent (90%) to the Managing Members and twenty percent (10%) to the Investor Members.

Section 5.3    Distributions Upon Dissolution

A.    Upon dissolution and termination, after payment of, or adequate provision for, the debts and obligations of the Company, the remaining assets of the Company (or the proceeds of sales or other dispositions in liquidation of the Company assets, as may be determined by the remaining or surviving Managing Members) shall be distributed to the Members in accordance with the positive balances in their Capital Accounts after taking into account all Capital Account adjustments for the Company taxable year, including adjustments to Capital Accounts pursuant to Sections 5.1.B and 5.3.B.  In the event that a Managing Member has a negative balance in its Capital Account following the liquidation of the Company or its interest in the Company after taking into account all Capital Account adjustments for the Company taxable year in which the liquidation occurs, such Managing Member shall pay to the Company in cash an amount equal to the negative balance in its Capital Account.  Such payment shall be made by the end of such taxable year (or, if later, within 90 days after the date of such liquidation) and shall, upon liquidation of the Company, be paid to recourse creditors of the Company or distributed to other Members in accordance with the positive balances in their Capital Accounts.

B.    With respect to assets distributed in kind to the Members in liquidation or otherwise, (i) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be profits and losses realized by the Company immediately prior to the liquidation or other distribution event; and (ii) such profits and losses shall be allocated to the Members in accordance with Section 5.1.B hereof, and any property so distributed shall be treated as a distribution of an amount in cash equal to the excess of such fair market value over the outstanding principal balance of and accrued interest on any debt by which the property is encumbered.  For the purposes of this Section 5.3.B, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such assets, taking into account the fair market value of the associated financing (but subject to Section 7701(g) of the Code), and the Company's adjusted basis in such assets computed in accordance with Treasury Regulation Section 1.704-1(b).  This Section 5.3.B is merely intended to provide a rule for allocating unrealized gains and losses upon liquidation or other distribution event, and nothing contained in this Section 5.3.B or elsewhere in this Agreement is intended to treat or cause such distributions to be treated as sales for value.  The fair market value of such assets shall be determined by an appraiser to be selected by the Managing Members with the Consent of the Special Investor Member.

Section 5.4    Special Provisions

Notwithstanding the foregoing provisions in this Article V:

A.    For federal income tax purposes, income, gain, loss and deduction with respect to property which has a variation between its basis computed in accordance with Treasury Regulation Section 1.704-1(b) and its basis computed for federal income tax purposes shall be shared among Members so as to take account of such variation in a manner consistent with the principles of Section 704(c) of the Code.

B.    Except as otherwise provided in this Article V where profits, losses or distributions are allocated according to Capital Account balances, all profits, losses, credits and distributions shared by the Members in each class of Members (e.g., the Managing Member class

14

or the Investor Member class) shall be shared by each Member in such class in the percentages set forth on the Schedule.

C.1.    If (i) the Company incurs recourse obligations or Partner Non-Recourse Debt to the Managing Members or their Related Persons (including without limitation Operating Deficit Loans) or (ii) the Company incurs losses from extraordinary events which are not recovered from insurance or otherwise (collectively "Recourse Obligations") in respect of any Company taxable year, then at the election of the Special Investor Member the calculation and allocation of profits and losses shall be adjusted as follows:  first, an amount of deductions (consisting of operating expenses but not cost recovery deductions) attributable to the Recourse Obligations shall be allocated to the Managing Members; and second, the balance of such deductions shall be allocated as provided in Section 5.1.A.

C.2.    If the Company makes any payment with respect to an obligation with respect to which a special allocation of deductions was made under Section 5.4.C.1, then the calculation and allocation of profit and losses in respect of the Company taxable year of such payment shall be adjusted as follows: first, an allocation of gross income shall be allocated to the Member or Members to whom the deductions were allocated under Section 5.4.C.1 in an amount equal to the lesser of (i) the amount of such deductions minus all previous allocations with respect to such deductions under this Section 5.4.C.2 or (ii) the amount of such payment; and second, the balance of such gross income shall be allocated as provided in Section 5.1.A.

D.    If there is a net decrease in Partner Non-Recourse Debt Minimum Gain during a Company taxable year, then each Member with a share of the minimum gain attributable to such debt at the beginning of such year will be allocated items of income and gain (including gross income if necessary) for such year (and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partner Non-Recourse Debt Minimum Gain during the year.  A Member is not subject to this Partner Non-Recourse Debt Minimum Gain chargeback to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(i)(4) applied consistently with Treasury Regulation Section 1.704-2(f)(2)-(5) apply.  Such allocations shall be made in a manner consistent with the requirements of Treasury Regulation Section 1.704-2(i)(4) under Section 704 of the Code.

E.    If the Company shall receive any purchase money indebtedness in partial payment of the purchase price of the Property and such indebtedness is distributed to the Members pursuant to the provisions of Section 5.2.B or Section 5.3, the distributions of the cash portion of such purchase price and the principal amount of such purchase money indebtedness hereunder shall be allocated among the Members in the following manner.  On the basis of the sum of the principal amount of the purchase money indebtedness and cash payments received on the sale (net of amounts required to pay Company obligations and fund reasonable reserves), there shall be calculated the percentage of the total net proceeds distributable to each class of Members based on Section 5.2.B or under Section 5.3, as applicable, treating cash payments and purchase money indebtedness principal fungibly for this purpose, and the respective classes shall receive such respective percentages of the net cash purchase price and purchase money principal. Payments on such purchase money indebtedness retained by the Company shall be distributed in accordance with the respective portions of principal allocated to the respective classes of Member in accordance with the preceding sentence, and if any such purchase money indebtedness shall be sold, the sale proceeds shall be allocated in the same proportion.

F.    If there is a net decrease in Partnership Minimum Gain during a Company taxable year, each Member will be allocated items of income and gain (including gross income if necessary) for such year (and, if necessary, subsequent years) in the proportion to, and to the

15

extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum Gain during the year.  A Member is not subject to this Partnership Minimum Gain chargeback to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(f)(2)-(5) apply.  Such allocations shall be made in a manner consistent with the requirements of Treasury Regulation Section 1.704-2(f) under Section 704 of the Code.

G.      If an Investor Member unexpectedly receives (1) an allocation of loss or deduction or expenditures described in Section 705(a)(2)(B) of the Code made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Company, (b) pursuant to Section 706(d) of the Code as the result of a change in any Member's interest in the Company, or (c) pursuant to Regulation Section 1.751-1(b)(2)(ii) as a result of a distribution by the Company of unrealized receivables or inventory items or (2) a distribution, and such allocation and/or distribution would cause the negative balance in such Member's Capital Account to exceed such Member's obligation, if any, to restore deficits in its Capital Account pursuant to Section 5.3.A or deemed under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) plus its share of Partner Non-Recourse Debt Minimum Gain plus its share of Partnership Minimum Gain, then such Member shall be allocated items of income and gain (including gross income if necessary) in an amount and manner sufficient to eliminate such negative balance as quickly as possible.  For purposes of this Section, a Member's Capital Account shall be treated as reduced by Qualified Income Offset Items.  If a Managing Member receives a distribution of Cash Flow and such distribution would cause a negative balance in such Managing Member's Capital Account, then there shall be allocated to such Managing Member an amount of gross income equal to the amount of such distribution.

H.      Notwithstanding anything to the contrary herein, it is the intention of the Company to conform to the requirements of any Treasury regulations issued with respect to the allocation of Company items, in a manner maximizing the benefits to the Investor Members, particularly with regard to any special provisions with respect to nonrecourse indebtedness.  The Managing Members may, with the Consent of the Special Investor Member, amend Article V to comply with any such regulations.

I.      If any portion of the Property is deemed to be tax-exempt use property within the meaning of Section 168(h) of the Code, then depreciation deductions with respect to the Property shall be allocated as follows:  first, to those Members who are not tax-exempt entities or who are entitled to the exception provided in Section 514(c)(9) of the Code, an amount of depreciation equal to their share of depreciation as if no part of the depreciation of the Property were required to be computed under Section 168(g) of the Code, and, second, the remainder of the depreciation deductions with respect to the Property shall be allocated to those Members which are tax-exempt entities not entitled to the exception under Section 514(c)(9) of the Code.

J.      In applying the provisions of Article V with respect to distributions and allocations, the following ordering of priorities shall apply:

(1)      Capital Accounts shall be deemed to be reduced by Qualified Income Offset Items.

(2)      Capital Accounts shall be reduced by distributions of Cash Flow under Section 5.2.A.

(3)      Capital Accounts shall be reduced by distributions from Capital Transactions under Section 5.2.B.

16

(4)     Capital Accounts shall be increased by any Minimum Gain chargeback under Section 5.4.D or 5.4.F.

(5)     Capital Accounts shall be increased by any Qualified Income Offset under Section 5.4.G.

(6)     Capital Accounts shall be increased by allocations of profits under Section 5.1.A.

(7)     Capital Accounts shall be reduced by allocations of losses under Section 5.1.A.

(8)     Capital Accounts shall be reduced by allocations of losses under Section 5.1.B.

(9)     Capital Accounts shall be increased by allocations of profits under Section 5.1.B.

K.     To the maximum extent permitted under the Code, allocations of profits and losses shall be modified so that the Members' Capital Accounts reflect the amount they would have reflected if adjustments required by Sections 5.4.D, 5.4.F and 5.4.G had not occurred.


ARTICLE VI -- Managing Member Rights, Powers and Duties

Section 6.1  Restrictions on Authority

Notwithstanding any other provisions of this Agreement, the Managing Members shall have no authority (a) to perform any act in violation of (i) any applicable law or regulations, (ii) any agreement between the Company and the Lenders or (iii) the Property Documents, or (b) to do any act required to be approved or ratified by the Investor Members under the Uniform Act unless such approval or ratification is given in advance.  The Managing Members shall not have any authority to do any of the following specific acts without the Consent of the Special Investor Member:

(1)     following completion of construction of the Property, to construct any new capital improvements, or to replace any existing capital improvements, which construction or replacement would substantially alter the character or use of the Property, or

(2)     to acquire any real property in addition to the Property, other than fee title or easements to de minimis parcels of land for the purpose of correcting record title to the Property, or

(3)     except to the extent permitted under Section 6.13.B, if any, to be personally liable on, or to guarantee, or to permit any Related Person of a Member of the Company to be personally liable on, to guarantee or otherwise bear the Economic Risk of Loss with respect to, the Mortgages, or

(4)     except as otherwise provided in Section 6.13.D, to refinance any Company indebtedness, to sell, convey or mortgage the Property, to materially amend or modify any Mortgage or Property Document, to submit any application to refinance any

17

Company indebtedness, to execute after the Admission Date any document in connection with the Permanent Mortgage Loan (other than periodic reporting required pursuant to the Permanent Mortgage Loan documents), or to market the Property for sale, or

(5)     to permit the occupancy of dwelling units in the Property in violation of Minimum Set Aside or any other requirement which must be complied with to enable the Property to generate the Projected Credit, or

(6)     to lease (i) pursuant to one lease (or pursuant to a series of leases which are negotiated as part of one transaction) more than 10% of the Property as an entity or (ii) the Property in such a manner as to cause the Property or any part thereof to be treated as tax-exempt use property within the meaning of Section 168(h) of the Code, or

(7)     to borrow on the general credit of the Company, except as specifically permitted hereunder as to Operating Deficit Loans and pursuant to Section 6.13, or

(8)     to cause the Company to operate any business on the Property other than the business of renting dwelling units, or to rent any portion of the Property other than for occupancy as a dwelling unit, or

(9)     to cause the Company to take any action referred to in clause (ii) of the definition of "Event of Bankruptcy" in Article XI.

Section 6.2  <u>Personal Services</u>

No Affiliate shall receive any compensation from the Company for services rendered to the Company in connection with the construction or operation of the Property or any other aspect of the business of the Company unless such compensation is provided for in Article VI or, if for services not compensated for pursuant to Article VI, such compensation is reasonable, does not exceed fees which would be payable on an arms-length basis to a non-Affiliate in the business of supplying such services, and complies with Lender regulations.  Any Member may engage independently or with others in other business ventures of every nature and description including, without limitation, the ownership, operation, management, syndication and development of real estate, including real estate which may be in competition with the Property and neither the Company nor any Member shall have any rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom.

Section 6.3  <u>Business Management and Control; Tax Matters Member</u>

A.     The Managing Members shall have the exclusive right to manage the business of the Company and, subject to all provisions of this Agreement including without limitation Articles III and VI, shall have full power, authority and discretion to cause the Company to do any of the acts described in Section 2.4 hereof.  No Investor Member (except one who may also be a Managing Member, and then only in his capacity as Managing Member) shall participate in or have control over the Company business, except as provided in Article VIII hereof or as required by law.  The Members hereby consent to the exercise by the Managing Members of the powers conferred on them by this Agreement.  No Investor Member (except one who may also be a Managing Member, and then only in his capacity as a Managing Member) shall have any authority or right to act for or to bind the Company.

B.     All Members hereby agree that, as long as it shall be a Managing Member, P&U Capital Partners, L.L.C. shall be the "Tax Matters Member."  The Tax Matters Member shall

18

employ experienced tax counsel to represent the Company in connection with any audit or investigation of the Company by the Internal Revenue Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit, and the fees of counsel shall be a Company expense.  The Tax Matters Member shall keep the Members informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, shall furnish to each Member (within five days after receipt) a copy of each notice or other communication received by the Tax Matters Member from the Internal Revenue Service, and shall not respond to any notice or other communication from the Internal Revenue Service which questions or challenges any item which has been or may be reported on a Company tax return until after the Special Investor Member has reviewed and commented on the proposed response. The Tax Matters Member shall have no authority, without the Consent of the Special Investor Member, to (i) enter into a settlement agreement with the Internal Revenue Service which purports to bind Members other than the Tax Matters Member, (ii) file a petition as contemplated in Section 6226(a) or 6228 of the Code, (iii) intervene in any action as contemplated in Section 6226(b) of the Code, (iv) file any request contemplated in Section 6227(b) of the Code, (v) enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code or (vi) to file any tax related litigation in a court other than the United States Tax Court, or (vii) to engage in any communication (written or oral) with the Internal Revenue Service or the Credit Agency, or submit any report or other correspondence to the Internal Revenue Service or the Credit Agency.

Section 6.4  Authority of Managing Members

A.     Every contract, deed, mortgage, lease and other instrument executed by a Managing Member shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that, at the time of the delivery thereof (except as shown in certificates or other instruments duly filed with the Filing Office), (a) the Company was in existence, (b) this Agreement had not been terminated or canceled or amended in any manner so as to restrict such authority, and (c) such Managing Member was duly authorized to execute such instrument. Except as otherwise provided in a certificate or other instrument filed in the Filing Office with respect to the Company, any Person dealing with the Company or the Managing Members may always rely on a certificate signed by the Managing Members hereunder:

(1)     as to who are the Managing Members or Investor Members hereunder,

(2)     as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by the Managing Members or are in any other manner germane to the affairs of the Company,

(3)     as to who is authorized to execute and deliver any instrument or document of the Company,

(4)     as to the authenticity of any copy of this Agreement and amendments thereto, or

(5)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

B.     If there shall be more than one Managing Member serving hereunder, each Managing Member (with the Consent of the Special Investor Member and subject to the provisions of Section 8.6) may from time to time, by an instrument in writing or by a provision in this Agreement, delegate his powers and authority hereunder to another Managing Member or

19

Managing Members to the extent stated therein.  Such writing shall fully authorize such other Managing Member to act alone without the requirement of any act or signature of the delegating Managing Member and to take any action of any type and to do anything and everything which a Managing Member may be authorized to take or do hereunder, and the delegating Managing Member thereafter shall have no right, power or authority to act for the Company with respect to the powers or authority so delegated.  No such delegation shall relieve the delegating Managing Member of any of its duties or obligations under this Agreement or otherwise with respect to the Company.

Section 6.5 <u>Duties and Obligations</u>

A.      The Managing Members shall promptly take all actions which may be necessary or appropriate for the completion of construction of the Property and the proper maintenance and operation of the Property in accordance with the provisions of this Agreement, the Project Summary attached hereto as Exhibit 3, the Property Documents, and applicable laws and regulations; and in compliance with the representations and warranties in Section 6.6 and any Mortgage requirements; and in a manner consistent with the fiduciary obligations of the Managing Members under law.  The Managing Members shall devote to the Company such time as may be necessary for the proper performance of their duties.  The Managing Members shall cause the project architect and any inspecting architect to use only those Plans and Specifications approved in writing by the Special Investor Member, and shall also make their best efforts to cause all reports and certifications prepared by the inspecting architect to be addressed directly to the Investor Members.

B.      The Managing Members shall cause the Company to obtain and keep in force, during the term of the Company, comprehensive casualty insurance, including, but not limited to, "All-Risk" Property insurance, and Commercial General  Liability insurance in favor of the Company (i) with such companies and in such amounts as shall be satisfactory to the Lenders, the Special Investor Member and any Credit Agency, or, if the Property is no longer subject to Lender or Credit Agency regulation or requirements, as shall be customary for apartment complexes similar to the Property, and (ii) in amounts which shall be no less than those amounts which are customary in the area for apartment complexes such as the Property and, in any event, sufficient to prevent the Company from becoming a co-insurer under any such policies.

In addition to the foregoing, the following specific coverage shall be maintained:

(1)     Construction Phase:  During construction, the following insurance coverages must be maintained:

(a)     Owner's Commercial General Liability Insurance:  Insurance of the real estate development class in amounts not less than $1,000,000 per occurrence/$2,000,000 general aggregate on a per location basis, with a maximum deductible of $10,000.  In addition, an Umbrella/Excess Liability policy is required in the amount of $5,000,000 (1 through 10 stories) or $10,000,000 (greater than 10 stories).  In the event that the Company and the Company Investor Member are reflected as Additional Named Insureds on the General Contractor's Commercial General and Umbrella Liability Policy pursuant to Section 6.5B(1)(c) below and such

20

policy continues to remain in effect, the Umbrella/Excess Liability policy in this Section 6.5B(1)(a) shall not be required.

(b)     All-Risk Builder's Risk Insurance:  Providing coverage in an amount equal to 100% of completed construction value, with an agreed-value clause or no co-insurance, including rent loss or equivalent soft cost coverage in an amount equal to actual loss sustained or 12 months' gross income/rents.  Policy must include a "Permission to Occupy" clause.  For rehabilitation projects, the original building's value is to be included in the Builder's Risk policy or insured under a separate policy.  Maximum deductible of $25,000.

(c)     General Contractor's Commercial General Liability Insurance:  Insurance of the construction exposure for not less than $1,000,000 per occurrence/$2,000,000 general aggregate on a per project aggregate basis, including Products/Completed Operations.  Completed Operations coverage to be continued for a minimum of three (3) years following Full Completion must be included.  In addition, an Umbrella Liability/Excess Liability policy is required in the amount of $5,000,000 (for structures 1 through 10 stories), or $10,000,000 (11 or more stories).  All policies in this paragraph shall name the Company and the Company Investor Member as Additional Named Insureds unless the Owners Umbrella/Excess Liability coverage in 6.5B(1)(a) above is purchased by the Company and endorsed to include construction related.

(d)     General Contractor's Pollution Coverage:  Minimum of $5,000,000 required for substantial rehabilitation/renovation of existing structures, and/or if lead and/or asbestos is present on the Property.  Policy shall provide defense and indemnity coverage for bodily injury, property damage, and environmental investigation and clean-up costs for pollution conditions arising from the General Contractor's operations.

(e)     General Contractor's Commercial Automobile Liability:  covering all autos, vans or trucks used for business purposes, if any, in the amount of $1,000,000 combined single limit for bodily injury/property damage.

(f)     General Contractor's Workers' Compensation and Employer's Liability:  Statutory limits for Workers' Compensation, and Employers Liability with limits of $1,000,000.

(g)     Architect's Errors and Omissions Insurance:  Insurance in an amount equal to the greater of $1,000,000 or 10% of the construction contract amount, in a form satisfactory to the Special Investor Member.

(h)     Civil Engineer's Errors and Omissions Insurance:  Insurance in an amount equal to the greater of $1,000,000 or 10% of the construction contract amount, in a form satisfactory to the Special Investor Member.

21

(2)    Permanent Insurance:  After the issuance of a certificate of occupancy for each building in the Property, the following insurance coverage must be maintained as to such building:

    (a)    Owner's Commercial General Liability Insurance:  Insurance in amounts not less than $1,000,000 per occurrence/$2,000,000 general aggregate on a per location aggregate basis, with a maximum deductible of $10,000.  In addition, an Umbrella/Excess Liability policy is required in the amount of $5,000,000 (1 through 10 stories) or $10,000,000 (greater than 10 stories).

    (b)    Owner's "All-Risk" Property Insurance:  Insurance on buildings and personal property in an amount not less than 100% of replacement value of such buildings and personal property, including Agreed Value clause or no co-insurance provision.  Maximum deductible of $25,000.

    (c)    Owner's Business Income/Rent Loss Insurance:  Insurance in an amount equal to actual loss sustained or twelve (12)  months' gross rental income.

    (d)    General Contractor's Commercial General Liability Insurance: Continuation of Products and Completed Operations insurance for a minimum of three (3) years following Full Completion.

(3)    Additional Owner/Company Coverages, if Applicable:

    (a)    Ordinance and Law Coverage – required in the following amounts when the apartment complex represents a non-conforming use under current building, zoning or land-use laws or ordinances:
Loss of Undamaged Portion of the Building – full replacement cost of the structure with agreed-value clause
Demolition Cost – minimum 10% of the replacement cost
Increased Cost of Construction – minimum 10% of the replacement cost

    (b)    Boiler and Machinery Insurance – required when any centralized HVAC equipment is in operation at the property and/or when the apartment complex contains boilers or other pressure-fired vessels that are required to be regulated by the state in which the property is located.
Coverage = Full replacement cost of the building that houses the equipment
Deductible no greater than the deductible on the property insurance policy

    (c)    Sinkhole / Mine Subsidence – required when the apartment complex is located in an area that is prone to sinkhole/mine subsidence.
Coverage = 100% replacement costs

    (d)    Windstorm Coverage – required if the "All-Risk" property damage insurance excludes wind-related events.  Must include business income/rent loss coverage for a minimum of 12 months.  May be issued

22

under a state-managed program if that is       the only coverage that is available.
Coverage = 100% replacement costs or actual cash value
Maximum deductible = 5% of the total insured value

(e)      Flood Insurance – required if property is located in a 100 Year Flood Zone (special flood hazard area with a FEMA designation of Zone A o r V). Coverage = 100% of the full replacement cost or, if that is unavailable, then the maximum amount of insurance available under the National Flood Insurance Program (NFIP).  An excess Flood or Difference in Conditions (DIC) policy should provide for the difference, if any, between the maximum limit provided by NFIP policies and the full replacement cost.
Maximum deductible = 2% of the total insured value per building

(f)      Earthquake Insurance – required if property is located in an area prone to seismic activity (seismic zones 3 or 4).
Coverage = 100% of the full replacement cost
Maximum deductible = 5% of the total insured value

(g)      Commercial Auto Liability – required on any cars, vans or trucks owned or leased by the owner/company for use at the apartment complex for business purposes, if any.  Coverage = $1,000,000 combined single limit bodily injury/property damage

(4)      Proof of Insurance:  Insurance coverage must be evidenced by certificates of insurance on ACCORD forms (ACCORD 27 for casualty insurance, and ACCORD 25 for general liability insurance).  Properly endorsed policies certified as true and correct by the insurance agent must follow within 90 days of the Admission Date (with respect to the policies listed in Section 6.5.B(1)) or the date of full completion (with respect to the policies listed in Section 6.5.B(2) and (3)). All evidence of insurance must satisfy the following requirements:  (a) the Company (rather than the Managing Members or the Developer) should be the named insured; (b) policies must be written with  a company carrying a minimum A.M Best rating of "A" and a size rating of "VIII" or better; (c) all binders and policies should contain a cancellation clause stating that the policy will not be canceled or non-renewed without at least thirty (30) days prior written notice to the Company (may be 10 days notice for non-payment of premium only); (d) certificates must document policy coverage amounts, deductibles, and policy expiration dates for each type of insurance shown on the certificate; and (e) all binders and policies must be accompanied by evidence of premium payment. Other than those deductibles set forth above, no deductible shall be greater than $10,000.  The Managing Members shall cause the applicable insurer to name the Company Investor Member and Special Investor Member as "additional insureds" on each Company insurance policy.  Prior to the expiration date for any such Company insurance policy, the Managing Members shall deliver to the Special

23

Investor Member a copy of the comparable new or replacement policy, including all endorsements thereto.

C.       The Managing Members shall obtain an owner's title insurance policy insuring title to the Property in favor of the Company in an amount (which amount is hereby agreed to be $16,230,000) sufficient to cover the sum of the outstanding amount of all Mortgages, the Capital Contributions of all Members and the anticipated Deferred Development Cost Payment (which policy shall include all endorsements requested by the Special Investor Member, including without limitation, the so-called "non-imputation" and "Fairway" endorsements, as well as zoning (Form 3.1), owner's comprehensive (with mineral rights coverage, if applicable), blanket easement (if applicable), contiguity (if appropriate), subdivision, access, separate tax parcel, and survey endorsements) and be subject to no exceptions other than those referred to in Section 6.6(10).

D.       The Managing Members shall take such actions as are necessary to make the Company eligible for the full amount of the available Low Income Housing Credit (including without limitation the renting of all dwelling units as Low Income Units in accordance with the requirements of Section 42 of the Code and all rules and regulations thereunder).  The Managing Members shall operate the Property such that the right of each tenant to occupancy of a dwelling unit shall be pursuant to an agreement and for a charge which shall be separate from the agreements and charges for the right of such tenant to receive any services or any other benefits, and no tenant shall be required to receive or pay for any of such other benefits as a condition of occupancy.  Upon not less than three (3) days prior written notice, the Managing Members shall cause the Company and the Management Agent to make available, to representatives of the Special Investor Member at the offices of the Management Agent during regular business hours (or, at the option of the Special Investor Member, to send copies of such documents to the Special Investor Member), all tenant files and leasing practices and procedures relating to the Property for review of compliance with Section 42 of the Code and the rules and regulations thereunder, the Property Documents, rules and policies of the Credit Agency and applicable file maintenance procedures.  The Managing Members will cause the Management Agent to cure promptly all deficiencies in the tenant files or practices and procedures identified by the Special Investor Member.  The Managing Members shall notify the Special Investor Member immediately if they become aware of any material opposition by community residents or governmental authority to (or material investigation of) the Property or, with respect to the Property, the Managing Members, the Developer, the Guarantors or any Affiliates thereof.

E.       The Managing Members shall elect to commence the Credit Period for each building including Low Income Units at the time such building is placed in service, except that, upon the written request of the Special Investor Member,  the Managing Members shall elect, for any building in which all Low Income Units are not occupied by Qualified Tenants by the end of the calendar year in which such building is placed in service, to defer commencement of the Credit Period for such building to January 1 of the next year.

F.       The Managing Members shall (i) not store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Property, or at or on any other Facility or Vessel owned, occupied, or operated either by any Managing Member or any Person for whose conduct any Managing Member is or was responsible; (ii) not transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Special Investor Member with written notice (x) upon any Managing Member's obtaining knowledge of any potential or known release, or threat of

release, of any Hazardous Material at or from the Property or any other Facility or Vessel owned, occupied, or operated by any Managing Member or any Person for whose conduct any Managing Member is or was responsible or whose liability may result in a lien on the Property; (y) upon any Managing Member's receipt of any notice to such effect from any Federal, state, or other governmental authority; and (z) upon any Managing Member's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any Managing Member may be liable or for which expense or loss a lien may be imposed on the Property; and (iv) indemnify and hold harmless the Company and the other Members against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by any of said indemnitees (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the violation by the Managing Members of any of the foregoing covenants or with the presence of any Hazardous Material at the Property.

G.  Subject to the Managing Member's right of first refusal to purchase the Property as set forth in Section 6.5H, if requested to do so by the Special Investor Member at any time after the expiration of the fourteenth year of the Compliance Period or any later date to which the Company may have agreed with the Credit Agency to defer its opportunity to make such submission, the Managing Members shall submit a written request to the Credit Agency to find a Person to acquire the Company's interest in the Property and/or take such other action permitted or required by the Code as the Special Investor Member may request to effect a sale of the Property immediately following the Compliance Period (including, without limitation, to consider any offer by the Investor Members or their affiliates to purchase the Property or resyndicate an interest in the Company) or to terminate the extended use commitment of Section 42(h)(6)(B) of the Code.

H.  The Managing Member shall have the right to purchase the Property during the one (1) year period immediately following the Compliance Period, at a price equal to fair market value, as determined below.  In the alternative, the Managing Member shall have the right during this one (1) year period to purchase the Interests of any of the Investor Members for a price equal to the amount such Investor Members would have received pursuant to Section 5.2B if the Property were sold at fair market value.

If the Managing Member fails to purchase the Property or the Interests of the Investor Members pursuant to the preceding sentences of this Section 6.5H, at any time after the expiration of the said one (1) year period:  (i) the Managing Members shall offer the Property for sale if requested to do so by the Special Investor Member, and (ii) the Special Investor Member shall be permitted to commence marketing the Property and obtain offers to purchase the Property.  If such a sale shall not be approved by the Members and consummated within one year after the Special Investor Member requests that the Managing Member offer the Property for sale (or one year after the Special Investor Member begins marketing the Property for sale) (the "Marketing Period"), then, the Managing Members and the Special Investor Members shall use reasonable efforts to agree upon the fair market value of the Property.  If the Managing Members and the Special Investor Member fail to reach agreement as to the fair market value within 30 days after the end of the Marketing Period, the Managing Members and the Special Investor Member shall each appoint an MAI appraiser within the following 30 days; the two appraisers shall then appoint a third MAI appraiser within the following 10 days; each of the appraisers shall determine the fair market value of the Property, which determinations shall be made within 30 days after the appointment of the third appraiser.  "Fair Market Value" for purposes of this Section 6.5.I shall then be the fair market value agreed upon by the Managing Members and the Special Investor Member, or, in the absence of such agreement, the average of the three determinations of the appraisers.  The Managing Members shall then have the right to purchase

25

the Company Interest of the Investor Members for a price, payable in cash in full at closing, equal to the cash which would be distributed to the Investor Members pursuant to Section 5.2.B if the Property were then sold to a third party for Fair Market Value, provided that the Managing Members gives notice to the Investor Members of their election to so purchase within 30 days after the determination of Fair Market Value and tender the purchase price within 60 days after giving such notice.  If the Managing Members fail to give timely notice of their election to purchase or fail to timely tender payment, then the Special Investor Member shall have the right to purchase the Company Interest of the Managing Members for a price, payable in cash in full at closing, equal to the cash which would be distributed to the Managing Members pursuant to Section 5.2.B if the Property were then sold to a third party for Fair Market Value, provided that the Special Investor Member gives notice to the Managing Members of its election to so purchase within 30 days after expiration of the Managing Members' right to purchase and tender the purchase price within 60  days after giving such notice.  The Company Interest to be purchased shall include all rights of the selling Members and their Affiliates to the return of Capital Contributions, the payment of fees and the repayment of loans by the Company, such that the selling Members and their Affiliates shall have no rights against the Company of any kind after such purchase is consummated.  If the Special Investor Member receives a bona fide offer to purchase the Property, which offer the Investor Members desire to have the Company accept, then the Special Investor Member shall send a copy of such offer (or a written description of any such oral offer) to the Managing Members.  Within thirty (30) days of their receipt of any such copy of an offer, the Managing Members must notify the Special Investor Member of their decision either to accept such offer on behalf of the Company or to refuse such offer.  If the Managing Members elect to accept such offer, the Managing Members shall be required to proceed promptly to close such transaction in accordance with the terms and conditions set forth in the offer unless otherwise instructed by the Special Investor Member.  If the Managing Members refuse the offer, the Managing Members shall be obligated to purchase all of the Investor Members' interests in the Company for a purchase price equal to the amount of net proceeds that the Investor Members would have been entitled to receive pursuant to Section 5.2B of this Agreement if the sale of the Property had been completed under the terms of the refused offer.

I.      The Managing Members shall operate the Company and the Property strictly in accordance with the Tax Credit Application and all rules and regulations promulgated by the Credit Agency, including without limitation, the Credit Agency's qualified allocation plan.

J.      By written notice delivered to the Special Investor Member by certified or registered mail or by overnight courier (with proof or receipt) at least three (3) weeks in advance, the Managing Members will invite the Investor Members, and their investors and representatives, to attend any groundbreaking, ribbon-cutting or other public relations ceremony or event for the Property or Company, and shall duly recognize the Investor Members, and their investors and representatives, at such ceremony or event.  The Investor Members and their Affiliates have the right to advertise, announce, publish and otherwise disclose the completion of this transaction, including without limitation, the Property name, location, Company Investor Member Capital Contribution amount, financing terms and other pertinent transaction information.

K.      The Managing Members shall be responsible for organizing the Company, causing the Company to acquire the Property, processing necessary documents with the Credit Agency in connection with the Low Income Housing Credits, arranging the Permanent Mortgage Loan financing for the Property and arranging for the admission to the Company of the Company Investor Member.  In consideration for their services set forth in this Section 6.5.K, the Managing Members have received their interest in the profits of the Company as set forth in Section 5.1.

26

L.     Each obligation of the Managing Members hereunder shall be the joint and several obligation of each Managing Member.  In the event of a default by the Managing Members in the performance of any of their obligations under this Agreement, then the amount in default shall be offset against all payments from the Company to the Managing Members, including repayments of loans, returns of Capital Contributions and payments of fees.  Nothing in Sections 6.7 or 6.8 shall have the effect of relieving the Managing Members of any liability for any of their obligations set forth in this Agreement.

M.     If the Property is financed with HUD financial assistance, including without limitation, HUD insurance or HUD rental subsidy, or with USDA-FMHA financing, the Managing Member shall, upon request by any Investor Member cooperate in providing the necessary Form 2530 Previous Participation Certificate or any other documentation required to obtain HUD approval for the transfer of an Investor Members' interest in the Company.

N.     Within twenty (20) days after Full Completion, the Managing Members shall deliver to the Special Investor Member a radon gas test measurement report and conclusion for each building in the Property, unless the Property is located in a county (or part thereof) in the lowest risk EPA radon map Zone 3.  The radon report shall have been prepared by a radon service professional (a) who meets the requirement of the State, if any, for providing such radon reports, and (b) who has a proficiency listing, accreditation, or certification in radon test measurement from either (1) the National Environmental Health Association (NEHA) National Proficiency Program or (2) the National Radon Safety Board (NRSB).  If the radon report demonstrates that the radon gas level for any building in the Property exceeds the EPA standard for radon action or remediation then in effect (which standard is currently four Pico curies per liter), the Managing Member within sixty (60) days after receipt of such report, shall cause the Company to install a radon mitigation system or take such other mitigation measures recommended by the radon report, and shall provide to the Special Investor Member within fifteen (15) days after the implementation of such mitigation system and/or measures, a follow-up radon report which confirms the effectiveness of such measures.

O.     The Managing Member shall cause all leases for dwelling units in the Property to contain a provision obligating the tenant to notify the Management Agent immediately of any suspected water leaks, moisture problems, or mold in the dwelling unit or common areas of the Property.

P.     The Managing Member shall on behalf of the Company, agree to contract with the Construction Consultant to perform an 11-month warranty review of the Property, and to issue a written report thereof. The Managing Member shall provide a copy of such report to the Special Investor Member within ten (10) days of its receipt thereof.  The Managing Member agrees to diligently pursue remediation of any adverse findings of such report with the General Contractor prior to expiration of the warranty period.

Section 6.6   Representations and Warranties

The Managing Members hereby represent and warrant to each Investor Member that as a condition to the payment of each Installment as provided in Section 4.1.B, the following are true and will be true on the due date for payment to the Company of each of such Installments, and that they will use their best efforts to maintain the truth of such representations and warranties which are then applicable to the Company at all other times (except as otherwise provided):

(1)     The Company is a duly organized limited liability company validly existing under the laws of the State and has complied with all filing requirements necessary for the protection of

27

the Investor Members and to maintain the limited liability of the Investor Members in the manner provided in Section 3.5.

(2)     Each of the Managing Members is a duly organized entity validly existing under the laws of the State.

(3)     Construction of the Property will be or has been completed in substantial conformity with the Property Documents.

(4)     All Development Costs will be paid or provided for by, or for the account of, the Company utilizing only those sources of funds referred to in Section 6.9.

(5)     No event, occurrence or proceeding is pending or threatened which would (a) materially adversely affect the Company or its properties, the Managing Members, the Guarantors or any Affiliate thereof, (b) materially adversely affect the ability of the Managing Members, the Guarantors or any Affiliate to perform their respective obligations hereunder or under any other agreement with respect to the Company or the Property, or (c) prevent the completion of construction of the Property in substantial conformity with the Property Documents.  This subparagraph shall be deemed to include, but not be limited to, the following: (x) legal actions or proceedings before any court, commission, administrative body or other governmental authority having jurisdiction over the zoning applicable to the Property, (y) labor disputes and (z) acts of any governmental authority.

(6)     No material default (or event which, with the giving of notice or the passage of time or both, would constitute a material default) has occurred and is continuing on the part of the Managing Members under this Agreement or on the part of the Managing Members or the Company under any of the Property Documents or any other agreement affecting the Property, the same are in full force and effect, and no default by the Company, the Managing Members or an Affiliate under any of the Property Documents has been asserted by any party thereto.

(7)     The Property is being operated in compliance with the requirements of this Agreement and the Property Documents, including without limitation the requirements of Section 6.5.C hereof.

(8)     Except to the extent permitted under Section 6.13.B, if any, no Member or Related Person of a Member of the Company has any personal liability or otherwise bears the Economic Risk of Loss with respect to the payment of principal or interest with respect to the debt evidenced by any of the Mortgages.

(9)     There is no material violation by the Company or the Managing Members of any zoning, environmental or similar regulation applicable to the Property; all necessary building and other applicable permits have been obtained to permit the rehabilitation of the Property; all permits necessary to operate the Property for its intended use have been or will be obtained prior to the operation; and the Company has complied with all applicable municipal and other laws, ordinances and regulations relating to such construction and use of the Property.

(10)     The Company owns the fee simple interest in the Property, subject to no material liens, charges or encumbrances other than the Permitted Loans and those which (a) are both permitted by the Property Documents and noted or excepted on Schedule B of the owner's title insurance policy/commitment no. 10928930 effective November 2, 2006, issued by Commonwealth Land Title Insurance Company and (b) do not materially interfere with the use

COLUMBUS/523644.6

of the Property or any part thereof for its intended purpose or have a material adverse effect on the value of the Property.

(11)     All appropriate and material roadways and public utilities, including, without limitation, sanitary and storm sewers, water, telephone and electricity, are available to the Property, and easements required in connection therewith have been or will be timely obtained and filed of public record.

(12)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken pertaining to the Company or the Property by each Managing Member and each Affiliate of a Managing Member which is a partnership, a limited liability company or a corporation have been or will be duly authorized by all necessary action by such Entity and the consummation of any such transactions with or on behalf of the Company will not constitute a breach or violation of, or a default under, the Company agreement, operating agreement, charter, by-laws or comparable organizational documents of said Entity or any agreement by which such Entity or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree.

(13)     To the best of the Managing Members' knowledge, the financial assumptions upon which the financial forecast attached hereto as Exhibit 2 are based, are reasonable and based upon information currently available.

(14)     The Company is not liable (nor has any claim been made against it) for any expense, debt, cost, liability or other charge other than costs incurred in connection with the acquisition and construction of the Property, operating expenses arising in the normal course of business and those relating to the Permitted Loans.

(15)     Prior to conversion of the Permanent Mortgage Loan, no circumstance has occurred or is likely to occur which would permit the Permanent Mortgage Lender to not fund the Permanent Mortgage Loan.

(16)     The Company shall have either elected to fix the "applicable percentage" pursuant to Section 42(b)(2)(A)(ii)(II) of the Code or shall have established the "applicable percentage" as to each building comprising the Property as of the date such building is placed in service as provided in Section 42(b)(2)(A)(i) of the Code.

(17)     No Event of Bankruptcy has occurred with respect to any Managing Member, any Guarantor or any Affiliate of a Managing Member.

(18)     None of those Persons named in Section 3.1 hereof as Managing Members have Retired other than as permitted in Section 8.1, no grounds for removal of a Managing Member pursuant to Section 8.6 exist, and no grounds for termination of the Management Agent or the General Contractor pursuant to Section 6.12 and Section 7.10, respectively, exist.

(19)     No Lender approval is required (or, if required, such approval has been obtained) with respect to the execution or delivery of this Agreement or the admission to the Company of the Investor Members.

(20)     No Person or Entity holds any equity interest in the Property other than the Company.

(21)     The Company has the sole responsibility to pay all maintenance and operating costs, including all taxes levied and all insurance costs, attributable to the Property.

(22)     The Company, except to the extent it is protected by insurance and excluding any risk borne by Lenders, bears the sole risk of loss if the Property is destroyed or condemned or there is a diminution in the value of the Property.

(23)     No Person or Entity except the Company has the right to any proceeds, after payment of all indebtedness, from the sale, refinancing or leasing of the Property.

(24)     The Property does not receive assistance under the HUD Section 8 Moderate Rehabilitation Program.

(25)     The fair market value of the Property exceeds the total amount of indebtedness, including accrued interest thereon, encumbering the Property and is expected to do so throughout the term of such indebtedness, and the Permanent Mortgage Loan has a fixed maturity date which is prior to the end of the anticipated economic life of the Property.

(26)     At least 50% of the aggregate basis of each building of the Property and the land on which such building is located (as provided in Section 42(h)(4) of the Code) will be financed by proceeds of tax exempt bonds under Section 103 of the Code which were issued under the volume limitations pursuant to Section 146 of the Code and which will be redeemed within a reasonable period by principal payments made on the Mortgage Loan.

(27)     No building constituting part of the Property was previously placed in service during the ten year period prior to its acquisition by the Company.

(28)     No building constituting part of the Property was previously placed in service by the Company or by any "related" person with respect to the Company within the meaning of Section 42(d)(2)(B)(iii) of the Code.

(29)     The Members and Related Persons thereto owned 10% or less of the capital interests and 10% or less of the profits interest in the Company or other entity (including proportionate shares of interests owned indirectly by the Members or such Related Persons through corporations, partnerships, estates or trusts) from which the Company acquired the Property.

(30)     Either (a) rehabilitation expenditures with respect to each building of the Property allocable to low income units during a twenty-four month period ending within the taxable year in which such building is deemed to be placed in service for purposes of Section 42 of the Code are (or will be) equal to or greater than the greater of $3,000 per low income unit or 10% of the unadjusted basis of the building or (b) rehabilitation expenditures with respect to each building of the Property allocable to low income units during a twenty-four month period ending within the taxable year in which such building is deemed to be placed in service for purposes of Section 42 of the Code are (or will be) equal to at least $3,000 per low income unit and the building was acquired from a governmental unit.

(31)     The Managing Members shall cause the Company to conduct its affairs in a manner such that at all times during the term of this Agreement the interest on the Bonds will not be includible in the gross income of the holders of the Bonds for Federal income tax purposes so

long as such holder is not a "substantial user" of the Property within the meaning of Regulation Section 1.103-11(b).

(32)    The 2006 low-income housing tax credit preliminary determination in the amount of $537,131 per annum for the Property has been obtained by the Company from the Credit Agency and the Issuer, as applicable, and is in full force and effect.

(33)    Unless a waiver has been obtained from the Credit Agency and subject to the Consent of the Special Investor Member, the Company is operating and will operate itself and the Property strictly in accordance with the Tax Credit Application, and all rules and regulations promulgated by the Credit Agency.

(34)    The factual information contained in the Property Summary set forth as Exhibit 3 hereto is accurate and complete in all material aspects.

(35)    The Company is operating itself and the Property strictly in accordance with the Tax Credit Application, and all rules and regulations promulgated by the Credit Agency, including without limitation, the Credit Agency's qualified allocation plan.

(36)    The Managing Members have consulted with the Accountants, and the Accountants have confirmed that:  (a) all amounts included in the determination of Eligible Basis as set forth in the Financial Forecast attached hereto as Exhibit 2 are properly includable pursuant to the Code and Internal Revenue Service rulings; and (b) all land preparation costs and impact fees included in Eligible Basis are inextricably associated with depreciable assets of the Company.

(37)    Based upon the experience and judgment of its principals, and after consultation with the Accountants, the Managing Members certify that:  (a) the value and magnitude of the services being rendered by the Developer to the Company in connection with the development of the Property and pursuant to the Development Agreement are such as to cause the amount of the Development Services Fee to be fair and reasonable; (b) that portion of the Development Services Fee that is included in Eligible Basis, including that portion of the payment which is deferred, is properly includable in Eligible Basis under the Code and Internal Revenue Service rulings; and (c) they shall provide to the Accountants and to the Special Investor Member, promptly upon their request, such written documentation as is reasonably required by the Accountants and/or the Special Investor Member, in order to verify the determination of Eligible Basis, including documentation supporting the allocation of any costs incurred by the Company into the determination of Eligible Basis.

Section 6.7   Liability

The Managing Members shall indemnify and hold harmless the Company and the other Members against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by any of said indemnitees (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Company, provided, however, that no Managing Member or Affiliate shall be liable, responsible or accountable for damages or otherwise to the Company or any Member for any act performed under this Agreement or for any failure to act, on its own part or that of any of its Affiliates, if such course of conduct did not constitute misconduct, gross negligence, material misrepresentation or material breach of covenant, warranty or fiduciary duty to the Investor Members and such Managing Member or Affiliate reasonably believed in good faith that such course of conduct was in the best interest of the Company and the Members.  The Managing Members shall not be responsible for

31

indemnifying the Company for liability on indebtedness that is non-recourse to the Company and/or its Members except for non-recourse carve out obligations under the Permanent Mortgage Loan

Section 6.8   Indemnification

A Managing Member and its Affiliates shall be indemnified and held harmless by the Company against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them (including reasonable attorneys fees, fines, damages and similar payments) in connection with the Company, provided that the same were not the result of a course of conduct constituting misconduct, gross negligence, material misrepresentation or material breach of covenant, warranty or fiduciary duty.

Notwithstanding the above, a Managing Member, its Affiliates and any person acting as a broker-dealer in connection with the offering and sale of interests in the Company shall not be indemnified by the Company for any losses, liabilities or expenses arising from or out of an alleged violation of Federal or state securities laws unless (1) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee; or (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee; or (3) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee.

In any claim for indemnification for Federal or state securities law violations, the party seeking indemnification shall place before the court the position of the Securities and Exchange Commission with respect to the issue of indemnification for securities law violations.

The Company shall not incur the cost of the portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

Any indemnity under this Section 6.8 shall be provided out of and to the extent of Company assets only, and no Investor Member shall have any personal liability on account thereof.

Section 6.9   Development Completion Obligation

A.      Pursuant to the Development Agreement, the Developer is obligated (the "Development Completion Obligation") to cause Full Completion to be achieved by June 1, 2007 for a fixed turnkey price of no greater than $16,170,203 (the "Guaranteed Development Cost"). The Managing Members guarantee to the Company and the other Members the Development Completion Obligation of the Developer. In addition, the Managing Member hereby agrees to pay any costs (the "GP Costs") necessary for the Company (i) to acquire the Land, (ii) to achieve Stabilized Occupancy, (iii) to pay all Operating Expenses and Debt Service in excess of Operating Revenues attributable to the period ending on the date of achievement of Stabilized Occupancy, (iv) to fund all reserves and escrows necessary to close the Permitted Loans and to fund the Rent-Up Reserve and the Operating Reserve, and (v) to repay in full the Construction Mortgage Loan if required by the Permitted Loan documents, to the extent funds are not available therefor from Development Funds. The Developer shall have no responsibility for the acquisition of the Property, the organization of the Company, the syndication of interests in the Company or the payment of the costs set forth in the immediately preceding sentence, all of which shall be the responsibility of the Managing Member, in consideration for which the Managing Member has received its interest in the Company. Any payments under the

32

Development Completion Obligation shall be treated as and added to the principal of the Managing Member Completion Loan, which Managing Member Completion Loan shall bear simple interest at the rate of 4% per annum repayable as provided in Section 5.2A hereof. The proceeds of any additional Capital Contribution made pursuant to Section 4.2.A(4) shall be used to repay such Managing Member Completion Loan before being applied for other purposes.

B.      All funds (collectively "Development Funds") constituting the proceeds of Permitted Loans and the Capital Contributions paid by or on behalf of the Company Investor Member, the Managing Member Equity and the Managing Member Completion Loan shall first be applied to enable the Company to acquire the Land then to pay when due all payments and expenses required to satisfy the Development Completion Obligation and then to pay the GP Costs or to reimburse the Managing Member therefor through a distribution of the Managing Member Equity. If Development Costs due at any time exceed available Development Funds, then such excess Development Costs shall be paid from funds which the Developer shall be required to furnish promptly to meet such Development Costs, and such funds shall be returned to the Developer from any Development Funds which thereafter become available. If Development Funds are not sufficient to return all funds to the Developer, then the shortfall shall be treated as a Deferred Development Cost Payment to the extent permitted pursuant to Section 6.11, and then as a Managing Member Completion Loan as provided in Section 6.9.A above.

Section 6.10  Operating Expense Obligation

If the Company incurs an Operating Deficit (determined after deferral of payment of the Base Management Fee required pursuant to Section 6.12.C) attributable to any time following Stabilized Occupancy and which cannot be met from funds available in the Operating Reserve, then such Operating Deficit shall be paid from advances ("Operating Deficit Loans") which the Managing Members shall be required to make to the Company, provided that (i) Operating Deficit Loans shall be made only to pay Operating Deficits attributable to the period (the "Operating Deficit Period") (1) commencing on the achievement of Stabilized Occupancy and (2) ending on the later of the fourth anniversary of Stabilized Occupancy or the last day of a period of four consecutive calendar quarters (which must be no earlier than the last four calendar quarters ending on or prior to such anniversary) during each of which the Project has maintained 120% Debt Service Coverage and economic occupancy in excess of 90%, and (ii) the Managing Members shall not be obligated to make an Operating Deficit Loan to the extent that such Operating Deficit Loan would cause the aggregate principal amount of Operating Deficit Loans then outstanding to exceed $649,456. Operating Deficit Loans shall not bear interest and shall be repayable only to the extent provided in Section 5.2A and 5.2B hereof.

Section 6.11  Development Services

A.      The Company has engaged the Developer, pursuant to a Development Fee Agreement dated effective as of October 23, 2006 (the "Development Agreement") to perform, or to engage and supervise others to perform services in connection with the negotiating, coordinating and supervising the planning, architectural, engineering and construction activities necessary to complete construction of the Property in accordance with the Plans and Specifications. To the extent of any conflict between this Agreement and the Development Agreement, the provisions of this Agreement shall control. The Company shall pay to the Developer the Development Services Fee of $1,891,313 in return for such services, which Development Services Fee shall be capitalized to the depreciable basis of the Property. The Development Services Fee shall be increased or decreased as permitted by the Credit Agency, provided, however, (i) the total Development Services Fee shall not exceed the amount permitted

33

by the State's qualified allocation plan, (ii) no portion of the Development Services Fee shall be based on costs incurred after Full Completion, and (iii) the final amount of the Development Services Fee shall be determined no later than the end of the first year of the Credit Period.  The Development Services Fee shall be earned as development of the Property progresses and shall be fully earned no later than Full Completion.  Notwithstanding the foregoing, however, in the event that, as of the last day of the first year of the credit period with respect to the first Building in the Property, the percentage of the aggregate basis of the land and buildings (including site improvements) of the Property funded from the tax-exempt bond proceeds of the Permanent Mortgage Loan would be less than 50% (as determined by the Accountants for purposes of Section 42(h)(4)(B) of the Code), the amount of the Development Services Fee set forth above shall be reduced to the extent necessary to assure that such percentage will be not less than 50% as of such date.

B.      The Development Services Fee forecasted to be paid from Development Funds in the Financial Forecast shall be paid no sooner than Stabilized Occupancy and after payment of all other Development Costs, to the extent Development Funds are available therefor.  Any unpaid Development Services Fee remaining after disbursement of all Development Funds shall be a deferred payment obligation of the Company (the "Deferred Development Cost Payment"), shall bear interest at a rate equal to the Long-Term Applicable Federal Rate in effect on the date that the amount of the Deferred Developer Cost Payment is determined, and shall be repaid only from cash flow set forth in 5.2 and shall be paid in full no later than the 13th anniversary of Full Completion.  In the event the Deferred Development Cost Payment is not paid in full by the 13th anniversary of Full Completion, the Managing Member shall make a Capital Contribution to the Company in the amount of the outstanding Deferred Development Cost Payment, and the Company shall pay such amount to the Developer to be applied to the Deferred Development Cost Payment.

Section 6.12  Property Management

A.      The Managing Members shall have overall responsibility for managing the Property and obtaining a Management Agent.  The Managing Members shall cause the Company, prior to commencement of operation of the Property, to enter into a Management Agreement with Allied Group, Inc., of Renton, Washington, to serve as the Management Agent.  The Management Agreement shall be terminable at any time on no more than 30 days notice by the Company for cause ( which shall include without limitation (a) the failure at any one time of two or more of the dwelling units in the Property to meet the requirements for a Low-Income Unit, (b) the existence at the Property of a building code violation which is not timely cured within 7 days, (c) the failure by the Management Agent to comply with any applicable compliance rule and/or reporting requirement under Section 42 of the Code which is not timely cured within 30 days, (d) the Management Agent's willful misconduct or gross negligence, (e) the occurrence of an Operating Deficit for any period of six consecutive months commencing on or after six months after Full Completion, (f) the Retirement of a Managing Member or the occurrence of an Event of Default as to a Managing Member as provided in Article VIII, (g) the transfer of the controlling interest in the Management Agent, or (h) the failure to collect, organize, and disseminate information necessary to produce timely reports as required under Section 7.4).  Upon the occurrence of an event which would constitute cause for termination, the Managing Members shall forthwith give notice of such event to the Investor Members and thereafter the Managing Members shall forthwith cause the Company to terminate the Management Agreement with the Management Agent, unless the Managing Members obtain the

34

Consent of the Special Investor Member to the retention of the Management Agent as the manager of the Property.  If the Management Agreement is terminated as aforesaid or for any other reason, the Managing Members shall immediately proceed to select a new Management Agent for the Property, which selection shall be subject to the Consent of the Special Investor Member.  Each Managing Member hereby grants to the Special Investor Member an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to take any action and to execute and deliver any and all documents and instruments on behalf of such Managing Member and the Company as the Special Investor Member may deem to be necessary or appropriate in order to effectuate the provisions of this Section 6.12.  Subject to Credit Agency and/or Lender approval, if required, the Company shall not enter into any future management arrangement or renew or extend any existing management arrangement unless such arrangement is terminable without penalty at will or upon the occurrence of the events described in this Section 6.12.

B.      The Company shall not enter into any Management Agreement which does not provide for payment of the Base Management Fees under the circumstances set forth in Section 6.12.C (or that provides for payment of a Base Management Fee in excess of the amounts permitted in this Agreement) or that does not provide for termination by the Company (a) at will or under the circumstances set forth in Section 6.12.A, (b) in the event of other malfeasance or nonperformance on the part of the Management Agent, or (c) upon the Retirement from the Company in violation of Section 8.1 of any Managing Member as to whom the Management Agent is an Affiliate.  Notwithstanding the foregoing, the Company shall not terminate any Management Agreement, whether for any of the specific reasons enumerated in this Section or for any other reason or for no reason, without the prior written Consent of the Special Investor Member.  The Managing Members shall have the duty to manage the Property during any period when there is no Management Agent, and shall be entitled to the Base Management Fee with respect to any period during which they so manage, and must comply with the provisions of this Agreement which would be applicable to the Management Agent.  During any period when there is no Management Agent and the Managing Members manage the Property with the Consent of the Special Investor Member, the Managing Members shall be entitled to the Base Management Fee.

C.      The Management Agent shall receive from the Company the Base Management Fee provided for in the Management Agreement from time to time in accordance with a reasonable and competitive fee arrangement (and in no event in excess of the amount permitted under the Property Documents), provided that the Base Management Fee payable to any Management Agent shall not exceed 4% of Operating Revenues.  Any Management Agent which is an Affiliate of a Managing Member shall be obligated to defer payment of its Base Management Fee to the extent necessary for any year so that the Company will not incur an Operating Deficit for such year, and the deferred amount shall then be payable in any future year as provided in Sections 5.2A, 5.2B and 6.9A.

D.      The Company shall pay to the Managing Members for their services in supervising and monitoring the performance of the Management Agent pursuant to the Management Agreement an annual Incentive Management Fee (which Fee shall be treated as a Company expense).  The Incentive Management Fee for each fiscal year shall be the amount available for payment thereof from Cash Flow pursuant to Section 5.2.A(2) up to a maximum which will not cause the total of the Base Management Fee plus the Compliance Fee plus the Company Management Fee plus the Incentive Management Fee for such year to exceed 12% of Operating Revenue for such year.

COLUMBUS/523644.6

Section 6.13 <u>Borrowings</u>

A.      All Company borrowings shall be subject to the terms of this Agreement, including the restrictions set forth in Section 6.1.  To the extent borrowings are permitted, such borrowings may be made from any source, including Members and Affiliates, except as otherwise provided in this Agreement.  No funds furnished to the Company by any Member shall be deemed to be a loan by such Member if such Member then owes funds to the Company under this Agreement, other than the Managing member Completion Loan, if any.  If any Member or Affiliate shall lend any monies to the Company, such loan shall be non-interest bearing, shall not be an increase of his Capital Contribution nor affect in any way his share of the profits, losses or distributions of the Company, and shall be unsecured.  Any loans which are made shall be on such other terms no less favorable to the Company than comparable loans from non-Affiliates.  A loan made by an Investor Member shall constitute a "Investor Member Loan"; a loan made by a Managing Member or an Affiliate of a Managing Member (other than an Operating Deficit Loan) shall constitute a "Managing Member Loan", except for the Managing Member Completion Loan as described in Section 6.9.  Investor and Managing Member Loans shall be repayable only as provided in Sections 5.2.A and 5.2.B.

B.      Subject to the provisions of this Agreement, the Company may borrow pursuant to the Permitted Loans such amounts as may be required for the acquisition, development, and construction of the Property and to meet the expenses of operating the Property.  Any other borrowings (excluding (a) normal trade payables outstanding in the ordinary course of business up to $25,000 and (b) borrowings to meet Company expenditures to remedy emergency circumstances up to $25,000) which are not contemplated by this Agreement and which are in excess of $10,000 in the aggregate must receive the Consent of the Special Investor Member.  Except as set forth in Construction Mortgage Loan, all Mortgages shall provide that no Member or Related Person of a Member of the Company shall bear the Economic Risk of Loss with respect to all or any part of principal or interest due with respect to the debt evidenced by such Mortgage.

C.      Each Managing Member shall be bound by the terms of the Property Documents and any other documents required in connection therewith, but in no event shall any Member or Related Person be personally liable for the debt evidenced by any Mortgage except to the extent permitted under Section 6.13.B, if any.  Any incoming Managing Member shall as a condition of receiving any interest in the Company property agree to be bound by the Property Documents and any other documents required by the Lenders in connection therewith to the same extent and on the same terms as the other Managing Member(s).

D.      The Managing Members may amend, modify or refinance a Mortgage (including any required transfer or conveyance of Company assets for security or mortgage purposes), and sell, lease, exchange or otherwise transfer or convey all or any substantial portion of the assets of the Company, <u>provided</u>, <u>however</u>, that the terms of any refinancing, amendment or modification of a Mortgage or any such sale, exchange or other transfer or conveyance must receive the Consent of the Special Investor Member before such transaction shall be binding on the Company.

E.      Subject to provisions of this Agreement with respect to related party loans, a limited partner or member – including without limitation the Federal Home Loan Mortgage Corporation – (such limited partner or member being referred to herein as a "Mortgagee") in any entity that is a Member at any time may make, guarantee, own acquire, or otherwise credit enhance, in whole or in part, a loan secured by a mortgage, deed of trust, trust deed, or other security instrument encumbering the Property (any such loan being referred to as a "Mortgage

36

Loan"). Under no circumstances will a Mortgagee be considered to be acting on behalf or as an agent or the alter ego of such Member. A Mortgagee may take any actions that the Mortgagee, in its discretion, determines to be advisable in connection with a Mortgage Loan (including in connection with the enforcement of a Mortgage Loan). By acquiring an interest in the Company, each Member acknowledges that no Mortgagee owes the Company or any Member any fiduciary duty or other duty or obligation whatsoever by virtue of such Mortgagee being a limited partner or member in a Member. Neither the Company nor any Member will make any claim against a Mortgagee, or against the Member in which the Mortgagee is a partner or member, relating to a Mortgage Loan and alleging any breach of any fiduciary duty, duty of care, or other duty whatsoever to the Company or to any Member based in any way upon the Mortgagee's status as a limited partner or member of a Member.

Section 6.14 <u>Reserves</u>

A.      Intentionally omitted.

B.      The Managing Members shall cause the Company to establish the Operating Reserve which shall be funded in the amount of $150,000 (the "Target Amount") from the proceeds of the Fourth Installment, any excess Development Funds remaining after payment of all Development Costs and any funds released from the Rent-Up Reserve. The Operating Reserve funds shall be maintained in an interest bearing account held at National City Bank (or an affiliate of National City Bank) in the name of the Company. All earnings shall remain in the Operating Reserve and be available for the purpose thereof. Withdrawals from the Operating Reserve shall be made with Consent of the Special Investor Member to fund Operating Deficits arising from and after the date on which the Operating Deficit Loan obligation set forth in Section 6.10 commences. If, at any of the following times, the balance in the Operating Reserve is then less than the Target Amount, the Operating Reserve shall be replenished from the specified source until such balance equals the Target Amount:

(a) from the proceeds of the Fifth Installment at the time such Installment is paid to the Company, and

(b) from Cash Flow, to the extent available for such purpose as provided in Section 5.2.A, at the close of each fiscal year.

Upon the expiration of the Operating Deficit Loan obligation set forth in Section 6.10, and if the Company and the Managing Members are not then in default under the Property Documents and this Agreement, then the Target Amount shall thereupon be reduced to $75,000 and any funds in the Operating Reserve in excess of the reduced Target Amount shall be applied as a distribution of Cash Flow in accordance with section 5.2A. The remaining balance in the Operating Reserve shall be applied as a distribution of Cash Flow in accordance with Section 5.2.A once the Project maintains a 125% Debt Service Coverage for four consecutive quarters after the expiration of the Operating Deficit Loan obligation set forth in Section 6.10. Upon the sale of the Property any balance in the Operating Reserve shall be disbursed as Capital Transaction Proceeds.

C.      The Managing Members shall cause the Company to establish the Replacement Reserve which shall be funded commencing with closing and funding of the Permanent Mortgage Loan from Operating Revenues at the rate of $250 (increased as of January 1 of each year thereafter by the then applicable CPI Adjustment) per apartment unit per year. The Replacement Reserve shall be inclusive of any reserve funding requirement set forth in the Permanent Mortgage Loan designated for capital repairs and replacements. Replacement Reserve funds (net of Replacement Reserves required and held by the Permanent Mortgage

37

Lender) shall be maintained in a Company account and shall be prudently invested at the direction of the Managing Members.  All earnings shall remain in the Replacement Reserve and be available for the purpose thereof.  Withdrawals from the Replacement Reserve shall be made with the Consent of the Special Investor Member to fund capital repairs and replacements for the Property.

ARTICLE VII -- <u>Books and Records, Accounting and Reports</u>

Section 7.1  <u>Books and Records</u>

The Managing Members shall keep or cause to be kept at the principal office of the Company complete and accurate books and records of the Company (including a list of the names and addresses of all Members) which shall be maintained in accordance with sound accounting practices, the Uniform Act and the requirements of the Lenders and the Credit Agency.  The Company may maintain such other books and records and may provide such other financial or other statements as the Managing Members deem advisable.  The Managing Members shall (and shall cause the Management Agent to): (i) afford to the Special Investor Member access to all of the books and records of the Company and the Property upon reasonable request during normal business hours; (ii) make available to the Special Investor Member upon reasonable request during normal business hours, the employees, agents and representatives of the Managing Members and the Management Agent for the purpose of responding to questions concerning the business and affairs of the Company and the Property and providing the Special Investor Member with reasonable physical access to the Property; and (iii) provide copies of documents and other information to the Special Investor Member.

Section 7.2  <u>Bank Accounts</u>

The bank accounts of the Company shall be maintained in such banking institutions as the Managing Members shall determine with the Consent of the Special Investor Member, and withdrawals shall be made only in the regular course of business on such signature or signatures, subject to the requirements of Section 8.6, as the Managing Members shall determine.  All deposits and other funds not needed in the operation of the business shall be deposited in interest-bearing accounts or invested in short-term United States Government or municipal obligations maturing within one year.

Section 7.3  <u>Fiscal Year and Accounting Method</u>

The fiscal year of the Company shall be the calendar year.  The books of the Company shall be kept on the accrual basis.

Section 7.4  <u>Annual Financial Statements, Tax Returns</u>

A.  The Managing Members shall cause the Accountants to prepare financial statements for each fiscal year of the Company, which shall include a balance sheet as of the end of each such year and statements of income, members' equity and cash flows for such year.  Such financial statements shall include a note setting forth a schedule of all loans to the Company, the Section of this Agreement under which such debt was incurred and the purpose for which such loan was applied by the Company.  Such schedule shall demonstrate that loans have been made, used, carried on the books of the Company (and repaid, if applicable) in accordance with the provisions of this Agreement.  In addition, such financial statements shall include a schedule computing the amount of Cash Flow distributable to the Members for such fiscal year and the amount of each fee payable by the Company the amount of which is based on the amount

38

of Cash Flow.  In addition, the financial statements of the Company for the fiscal year in which Full Completion occurs shall include a depreciation schedule for that year and all future years, along with the depreciation worksheet.  The books of the Company shall be examined in accordance with generally accepted auditing standards as of the end of each fiscal year of the Company by the Accountants, who shall then express their opinion that the aforesaid balance sheet and statements have been prepared in accordance with generally accepted accounting principles applied consistently with prior periods except as to any matters to which the Accountants take exception and stating, to the extent practicable, the effect of each such exception on such financial statements.  The Managing Members shall, promptly upon receipt of such balance sheet, statements and opinion and in any event by February 28 after the end of each fiscal year, transmit copies thereof to the Special Investor Member for its review (and review by any accounting firm designated by the Special Investor Member), and shall cause the Accountants to consider in good faith any modifications and corrections proposed by the Special Investor Member and make any revisions thereto which are reasonably appropriate.

B.     The Accountants shall prepare the Federal and state (if applicable) income tax returns of the Company.  The Managing Members shall complete the books of the Company in such time as will allow the Accountants to complete (subject to the following review by the Special Investor Member) such tax returns by February 28 after the end of such fiscal year.  The Managing Members shall cause the Accountants to (1) submit the completed tax returns on or before February 28 to the Special Investor Member for its review (and review by an accounting firm designated by the Special Investor Member), (2) consider in good faith any modifications and corrections proposed by the Special Investor Member within 10 days after receipt by the Special Investor Member of the tax returns and make any revisions thereto which are reasonably appropriate, (3) file such tax returns by March 15 (and in any event within the time periods required by law), and (4) immediately upon the filing thereof transmit to the Investor Members a copy of each of the Federal and state income tax returns, Federal Form K-1 and the appropriate state analogs to Form K-1.

C.     Together with the financial statements to be delivered pursuant to Section 7.4.A, the Managing Members shall send to the Special Investor Member comparable financial statements (including a balance sheet and statement of income) for each Managing Member and Guarantor relating to the same period which need not be audited.

Section 7.5  <u>Other Financial Statements, Reports and Information</u>

A.     Within 21 days following the end of each of the first three quarters of each fiscal year after the Completion Date, the Managing Members shall send to the Special Investor Member one or more reports which, taken together, provide the following information (which need not be audited):  (i) a balance sheet as of the end of such quarter; (ii) a statement of income for such quarter; (iii) a statement of available cash from all operating accounts and reserve accounts at the end of such quarter; (iv) a statement describing (a) any new agreement, contract or arrangement between the Company and a Managing Member or an Affiliate of a Managing Member, and (b) the amount of all fees and other compensation and distributions and reimbursed expenses paid by the Company for the quarter to any Managing Member or Affiliate of a Managing Member, (v) a summary report providing year-to-date operating income and expense detail, together with corresponding year-to-date budgeted projections, and (vi) a report of the significant activities of the Company during the fiscal quarter.

B.     The Managing Members shall cause the Management Agent to furnish to the Special Investor Member, in such form and detail as reasonably requested by the Special Investor Member and within 21 days after the end of each month of each fiscal year, (1) a

monthly general ledger related to the Property's operating income and expense detail, (2) a rent roll for the Property specifically identifying all new tenants, all changes in tenant status and any units that are not rented in compliance with the Rent Restrictions as of the end of the preceding period, and (3) a summary operating statement for the preceding month.  The Managing Members shall cause the Management Agent to (a) respond promptly to reasonable additional inquiry or review by the Special Investor Member with respect to any transactions which appear unusual or extraordinary in nature, and (b) notify the Managing Members and the Special Investor Members promptly upon the occurrence of any change in the individual(s) who (i) control the business of the Management Agent or (ii) have decision-making responsibility with respect to the operation of the Property.

C.      The Managing Members shall provide the Special Investor Member with (i) a copy of each draw request for construction or development costs as such requests are made to the Lender; (ii) a copy of each inspection report, evaluation or similar report issued to the Company by the Credit Agency or the Lender promptly upon receipt thereof; (iii) a copy of each Low Income Housing Credit compliance report delivered to or prepared by the Credit Agency with respect to the Property; (iv) prompt notice of any casualty or other significant adverse event relating to the Company and (v) such other information as the Special Investor Member may specifically and reasonably request from time to time with regard to the progress of construction, initial lease-up or any other matters concerning the business or operations of the Company and the financial and physical condition of the Property.

D.      An annual operating budget for each full calendar year after Full Completion shall be prepared by the Managing Members and furnished to the Special Investor Member no later than 45 days prior to the beginning of such calendar year.  In addition, the Managing Members shall prepare at the expense of the Company and furnish to the Special Investor Member an estimate of the profits and losses of the Company for Federal income tax purposes for the current fiscal year not later than September 30 of each year.

E.      The Managing Members shall forward annually to the Special Investor Member renewal policies for the insurance required to be maintained pursuant to Section 6.5.B.

F.      Prior to commencement of lease-up of the Property, the Managing Members shall cause the Management Agent to submit to the Special Investor Member for review and comment all of the forms and written policies, practices and procedures to be used by the Management Agent in the leasing and management of the Property, and to make such modifications in such forms and written policies, practices and procedures as may be reasonable in order to assure effective compliance with the Property Documents, applicable laws and regulations and accepted property management practices with respect to apartment properties generating Low Income Housing Credits, and shall cause the Management Agent to submit all proposed additions or modifications of such forms and written policies, practices and procedures to the Special Investor Member for such review, comment and revision.

G.      The Managing Members will cause the Management Agent to: (i) notify the Special Investor Member of each audit of, review of, or site visit to the Property by or on behalf of the Credit Agency, and provide the Special Investor Member with copies of any written report or correspondence from the Credit Agency with respect to any such audit, visit or review; and (ii) provide the Special Investor Member with copies of all reports, or correspondence submitted by or with respect to the Company to the Credit Agency.

40

H.      The Managing Members shall notify the Special Investor Member of any event that constitutes, or with lapse of time, notice or both will constitute, an event of default by the Company with respect to any component of the Permitted Loans.

I.      The Managing Members shall keep the Special Investor Member informed concerning the general state of the business and financial condition of the Company and shall, upon reasonable request of the Special Investor Member, furnish full information, accounts and documentation concerning the general state of the business and financial condition of the Company.

J.      Except as otherwise expressly provided for in this Agreement, the fees, costs and expenses related to preparation of the statements, returns, forms and reports and the performance of any other duties called for in this Article VII by the Company, the Managing Members and/or the Accountants shall be an expense of the Company.

K.      If the Managing Members fail, within the time periods set forth in Sections 7.4.A, 7.4.B and 7.5.A, to file and/or distribute copies of the statements, returns, forms and reports provided for in said Sections (a "Reporting Default"), the Managing Members shall, upon the request of the Special Investor Member and assuming that no Investor Member has caused such delay, pay as damages the sum of $100 per day to the Company Investor Member until the item in question has been filed and/or distributed.  Such damages shall be paid forthwith by the Managing Members and failure to so pay shall constitute a default of the Managing Members under Section 8.6 hereof.  In addition, if the Managing Members fail to so pay, the Managing Members and their Affiliates shall forthwith cease to be entitled to the amounts otherwise payable to them pursuant to Section 5.2.A.  Such Section 5.2.A payments shall accrue but only be paid upon the payment of such damages in full and any amount of such damages not so paid shall be deducted against such Section 5.2.A payments otherwise due to the Managing Members or their Affiliates.  In addition, if a Reporting Default shall occur, the Special Investor Member may select a firm of accountants who shall prepare the statements, returns, forms and reports required under Sections 7.4.A, 7.4.B and 7.5.A, and the fees and expenses of such accountants shall be paid by the Managing Members.  The Managing Members shall immediately furnish to such accountants all documentation and other information necessary to prepare such statements, returns, forms and reports.

Section 7.6   Site Visits

The Managing Members shall cooperate with and assist (and shall cause the Management Agent to so cooperate with and assist) the Special Investor Member in making periodic site visits to the Property and the principal office of the Company, during which the Managing Members and the Management Agent shall make available to the Special Investor Member: (i) the site and all buildings comprising the Property for physical inspection; (ii) all relevant construction documents including building inspection reports, evidence of utility availability, evidence of zoning compliance and as built Plans and Specifications; (iii) the maintenance and repair records for the Property; (iv) the Property's rent rolls, waiting list, advertising materials, standard lease and tenant qualification documentation and management practices and procedures; (v) the incident report files with respect to the Property; and (vi) the resident manager for the Property and the Management Agent's supervisor with respect to the Property for purposes of answering questions and providing additional information.  Such site visits shall occur within three days following written notice by the Special Investor Member to the Managing Members; the Special Investor Member expects to make an initial site visit within 45 days after Full Completion and thereafter on an annual basis, but shall have the right to make more frequent site visits in its reasonable discretion.

Section 7.7   <u>Tenant File Review</u>

A.      The Managing Members shall cooperate with and assist (and shall cause the Management Agent to so cooperate with and assist) the Special Investor Member in making periodic reviews of the Company's tenant files for the purpose of assessing compliance with respect to the Property's leasing practices under the Code and the requirements of the Credit Agency.  During each review the Managing Members and the Management Agent shall make available to the Special Investor Member (either at the office of the Management Agent during regular business hours or, if so requested by the Special Investor Member, by sending photocopies to the Special Investor Member) all tenant files and leasing practices and procedures of the Property.  Such reviews (or sending of photocopies) shall occur within three days following written notice by the Special Investor Member to the Managing Members; the Special Investor Member expects to make reviews periodically during initial lease up of the Property and thereafter on an annual basis, but shall have the right to make more frequent reviews in its reasonable discretion.  Neither the making of such reviews nor the existence of the right to make such reviews shall relieve the Managing Members of their sole obligation (or constitute a defense against breach of such obligation) to maintain the Property in compliance with all rules and requirements under the Code and of the Credit Agency.  The Managing Members shall cause the Management Agent to cure all deficiencies in tenant files or practices and procedures identified by the Special Investor Member as a result of such reviews.

B.      After closing and no later than 30 days prior to the beginning of the month initial Low Income Housing Credit delivery is anticipated, the Managing Member is required to furnish copies tenant files for all units including all income verification documentation and executed leases, and leasing practices and procedures for the Property to the Special Investor Member (acting itself or through  its designated compliance consultant).  Upon the receipt of all tenant files required hereunder, the Special Investor Member shall have 30 days to complete its review. The Managing Members shall cooperate with and assist (and shall cause the Management Agent to so cooperate with and assist) in the conduct of each initial tenant file review, and shall cause the Management Agent to promptly cure any deficiencies in tenant files or practices and procedures identified during the initial tenant file review.  The out-of-pocket costs incurred by the Special Investor Member (including without limitation reasonable fees paid to an accounting or consulting firm designated by the Special Investor Member as aforesaid) shall be paid by the Special Investor Member.  Neither the making of such reviews nor the existence of the right to make such reviews shall relieve the Managing Members of their sole obligation (or constitute a defense against breach of such obligation) to maintain the Property in compliance with all rules and requirements under the Code and of the Credit Agency.

Section 7.8   <u>Tax Elections</u>

A.      If requested to do so by the transferee of a Company interest, the Managing Members shall make the election under Section 754 of the Code, on behalf of the Company, at such time and in such manner as to obtain all the benefits provided for by such Section; provided that the transferee will pay all costs associated therewith and neither the Company nor the Managing Members shall be held responsible or liable for the failure to make such elections if the Managing Members are not given notice of the event giving rise to an adjustment for which such election is needed at or prior to the close of the fiscal year during which the event occurs.

B.      All other elections required or permitted to be made by the Company under the Code shall be made by the Managing Members in such manner as will, in the opinion of the

42

Accountants and the Special Investor Member, be most advantageous to the Company Investor Member but shall not create additional obligations on the part of the Managing Members.

Section 7.9   Asset Manager, Asset Management Fee and Reimbursement

A.      The Special Investor Member shall have the right from time to time to appoint its Affiliate (and from time to time to substitute another Affiliate) to exercise on its behalf any or all of the rights and to perform any or all of its functions of either or both of the Investor Members under this Agreement (such appointee is herein referred to as the "Asset Manager"), and all rights, authority and Consents of any Investor Member hereunder, when exercised by the Asset Manager, shall have the same force and effect as if exercised by such Investor Member. Pursuant to the foregoing, the Special Investor Member hereby appoints Red Capital Markets, Inc. to be the Asset Manager, and the Managing Members hereby recognize such appointment. The Investor Members (and the Asset Manager) shall have the right to engage lawyers, accountants, appraisers and consultants to assist in the performance of their functions under this Agreement, and the Managing Members and the Management Agent shall cooperate with and assist such lawyers, accountants, appraisers and consultants in the performance of their respective engagements.

B.      The Company shall pay to the Asset Manager (or to such other party as the Special Investor Member may designate if no Asset Manager has been appointed) the Asset Management Fee for reviewing the reports provided for in this Article VII, otherwise monitoring the affairs of the Company and the Property and making appropriate studies with respect to Consents which may be requested from it.  The Asset Management Fee shall be in the amount of $8,500 (increased as of January 1 of each year, commencing January 1, 2008, by the then applicable CPI Adjustment) per annum from and after the Admission Date, shall be due and payable prior to the end of each calendar quarter from (i) Development Sources, (ii) to the extent cash is available as provided in Section 5.2.A or (iii) from the proceeds of an Operating Deficit Loan.  All accrued but unpaid Asset Management Fees shall be paid at the time of a Capital Transaction to the extent cash is available as provided in Section 5.2.B.  The first quarterly payment due will be prorated based on the month the First Installment occurs.

C.      The Company shall reimburse the Asset Manager (or such other party as the Special Investor Member may designate if no Asset Manager has been appointed) for all reasonable out-of-pocket expenses incurred in connection with the performance of its duties or the exercise of its rights under this Agreement, including legal, accounting and other professional fees and expenses and travel expenses; provided, however, that no reimbursement shall be paid for:

(1)      the ordinary fees and expenses of accountants engaged by the Asset Manager with respect to the review of the audit of the annual financial statements provided for under Section 7.4.A;

(2)      the ordinary fees and expenses of accountants engaged by the Asset Manager in connection with the review of tenant files as provided for in Section 7.7 or the review of forms, practices and procedures provided for in Section 7.5.I;

(3)      the ordinary fees and expenses of the Asset Manager in connection with the site visits provided for in Section 7.6;

43

(4)     any fees or expenses incurred by the Asset Manager in connection with the preparation and distribution of reports or other communications to the Company Investor Member or the partners or members thereof; and

(5)     any salary or other overhead expense incurred in connection with the ongoing performance of normal review functions under this Agreement.

By way of example and without limitation, however, the Asset Manager shall be entitled to reimbursement for reasonable fees and expenses incurred by it, acting in good faith, in connection with the review, investigation and resolution of any event or circumstance which may constitute an irregularity or breach of this Agreement in connection with the Company or the Property, including any grounds for removal of the Managing Members under the Operating Agreement or the Management Agent under the Operating Agreement or Management Agreement, any event that constitutes, or may with the lapse of time, notice or both, constitute an event of default with respect to any component of the Permitted Loans, any potential breach or noncompliance with any requirements pertaining to the Low Income Housing Credit, any potential mismanagement of the Property, any proposed refinancing of any component of the Permitted Loans, or any proposed sale or other disposition of the Property.

44

Section 7.10 <u>General Contractor</u>.

The General Contractor and the Company have entered into the Construction Contract. In no event shall a future modification, revision or amendment to the Construction Contract be effective without the Consent of the Special Investor Member.  The Construction Contract shall be terminable at any time on no more than 30 days' notice by the Company for cause (which shall include, without limitation (a) the failure to obtain 50% Completion of Construction by December 31, 2006, (b) the failure to obtain 75% Completion of Construction by April 1, 2007, (c) the Retirement of a Managing Member or the occurrence of an Event of Default as to a Managing Member as provided in Article VIII, or (d) the transfer of the controlling interest in the General Contractor.  Upon the occurrence of an event which would constitute cause for termination, the Managing Members shall forthwith give notice of such event to the Investor Members and thereafter the Managing Members shall forthwith cause the Company to terminate the Construction Contract with the General Contractor, unless the Managing Members obtain the Consent of the Special Investor Member to the retention of the General Contractor as the contractor of the Property.  If the Construction Contract is terminated as aforesaid or for any other reason, the Managing Members shall immediately proceed to select a new general contractor for the Property, which selection shall be subject to the Consent of the Special Investor Member.  Each Managing Member hereby grants to the Special Investor Member an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to take any action and to execute and deliver any and all documents and instruments on behalf of such Managing Members and the Company as the Special Investor Member may deem to be necessary or appropriate in order to effectuate the provisions of this Section 7.10.  Subject to Credit Agency and Lender approval, if required, the Company shall not enter into any future Construction Contract or review or extend any existing Construction Contract unless such Construction Contract is terminable without penalty upon the occurrence of the events described in this Section 7.10.

<u>ARTICLE VIII</u> -- <u>Retirement of a Managing Member</u>

Section 8.1  <u>Retirement</u>

A.      No Managing Member shall Retire (other than by reason of death or adjudication of incompetence or insanity) from the Company or sell, assign, transfer or encumber his interest as a Managing Member without the Consent of the Special Investor Member.  In the event of a Retirement of a Managing Member his status and the disposition of his interest in the Company shall be determined in accordance with Section 8.4.  In no event shall any Managing Member assign, transfer or sell all or any part of his interest as a Managing Member to any Entity which is a tax-exempt entity as defined in Section 168(h)(2) of the Code.

B.      Upon the Retirement of any of the Managing Members named on the Schedule under circumstances which are in violation of the provisions of Section 8.1, then, at the election of the Special Investor Member exercised at any time thereafter, any or all of the other Managing Members shall also Retire from the Company as Managing Members, and such Retirement shall be deemed to be in violation of Section 8.1 and shall be subject to the consequences thereof as provided in Section 8.4.A.

Section 8.2  <u>Obligation to Continue</u>

Upon the Retirement of a Managing Member, any remaining Managing Member or Managing Members, if any, or, if none, the Retired Managing Member or his heirs, successors or

assigns, shall immediately send notice of such Retirement (the "Retirement Notice") to each Investor Member, and the Company shall be (i) dissolved if there is no remaining Managing Member and the Company is not reconstituted pursuant to Section 8.3 hereof, or (ii) continued by the remaining Managing Member(s) as provided in the sentence next following.  The Managing Members shall have the right, and hereby covenant and agree to, unless there is no remaining Managing Member, to elect to continue the business of the Company.

Section 8.3   <u>Retirement of a Sole Managing Member</u>

If, following the Retirement of a Managing Member, there is no remaining Managing Member of the Company, or if there are remaining Managing Members but they shall fail to elect to continue the business of the Company, then the Special Investor Member may designate a Person (which Person may be the Special Investor Member) to become a successor Managing Member of the Company as reconstituted as hereinafter provided.

Section 8.4   <u>Interest of Retired Managing Member</u>

A.      Each Managing Member hereby agrees that at the time of his Retirement if such Retirement is in violation of the provisions of Section 8.1, (a) the Retired Managing Member and all Members who are Affiliates of the Retired Managing Member shall be immediately and automatically withdrawn from the Company and the interest in the Company of the Retired Managing Member and such Affiliates shall be automatically transferred and be deemed transferred to the Company for the benefit of the remaining Members, (b) the right of the Retired Managing Member and such Affiliates to receive all fees, loan repayments and any other amounts from the Company shall terminate and (c) the Retired Managing Member and such Affiliates shall remain liable for the performance of all of their obligations under this Agreement. For the purposes of Article V hereof, the effective date of the aforesaid transfers shall be deemed to be the date on which such Retirement occurs.

B.      In the event that a Managing Member shall Retire as a Managing Member under circumstances not in violation of Section 8.1, such Retired Managing Member shall be deemed to have automatically transferred to the remaining or successor Managing Members, in proportion to their respective Managing Member interests, all or such portion of the interest of such Retired Managing Member in each of the profits, losses and distributions of the Company (as set forth in Article V hereof) which, when aggregated with the existing Managing Member interests of all such remaining and successor Managing Members, will be sufficient to assure such remaining and successor Managing Members an aggregate 0.01% interest in all such profits, losses and distributions of Cash Flow and Capital Transactions proceeds of the Company under Article V hereof.  No documentation shall be necessary to effectuate such transfer and the same shall be deemed effective upon the Retirement of such Retired Managing Member.  The Retiring Managing Member shall retain the right to be paid all fees, loan repayments and other amounts from the Company which have become due at the time of such Retirement, and shall not be liable for any obligations of the Company arising after the date of his Retirement.  Those Persons succeeding to the portion of the interest of the Retired Managing Member not so transferred to the remaining and successor Managing Members shall become Investor Members hereunder provided that such Persons shall not participate in any of the votes or Consents of the Investor Members set forth herein nor share in any of the profits, losses or distributions of the Company expressly accorded to the Investor Members under Article V, but shall have instead the same share of such Company profits, losses and distributions represented by such interest when held by the Retired Managing Member after the transfer called for in the first sentence of this Section 8.4.B.  Notwithstanding the foregoing, however, all Company interests and all fees, loan payments and other amounts payable which are reserved to the Retired Managing Member and

46

his successors pursuant to this Section 8.4.B shall be subject to offset by any amounts and Company interests which the Company must pay or assign to a competent professional real estate developer/manager to induce it to become a Managing Member in replacement of the Retired Managing Member and to carry out the purposes of the Company and assume the Managing Member obligations hereunder.

Section 8.5   Designation of New Managing Members

Any incoming Managing Member (other than a Managing Member admitted pursuant to Section 8.6) shall as a condition of receiving any interest in the Company agree to be bound by the Mortgages, all other Property Documents, and any other documents required in connection therewith and by the provisions of this Agreement, to the same extent and on the same terms as any other then Managing Member(s).

Section 8.6   Additional and Substitute Managing Members

A.      Upon the occurrence of any one or more of the Events of Default set forth in Section 8.6.B below, the Special Investor Member shall have the right to cause itself or its Affiliate to be admitted to the Company as an additional Managing Member as provided in Section 8.6.C, and/or to remove the Managing Members as provided in Section 8.6.D.  Each of the Members hereby makes, constitutes, and appoints the Special Investor Member, with full power of substitution, the true and lawful attorney of, and in the name, place and stead of, such Member, with power from time to time to take all action and do all things necessary or appropriate to implement and carry out the provisions of this Section 8.6.  Such appointment shall constitute a power coupled with an interest, shall be irrevocable, shall survive the death, incompetence or dissolution of any Member and shall be binding on any assignee of all or any portion of the interest of any Member.

B.      The following shall each be an "Event of Default":

(1)      A Managing Member or any Affiliate of such Managing Member (including if applicable the Management Agent) has in connection with the Company or the Property, performed an act or failed to perform any act constituting fraud, willful misconduct, gross negligence, violation of law, breach of fiduciary duty, misappropriation or commingling of funds, dishonesty or misrepresentation or non-disclosure of material facts.

(2)      A Managing Member has materially breached any written representation or warranty made to the Investor Members.

(3)      Failure of a Managing Member to observe or perform any material obligation or covenant to be observed or performed under this Agreement by such Managing Member (including without limitation the failure to provide on a timely basis any of the financial statements, tax returns, reports and other items set forth in Section 7.4).

(4)      The Company shall be in material default of any of its obligations under the Property Documents, which default, in the reasonable judgment of the Special Investor Member, threatens an assignment or foreclosure of any Mortgage.

47

(5)     The Managing Members fail to enforce the material terms and conditions of the Management Agreement or to supervise the performance by the Management Agent of its duties thereunder.

(6)     At any one time five percent or more of the dwelling units in the Property shall not be in compliance with Section 42 of the Code.

(7)     An Event of Bankruptcy shall occur with respect to a Managing Member, the Developer, or a Guarantor, or a Guarantor shall be in default under its guaranty of the obligations of the Managing Members entered into of even date herewith.

(8)     Failure by the Company to attain either: (a) 50% Completion of Construction by April 1, 2007, or (b) 75% Completion of Construction by July 1, 2007.

Any dispute or controversy as to whether any of the Events of Default has occurred, or whether such event has been cured or is susceptible of being cured within any grace period specified, shall be initially determined solely by the Special Investor Member, whereupon the Special Investor Member may exercise its rights set forth in this Section 8.6.  However, such determination shall be subject to review in a judicial proceeding brought by either the Managing Members or the Special Investor Member in a federal district court of general jurisdiction sitting in Tacoma, Washington.  Any judicial findings which are contrary to the determination of the Special Investor Member shall not retroactively impair or otherwise affect the rights and authority of the Special Investor Member hereunder prior to the issuance of such findings.  However, the Special Investor Member shall indemnify and hold harmless the Managing Members for all claims, damages, loss and expense arising from its actions as a Managing Member pursuant to this Section 8.6 prior to such judicial review if such review shall conclude that an Event of Default did not in fact occur.  Each of the parties shall bear its own expense of litigation.

C.     If the Special Investor Member elects to admit itself or its Affiliate as an additional Managing Member, such admission shall occur automatically and without further action by any Member upon the giving of notice thereof by the Special Investor Member to the Members, and each of the Members hereby agrees and consents in advance to the foregoing admission.  Upon the occurrence of such admission, any delegation of authority agreed to between the Managing Members in accordance with Section 6.4.B hereof (whether expressly set forth in this Agreement or otherwise) shall be canceled and of no further force and effect, and instead all of the other Managing Members shall be deemed to have delegated, automatically and without the requirement of a writing or any other action other than as set forth above, all their powers and authority (including, without limitation, all right to deposit to, withdraw from and otherwise control all Company bank accounts) to the Special Investor Member in its capacity as an additional Managing Member as set forth in Section 6.4.B.  Notwithstanding its admission to the Company, said additional Managing Member shall not undertake or assume, or be deemed to have undertaken or assumed, any obligations or liabilities imposed on the Managing Members pursuant to this Agreement or which arise in any other manner with respect to the Company or the Members.  Each Member agrees that the Special Investor Member or any Person it causes to be admitted as a Managing Member pursuant to this Section 8.6 may withdraw as a Managing Member without the consent of any other Member.

D.     If the Special Investor Member shall elect to remove one or more of the Managing Members, then such removal shall occur automatically and without further action by any Member upon the giving of notice thereof by the Special Investor Member to the Members.  Upon such removal, (1) the removed Managing Member shall have the obligation to sell his

48

Company interest to the Special Investor Member upon payment of the amount of the removed Managing Member's Capital Account less any and all damages suffered by the Company relating to the Event of Default and less any amounts which must be paid by the Company to induce a competent professional real estate developer/manager to become a Managing Member and carry out the purposes of the Company and assume the Managing Member obligations hereunder; (2) the removed Member's right, if any, to be paid all fees, repayments of loans and other payments by the Company shall terminate; (3) any delegation of authority agreed to between the removed Managing Member in accordance with Section 6.4.B hereof (whether expressly set forth in this Agreement or otherwise) shall be canceled and of no further force and effect; and (4) the removed Managing Member shall remain liable for all obligations to the Company arising before and after the effective date of such Member's removal.  The remedies specified in this paragraph shall not apply if a court determines that an Event of Default did not in fact occur.

Section 8.7  Amendment of Certificate

Upon the admission of an additional or replacement Managing Member, the Schedule shall be amended to reflect such admission and an amendment to the Articles of Organization, also reflecting such admission, shall be filed in accordance with the Uniform Act.

ARTICLE IX – Investor Member Transfers

Section 9.1  Assignments

A.      Each Investor Member shall have the right to assign all or any portion of its Interest without the consent of any other Member.  An assignee of an Investor Member who does not become a Substitute Investor Member in accordance with Section 9.2 shall have the right to receive the same share of profits, losses, credits and distributions of the Company to which the assigning Investor Member would have been entitled if no such assignment had been made by such Investor Member.

B.      In the event any assignment of an Investor Member's interest as an Investor Member shall be made, there shall be filed with the Company (and the Company need not recognize such assignment until such filing) a duly executed and acknowledged counterpart of the instrument making such assignment.  Such instrument must evidence the written acceptance of the assignee to all the terms and provisions hereof.

C.      Notwithstanding the foregoing, the obligations of any assigning Investor Member to pay Installments to the Company shall be extinguished only by and to the extent of the aggregate amount of Installments paid to the Company by such assigning Investor Member or on its behalf by its assignee.

D.      The Managing Members, at the sole expense of the assigning Investor Member, shall cooperate in good faith to effect such assignment as expeditiously as possible, including without limitation, the execution and delivery of appropriate amendments to, or updates of, the Agreement, the Managing Member Closing Certificate, Guaranty of Managing Member Obligations and any other documents which the assigning Investor Member reasonably determines necessary or appropriate to accomplish such assignment, including, but not limited to, an updated legal opinion of Company Counsel; updated title insurance documentation with "date down" endorsement; authorizing resolutions of the Managing Members and Developer and

49

any other documents reasonably deemed necessary and appropriate by the Company Investor Member.

Section 9.2   <u>Substitute Investor Members</u>

A.      Each Investor Member shall have the right to substitute an assignee as an Investor Member in its place.  Any Substitute Investor Member shall, as a condition of receiving any interest in the Company assets, agree to be bound to the extent required under Section 3.6.B.

B.      Upon the admission of a Substitute Investor Member, the Schedule shall be amended to reflect the name and address of such Substitute Investor Member and to eliminate the name and address of the assigning Investor Member, and, if required under the Uniform Act, an amendment to the Articles of Organization of the Company reflecting such admission shall be filed in accordance with the Uniform Act.  Each Substitute Investor Member shall execute such instrument or instruments as shall be required by the Managing Members to signify its agreement to be bound by all the provisions hereof, and shall pay reasonable legal and filing expenses in connection with its substitution as an Investor Member.

Section 9.3   <u>Restrictions</u>

A.      In no event shall all or any part of an Investor Member interest in the Company be assigned or transferred to a minor (other than to a member of an Investor Member's Immediate Family by reason of death) or to an incompetent.

B.      Any sale, exchange, transfer or other disposition in contravention of any of the provisions of this Section 9.3 shall be void and ineffectual and shall not bind or be recognized by the Company.

Section 9.4   <u>Other Investor Members</u>

The Special Investor Member shall have the right at any time and from time to time to substitute in its place as Special Investor Member any Person which (a) controls the Special Investor Member, (b) is owned in substantial part by the Special Investor Member or (c) is controlled by the Person controlling the Special Investor Member.  Each Member hereby consents to such substitution(s) if and when it occurs, and agrees that the substitute Special Investor Member shall have all the rights, benefits and duties set out in this Agreement for the Special Investor Member.


<u>ARTICLE X</u> -- <u>General Provisions</u>

Section 10.1   <u>Amendments to Certificate</u>

Within 120 days after the end of any fiscal year in which the Investor Members shall have received any distributions under Article V hereof, the Managing Members shall file if required under the law of the State and elsewhere as the Managing Members deem appropriate or required an amendment to the Articles of Organization reducing by the amount of his allocable share of such distribution the amount of Capital Contribution of each Investor Member as stated in the last previous amendment to the Articles of Organization.  Nothing in this Section 10.1 shall authorize, however, any change in the Schedule.

Section 10.2   Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given (i) four business days after being deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) two business days after being deposited with Federal Express or similar overnight delivery service, (iii) on the business day after the day of transmission by telecopier or other facsimile transmission, or (iv) on the business day following delivery personally, in each case to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Company:

(i)       If to the Company, at the principal office of the Company set forth in Section 2.2, and

(ii)      if to a Member, at that Member's address set forth in the Schedule,

in each case with copies to:

(iii)     The Special Investor Member, SCDC, LLC, c/o Red Capital Markets, Inc., 150 East Gay Street, 22nd Floor, Columbus, OH 43215 (Attention:  Tax Credit Asset Management);

(iv)     Michael D. Saad, Esq., Squire, Sanders & Dempsey L.L.P., 1300 Huntington Center, 41 S. High St., Columbus, Ohio 43215; and

(v)      Jeffrey C. Nave, Esq., Foster Pepper PLLC, 422 West Riverside Avenue, Suite 1310, Spokane, Washington 99201-0302.

Section 10.3   Word Meanings

The words such as "herein," "hereinbefore," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.  For purposes of this Agreement, the definition of "material" and all determinations of whether or not an act constitutes "gross negligence" or "willful misconduct" or whether or not a violation has a "material adverse effect" shall be made by the Special Investor Member, and all such determinations so made shall be final (subject to judicial review thereof).

Section 10.4   Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assigns of the respective parties hereto.

Section 10.5   Applicable Law

This Agreement shall be construed and enforced in accordance with the laws of the State.

COLUMBUS/523644.6

Section 10.6  <u>Counterparts</u>

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

Section 10.7  <u>Separability of Provisions</u>

Each provision of this Agreement shall be considered separable and (a) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (b) if for any reason any provision or provisions herein would cause the Investor Members to be bound by the obligations of the Company under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

Section 10.8  <u>Paragraph Titles</u>

Paragraph titles are for descriptive purposes only and shall not control or alter the meaning of the Agreement as set forth in the text.

Section 10.9  <u>Amendments</u>

Except as otherwise provided in Section 5.4.H, this Agreement may not be amended or modified except by a written instrument signed by all of the Members.

Section 10.10  <u>Time of Admission</u>

Each Investor Member shall be deemed to have been admitted to the Company as of the first day of the month during which its actual admission occurs for all purposes of this Agreement including Article V.

<u>ARTICLE XI</u> -- <u>Defined Terms</u>

Certain capitalized terms used in this Agreement shall have the meanings specified below:

"<u>Accountants</u>" means shall be Favors Rettig, CPA's, or such other certified public accountants as shall be engaged by the Managing Members with the Consent of the Special Investor Member.

"<u>Adjustment Amount</u>" has the meaning set forth in Section 4.2.

"<u>Admission Date</u>" means the date on which this Agreement shall have been fully executed by, delivered among and become binding on all of the Members which date may occur after the deemed admission date specified in Section 10.10.

"<u>Affiliate</u>" means, as to any named Person or Persons (or as to every Managing Member if no Person is specifically named): (1) such Person; (2) member of the Immediate Family of such Person; (3) legal representative, successor or assignee of any Person referred to in the preceding clauses (1) or (2); (4) trustee of a trust for the benefit of any Person referred to in the preceding clauses (1) or (2); or (5) any other Person (a) who directly or indirectly controls, is

52

controlled by, or is under common control with such Person, (b) who owns or controls 10% or more of the outstanding voting interests of such Person, (c) of which 10% or more of the outstanding voting interests is owned by such Person or any of the Persons referred to in the foregoing clauses (1) through (3); (d) who is an officer, director, partner or trustee of such Person, or (e) for which such Person acts in the capacity of officer, director, partner or trustee.

"<u>Agreement</u>" means this Amended and Restated Operating Agreement as it may be amended from time to time.

"<u>Annual Reported Credit</u>" has the meaning set forth in Section 4.2.A.

"<u>Articles of Organization</u>" means the company's certificate of formation filed pursuant to RCW 25.15.070, as the same may be amended, supplemented, restated and revised from time to time.

"<u>Asset Manager</u>" means the party appointed by the Special Investor Member to exercise certain rights and perform certain functions on behalf of the Investor Members pursuant to Section 7.9.A.

"<u>Asset Management Fee</u>" means the fee payable to the Asset Manager by the Company pursuant to Section 7.9.B.  In the case of any provisions of this Agreement which relate to the payment of the Asset Management Fee, the term "Asset Management Fee" shall be deemed to include the reimbursements payable pursuant to Section 7.9.C.

"<u>Base Management Fee</u>" means the amount payable from time to time by the Company to the Management Agent (or to the Managing Members if there shall be no Management Agent serving hereunder) on an annual basis for management services in accordance with the Management Agreement, as referred to in Section 6.12.C.

"<u>Basis Certification</u>" means (a) the receipt by each Investor Member of the written certification of the Accountants, in a form and in substance satisfactory to the Special Investor Member, as to the itemized amounts of the construction and development costs of the Property and the "eligible basis" and "applicable percentage" (as defined in the Code) pertaining to each building in the Property following Full Completion, and (b) the written acceptance of such certification by the Special Investor Member after review thereof by a certified public accounting firm engaged by the Special Investor Member for such purpose.

"<u>Breakeven Operations</u>" shall be deemed to have occurred at the end of a period, commencing on or after the occurrence of the Initial Qualified Occupancy Date, of three consecutive calendar months during each of which months, as determined by the Accountants, the Operating Revenue actually received during such month by the Company on a cash basis (excluding rent which is not paid by a Qualified Tenant) shall equal or exceed the sum of Debt Service plus all Operating Expenses for such month (Operating Expenses shall be equal to the higher of the pro forma amount set forth in the financial forecast attached as Exhibit 2 or actual Operating Expenses) determined on an annualized accrual basis including a ratable share of seasonal expenses which are normally incurred on an unequal basis during each month of a full annual period of operation and real estate taxes based on the full valuation of the Property following Full Completion.

"<u>Capital Account</u>" has the meaning set forth in Section 3.3.

"Capital Contribution" means the total amount of cash contributed or agreed to be contributed to the Company by each Member as shown in the Schedule, including any amounts which are paid on behalf of the Company Investor Member pursuant to the provisions of Section 4.2.B herein.  Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member with respect to the Company interest of such then Member.

"Capital Transaction" means any transaction or other source of funds the proceeds of which are not includable in determining Cash Flow including, without implied limitation, the sale or other disposition of all or substantially all of the assets of the Company and any refinancing of any Mortgage, but excluding the payment of Capital Contributions by the Members.

"Cash Flow" means for any period the excess of (a) Operating Revenues for such period over (b) the sum of Operating Expenses and Debt Service for such period.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company governed by this Agreement as said limited liability company may from time to time be constituted and amended.

"Company Investor Member" means Provident Tax Credit Fund IX, LLC, an Ohio limited liability company, or any Person who becomes a Substitute Company Investor Member as provided herein, in each such Person's capacity as the Company Investor Member of the Company.

"Company Management Fee" means an annual fee in the amount of $5,000 payable to the Managing Member for providing administrative services to the Company, which fee shall accrue without interest and is payable as set forth in Sections 5.2A and 5.2B.

"Compliance Fee" means an annual fee in the amount of $7,920 payable to the Credit Agency for compliance related services, which fee shall accrue without interest and is payable as set forth in Sections 5.2A and 5.2B.

"Compliance Period" means the "compliance period" as defined in Section 42 of the Code for the Property or any building comprising a part of the Property.

"Consent" of any Member means the advance written consent or approval of such Member.

"Construction Consultant" means ABACUS, or any other architectural or engineering firm designated by the Special Investor Member.

"Construction Contract" means the AIA Standard Form of Agreement Between Owner and Contractor dated September 18, 2006, by and between the Company and the General Contractor, including any amendments or change orders thereto which shall have received the consent of the Special Investor Member.

"Construction Lender" means the Permanent Mortgage Lender.

"Construction Mortgage Loan" means the Permanent Mortgage Loan outstanding prior to Conversion (as such term is defined in the Permanent Mortgage Loan documents).

54

"CPI Adjustment" means the ratio of (a) the Consumer Price Index most recently published prior to the specified date the CPI Adjustment is to be determined, divided by (b) the Consumer Price Index most recently published prior to the Admission Date.  "Consumer Price Index" means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics.  In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Credit Agency" means the Washington State Housing Finance Commission.

"Credit Period" means the "credit period" for the Property or any building comprising a part of the Property, as defined in Section 42 of the Code.

"Debt Service" shall mean all payments of interest, principal and recurring charges due and payable on the Mortgages during a specified period.

"Debt Service Coverage" means actual Net Operating Income as determined by the Accountants for a specified number of consecutive months expressed as a percentage of all Debt Service payments from the Permanent Mortgage Loan required to be paid (or which would have been due if monthly payments of Debt Service on the Permanent Mortgage Loan were fully funded) during the same specified number of consecutive months.

"Deferred Development Cost Payment" means the deferred payment to be made by the Company to the Managing Members  in partial payment of the Guaranteed Development Cost under the circumstances set forth in Section 6.9 hereof.

"Designated Prime Rate" means the "prime rate" established by a preponderance of the largest U.S. banks as announced from time to time in the Wall Street Journal.

"Developer" means Prium Development, L.L.C., a Washington limited liability company, in its capacity as the developer of the Property which has contracted with the Company to perform certain services relating to the development of the Property.

"Development Agreement" has the meaning specified in Section 6.11.A.

"Development Completion Obligation" means the obligation of the Developer to acquire and develop the Property for a fixed turnkey price, as set forth in Section 6.9.

"Development Costs" means those costs included in the financial model attached as Exhibit 2 hereof necessary to achieve Full Completion and fully fund all reserves required hereunder.

"Development Funds" means those sources of funds available to meet Development Costs as more specifically described in Section 6.9B.

"Development Services Fee" means the fee payable pursuant to Section 6.11 to the Developer for the development services referred to therein.

"Economic Risk of Loss" has the meaning set forth in Treasury Regulation Section 1.752-2.

"8609 Issuance" means the receipt by the Company from the Credit Agency of Internal Revenue Service Form(s) 8609 with respect to all buildings in the Property and allocating to the Company Low Income Housing Credit in an amount equal to at least 100% of the maximum annual Projected Credit.

"Eligible Basis" shall mean the adjusted basis of all the buildings in the Property, determined as to each such building as of the close of the first year of the Credit Period, as more particularly defined in Section 42(d) of the Code.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association.

"Event of Bankruptcy" means with respect to any Person:

(i)      the entry of a decree or order for relief by a court having jurisdiction in respect of such Person in a case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or state bankruptcy, insolvency or other similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or the issuance of an order for the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(ii)      the commencement by such Person of a proceeding seeking any decree, order or appointment referred to in clause (i), the consent by such Person to any such decree, order or the appointment, or taking of any action by such Person in furtherance of any of the foregoing.

"Exit Taxes" means the amount of federal income taxes and (to the extent applicable) State income taxes and Ohio income taxes payable by the partners of the Company Investor Member (taking into account all applicable deductions and credits attributable to such taxes in each taxing jurisdiction) in connection with a specified sale of the Property or liquidation of the Company; in each case assuming each such partner is a corporation that is not a closely-held corporation (as defined in the Code), pays taxes at the highest applicable marginal tax rate generally applicable to corporations and is not subject to the alternative minimum tax, and taking into consideration on a reiterative basis, the payment of such Exit Taxes as part of such sale or liquidation.

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"50% Completion of Construction" means 50% completion of construction of the entire Property (based upon the total of hard costs incurred for work completed as a percentage of total hard costs in the development budget for the Property), as certified by the architect of the Property in a manner satisfactory to the Special Investor Member.

"Filing Office" means the office of the Secretary of State of the State.

"Full Completion" means the occurrence of (a) completion of construction of the entire Property no later than September 1, 2007 and in compliance with the Property Documents, as such completion is evidenced by the receipt by the Company of (i) written confirmation thereof from the Inspecting Architects and from the General Contractor and (ii) written approval of

56

occupancy by all state and municipal agencies empowered or required to issue such approval, and the remedy of any defects in the construction of the Property or variance in construction from the Plans and Specifications which in each case are or should have been discovered within two (2) years after initial occupancy of all of the dwelling units, (iii) all conditions with respect to the payment of retainages under the Construction Mortgage Loan documents, the Construction Contract and all construction subcontracts shall have been satisfied and all such retainages shall have been disbursed; (b) satisfaction of all requirements in the Property Documents relating to completion of the entire Property, (c) placement of the Property in service for purposes of the Code and (d) the commencement of continuous and diligent efforts to obtain tenants for the Property.

"General Contractor" means Prium Construction Company, L.L.C.

"Guaranteed Development Cost" means the fixed turnkey cost for which the Managing Members guarantee to complete development of the Property pursuant to Section 6.9.A.

"Guarantors" means Prium Companies, L.L.C., a Washington limited liability company, has executed a guaranty of certain of the obligations of the Managing Members with respect to the Company (if there be only one Guarantor at any time, such term shall refer to such sole Guarantor).

"Hazardous Material" shall have the collective meanings given to the terms "hazardous material," "hazardous substances," "hazardous wastes," "toxic substances" and analogous terms in the Hazardous Waste Laws. In addition, the term "Hazardous Material" shall also include oil and any other substance known to be hazardous.

"Hazardous Waste Laws" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"Immediate Family" means, with respect to any Person, his spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law and grandchildren-in-law.

"Incentive Management Fee" means the fee payable by the Company pursuant to Section 6.12.D hereof.

"Initial Qualified Occupancy Date" means the first date following Full Completion on which at least 100% of the Low Income Units in the Property shall be occupied by Qualified Tenants paying rent, and written confirmation thereof from the Managing Members and the Management Agent has been delivered to the Investor Members.

"Inspecting Architect" means collectively, the project architect and the Construction Consultant.

"Installment" means a portion of the Capital Contribution due from the Company Investor Member as more fully set forth in Article IV.

"Interest" means the entire interest of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled hereunder and the obligation of such Member to comply with the terms of this Agreement.

"Investment Expenses" shall mean the sum equal to not less than 7% of the total Capital Contributions of the Company Investor Member set forth in Section 4.1.A, which is the share of expenses incurred by the Company Investor Member which are attributable to its investment in the Company.

"Investor Member" or "Investor Members" means the Company Investor Member and the Special Investor Member.

"Investor Member Loan" means a loan to the Company by an Investor Member referred to in Section 6.13.A.

"Land" means that certain parcel of land located in the City of Tacoma, State of Washington, upon which the improvements are to be constructed.

"Lenders" means the lenders with respect to the Permitted Loans.

"Low Income Housing Credit" means the amount of low-income housing tax credit, as certified by the Accountants, which the Company and/or its Members has or will claim pursuant to Section 42 of the Code (or successor provisions) with respect to the Property.

"Low Income Unit" means one of the 176 dwelling units in the Property which is to be occupied by a Qualified Tenant meeting the requirements in both clauses (a) and (b) of the definition of "Qualified Tenant" in Article XI and at a rent level and otherwise in compliance with all requirements such that such dwelling unit will be included in the numerator of the "unit fraction" for purposes of Section 42(c)(1)(C) of the Code.

"Management Agent" means the managing and rental agent for the Property engaged by the Company pursuant to Section 6.12.

"Management Agreement" means the agreement between the Company and the Management Agent in effect from time to time providing for management services to the Property.

"Managing Member Closing Certificate" means the Managing Member Closing Certificate dated November 1, 2006.

"Managing Member Loan" means a loan to the Company by a Managing Member or an Affiliate of a Managing Member referred to in Section 6.13.A.

"Managing Members" means all Persons designated as Managing Members in the Schedule and all Persons who become Managing Members as provided herein, in each such Person's capacity as a Managing Member of the Company, and if there be only one Managing Member at any time, such term shall refer to such sole Managing Member.

"Managing Member Equity" means that capital contribution in the amount of approximately $1,768,159 to be made by the Managing Member prior to the payment of the First Installment, which shall be distributed to the Managing Member to the extent of available funds as set forth in Section 6.9.

"Managing Member Completion Loan" means that certain subordinate financing in the original principal amount of $531,841 as more particularly set forth in Section 6.9.

"Member" or "Members" means any or all of the Managing Members and the Investor Members.

"Minimum Set Aside" means occupancy of dwelling units in all of the Property sufficient to satisfy the "40-60 test" set forth in Section 42(g) of the Code within the time period required thereunder, and any additional set-aside required by either the Credit Agency.

"Mortgage" or "Mortgages" means any or all of the indebtedness of the Company evidenced by the Permitted Loans, and any other indebtedness secured by a mortgage of the Property.  Where the context admits, the term Mortgage shall include any mortgage, deed, note, security agreement or other instrument executed in connection with a Mortgage which is binding on the Company; and in case a Mortgage is replaced or supplemented by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages.

"Net Operating Income" for a particular period shall be the excess of Operating Revenue (excluding rent which is paid by any tenant who is not a Qualified Tenant) actually received during such period by the Company on a cash basis (except that, for Debt Service Coverage purposes only, any rental subsidies payable by a government agency pursuant to Section 8 certificates or comparable subsidy programs shall be included in Operating Revenues on an accrual basis) over all Operating Expenses for such period (Operating Expenses shall be equal to the higher of the pro forma amount set forth in the financial forecast attached as Exhibit 2 or actual Operating Expenses) determined on an annualized accrual basis including a ratable share of seasonal expenses which are normally incurred on an unequal basis during each month of a full annual period of operation and assuming real estate taxes are paid in the amount due following assessment of the Property after Full Completion.

"Operating Deficit" means the excess (if any) of the sum of Operating Expenses, required Debt Service and the Asset Management Fee over Operating Revenues for a particular period, as more specifically described in Section 6.10.

"Operating Deficit Loan" means a loan made to the Company pursuant to Section 6.10 and which is repayable without interest and only as provided under this Agreement.

"Operating Expenses" means all the costs and expenses of any type which are incident to the ownership and operation of the Property, including, without limitation, real estate and other taxes, the cost of operations (including the cost of any services provided to residents), maintenance and repairs, the Base Management Fee, the funding of the Replacement Reserve, any reserves required to be maintained by the Lenders and all amounts due with respect to Company indebtedness, but specifically excluding Debt Service, initial funding or replenishment of the Operating Reserve, the Asset Management Fee, the cost of those items which are included in Development Costs pursuant to Section 6.9, payments made pursuant to Section 5.2.A or 5.2.B, depreciation and other non-cash charges and cash distributions to Members.

"Operating Reserve" shall mean the reserve maintained pursuant to Section 6.14.B to meet Operating Deficits.

"Operating Revenue" means all collected rental revenue (excluding rent paid more than 30 days in advance or rent concessions not collected), laundry income, parking revenue and other

incidental revenues which are received by the Company and arise from the operation of the Property as a rental apartment property.

"Original Agreement" has the meaning set forth in the Preliminary Statement.

"Original Investor Member" has the meaning set forth in the Preliminary Statement.

"Outstanding Capital" means, as to any Member at any point in time, the excess of: (a) the amount of the Capital Contributions paid in by such Member through such time (in the case of the Company Investor Member,  including both amounts paid pursuant to Section 4.1, all amounts paid or payable on behalf of the Company Investor Member by the Managing Members pursuant to Section 4.2 and the Investment Expenses and, in the case of the Managing Members, including only amounts paid by the Managing Members pursuant to Section 3.1), over (b) in the case of the Company Investor Member, amounts which have previously been distributed to the Company Investor Member pursuant to Sections 5.2A and 5.2B as distributions in respect of its Positive Capital Account.

"Partnership Minimum Gain" means the amount determined by computing, with respect to each Partnership Non-Recourse Liability, the amount of gain, if any, that would be realized by the Company if it disposed of (in a taxable transaction) the property subject to such liability in full satisfaction of such liability, and by then aggregating the amounts so computed.  Such computations shall be made in a manner consistent with Treasury Regulation Section 1.704-2(d).

"Partner Non-Recourse Debt" means any Company liability (1) that is considered non-recourse under Regulation Section 1.1001-2 or for which the creditor's right to repayment is limited to one or more assets of the Company and (2) for which any Member or Related Person bears the Economic Risk of Loss.

"Partner Non-Recourse Debt Minimum Gain" means the amount of partner non-recourse debt minimum gain and the net increase or decrease in partner non-recourse debt minimum gain determined in a manner consistent with Treasury Regulation Sections 1.704-2(d) and 1.704-2(g)(3).

"Partnership Non-Recourse Liability" means any Company liability (or portion thereof) for which no Member or Related Person bears the Economic Risk of Loss.

"Permanent Mortgage Lender" means CapMark Capital Management, LLC, in its capacity as the lender of the Permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permanent Mortgage Loan" means the Mortgage to be made by the Permanent Mortgage Lender in the original principal amount of $8,235,000, as evidenced by, and on such other terms as are set forth in, a commitment letter dated October 23, 2006.  Except as and to the extent otherwise Consented to by the Special Investor Member, the Permanent Mortgage Loan shall:  (i) be made by a lender which shall have received the Consent of the Special Investor Member; (ii) be in a principal amount of not more than $9,060,000; (iii) be made pursuant to loan documents which shall have received the Consent of the Special Investor Member; and (iv) have terms and conditions no less favorable to the Company than:  (a) a 18-year term, (b) a 35-year amortization schedule, (c) non-recourse to all the Members, subject to customary non-recourse carve-outs, (d) a fixed interest rate of 6.365 percent per annum, and (e) debt service payments in an amount that will assure a minimum Debt Service Coverage of 1.15 to 1.00.  Prior

60

to executing any documents in connection with the Permanent Mortgage Loan, the Managing Members shall obtain written confirmation from the Special Investor Member that the Permanent Mortgage Loan satisfies the criteria set forth in the previous sentence.

"Permitted Loans" means the Construction Mortgage Loan and the Permanent Mortgage Loan.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits; and, unless the context otherwise requires, the singular shall include the plural, and the masculine gender shall include the feminine and the neuter and vice versa.

"Plans and Specifications" means the Scope of Work as set forth on Exhibit A of the Construction Contract, which have been delivered to the Special Investor Member together with future revisions thereof which shall have received the Consent of the Special Investor Member. In no event shall a future modification, revision or any amendment to the Plans and Specifications be effective unless such modification, revision or amendment has been initialed by both Managing Member and the Special Investor Member.

"Positive Capital Account" means the capital account (if positive) of the Company Investor Member as computed immediately prior to (and without giving effect to cash distributions from or allocations of taxable profit or loss arising from) a specified Capital Transaction.

"Projected Credit" means the projected amounts of Low Income Housing Credit set forth in the table in Section 4.2.A.

"Property" means the real property located in nineteen buildings in Tacoma, Washington, which real property is more fully described in Exhibit 1 attached hereto, together with (i) all buildings and other improvements or to be constructed thereon and (ii) all furnishings, equipment, fixtures and personal property covered by the Mortgages, known or to be known as Orchard Hills Apartments.

"Property Documents" means all promissory notes, mortgages, agreements and other instruments executed in connection with any of the Mortgages; the Plans and Specifications; the Management Agreement; all applications, reservations, carryover allocations, restrictive covenants and extended use agreements and all other agreements and documents related to the Low Income Housing Credit; agreements relating to real estate taxation and assessments relating to the Property; agreements relating to the availability of parking for users of the Property; and any other agreement or instrument relating to the Property or under which the Company is bound.

"Qualified Income Offset Item" means (1) an allocation of loss or deduction that, as of the end of each year, reasonably is expected to be made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Company, (b) pursuant to Section 706(d) of the Code as the result of a change in any Member's Interest, and (c) pursuant to Regulation Section 1.751-1(b)(2)(ii) as the result of a distribution by the Company of unrealized receivables or inventory items and (2) a distribution that, as of the end of such year, reasonably is expected to be made to a Member to the extent it exceeds offsetting increases to such Member's Capital Account which reasonably are expected to occur during or prior to the Company taxable year in which such distribution reasonably is expected to occur.

"Qualified Tenant" means a tenant (a) who occupies a dwelling unit in the Property pursuant to an executed lease which is for a term of at least six months, requires payment of rent at levels not less than those set forth on Exhibit 2 and conforms to all requirements of the Property Documents and (b),  in the case of a tenant occupying a Low Income Unit, who meets the income requirements for a "low income unit" (as defined in Section 42 of the Code) and will not prevent the Company from obtaining the Low Income Housing Credit with respect to such Low Income Unit.

"Related Person" has the meaning set forth in Treasury Regulation Section 1.752-4(b) or any successor regulation thereto.

"Replacement Reserve" shall mean the reserve maintained pursuant to Section 6.14.C to make capital repairs and improvements.

"Retirement" (including the verb form "Retire" and the adjective form "Retiring") means as to a Managing Member, the occurrence of death, adjudication of insanity or incompetence, Event of Bankruptcy, dissolution, or voluntary or involuntary withdrawal from the Company for any reason, and shall constitute "retirement" for purposes of the Uniform Act.  "Retirement" shall also mean the sale, assignment, transfer or encumbrance by a Managing Member of its interest as a Managing Member.  A Managing Member which is a corporation, limited liability company or partnership shall be deemed to have sold, assigned, transferred or encumbered its interest as a Managing Member in the event of any sale, assignment, transfer or encumbrance of a controlling interest in a corporate or limited liability company Managing Member or of a general partnership interest in a Managing Member which is a partnership.

"75% Completion of Construction" means 75% completion of construction of the entire Property (based upon the total of hard costs incurred for work completed as a percentage of total hard costs in the development budget for the Property), as certified by the architect of the Property in a manner satisfactory to the Special Investor Member.

"Schedule" means Schedule A of Members annexed hereto as amended from time to time and as so amended at the time of reference thereto.

"Special Investor Member" means SCDC, LLC, an Ohio limited liability company, or such other Person as it may substitute pursuant to Section 9.4 hereof.

"Stabilized Occupancy" means, for a period of three consecutive months, (a) the achievement of 115% Debt Service Coverage over such period (for purposes of Sections 6.9 and 6.10, the occurrence of Stabilized Occupancy must be verified by the financial statements prepared pursuant to Section 7.4.A), and (b) occupancy of at least 90% of the apartment units by tenants (who must be Qualified Tenants in the case of the Low-Income Units) paying rent under written leases in good standing, (c) closing and full funding of the Permanent Mortgage Loan and (d) achievement of Initial Qualified Occupancy.

"State" means the State of Washington.

"Substitute Investor Member" means any Person who is admitted to the Company as an Investor Member under the provisions of Sections 9.2 or 9.4.

"Supplemental Management Fee" means the amount payable (in addition to the Base Management Fee) from time to time by the Company to the Management Agent (or to the

Managing Members if there shall be no Management Agent serving hereunder) on an annual basis for management services in accordance with Sections 5.2.A and 6.12.C.

"Tax Credit Application" means the Washington State Housing Finance Commission Low Income Housing Tax Credit Program 2006 Application dated June 28, 2006 and submitted to the Credit Agency by the Company, as amended and supplemented to date.

"Uniform Act" means the Washington Limited Liability Company Act (Chapter 25.10 of the Revised Code of Washington).

"Vessel" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

WITNESS the execution hereof under seal as of the 6th day of November, 2006.

MANAGING MEMBER

P&U CAPITAL PARTNERS I, L.L.C.,
A Washington limited liability company

By:    Prium Companies, L.L.C., a Washington
       limited liability company, its sole member

      By: _____
          Hyun J. Um, Management Committee Member

      By: _____
          Thomas W. Price, Management Committee Member

COMPANY INVESTOR MEMBER

PROVIDENT TAX CREDIT FUND IX, LLC

Red Capital Community Development Company, LLC, its managing member

By: _____
    Anil Advani, Vice President

S-1

WITNESS the execution hereof under seal as of the 6th day of November, 2006

MANAGING MEMBER

P&U CAPITAL PARTNERS I, L L C ,
A Washington limited liability company

By:     Prium Companies, L. L C , a Washington
        limited liability company, its sole member

        By:_____
              Hyun J. Um, Management Committee Member

        By:_____
              Thomas W  Price, Management Committee Member

COMPANY INVESTOR MEMBER

PROVIDENT TAX CREDIT FUND IX, LLC

Red Capital Community Development Company, LLC, its managing member

By:     _____
        Anil Advani, Vice President

SPECIAL INVESTOR MEMBER

SCDC, LLC

By: _____

Anil Advani, Vice President


The undersigned executes this Agreement not as a Member but only to confirm that it is bound by the provisions of Sections 6 5B(1), 6 5(2)(d) and  7 10 hereof

PRIUM CONSTRUCTION COMPANY, L.L C

By: _____
Name: _____
Title: _____


The undersigned executes this Agreement not as a Member but only to confirm that it is bound by the provisions of Section 6 9 hereof

PRIUM DEVELOPMENT, L L C

By: _____
Name: _____
Title: _____


Attachments

Exhibit 1      Legal Description Of Property
Exhibit 2      Financial Forecast
Exhibit 3      Project Summary
Schedule A    Schedule of Members

SPECIAL INVESTOR MEMBER

SCDC, LLC

By:_____
       Anil Advani, Vice President

      The undersigned executes this Agreement not as a Member but only to confirm that it is bound by the provisions of Sections 6.5B(1), 6.5(2)(d) and  7.10 hereof.

                                    PRIUM CONSTRUCTION COMPANY, L.L.C.

                                    By: _____
                                    Name: _____
                                    Title: _____

      The undersigned executes this Agreement not as a Member but only to confirm that it is bound by the provisions of Section 6.9 hereof.

                                      PRIUM DEVELOPMENT, L.L.C.

                                    By: _____
                                    Name: _____
                                    Title: _____

Attachments

| Exhibit 1 | Legal Description Of Property |
| Exhibit 2 | Financial Forecast |
| Exhibit 3 | Project Summary |
| Schedule A | Schedule of Members |

S-2

Exhibit 1

PRIUM ORCHARD HILLS, L.L.C.

Legal Description Of Property

COLUMBUS/523644.6

PARCEL A:

THAT PORTION OF GOVERNMENT LOT 1, SECTION 23, TOWNSHIP 20 NORTH, RANGE 2 EAST OF THE W.M., LYING NORTH OF THE NORTH LINE OF JOHN RIGNEY DONATION LAND CLAIM AND SOUTHEASTERLY OF THE SOUTHEASTERLY LINE OF RELOCATED HANNAH PIERCE ROAD, AS CONVEYED TO PIERCE COUNTY BY DEED DATED MARCH 12, 1948, AND RECORDED MARCH 18, 1948, UNDER AUDITOR'S FILE NO. 1478252;

**EXCEPT** THAT PORTION CONVEYED TO THE CITY OF TACOMA, A MUNICIPAL CORPORATION BY DEED RECORDED AUGUST 11, 1975, UNDER AUDITOR'S FILE NO. 2610316;

**AND EXCEPT** THE PORTION DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE RIGNEY DONATION LAND CLAIM LOCATED IN SECTION 23, TOWNSHIP 20 NORTH, RANGE 2 EAST OF THE W.M., AND THE EAST LINE OF SAID SECTION 23, SAID INTERSECTION FOR REFERENCE PURPOSES BEING A POINT 781.02 FEET, MORE OR LESS, SOUTH 01°58'40" EAST FROM THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION;
THENCE NORTH 01°58'40" WEST ALONG SAID EAST LINE 380.01 FEET;
THENCE SOUTH 88°22'53" WEST, 123.14 FEET TO THE EASTERLY LINE OF RELOCATED HANNAH PIERCE ROAD AS SHOWN ON SURVEY FILED FOR RECORD JUNE 20, 1974, IN BOOK 4 OF SURVEYS, PAGE 47 UNDER NO. 347;
THENCE SOUTHWESTERLY ALONG THE EASTERLY LINE OF SAID RELOCATED COUNTY ROAD, A DISTANCE OF 300.01 FEET TO THE NORTH LINE OF A TRACT OF LAND CONVEYED TO CLINTON A. PIPER AS DESCRIBED IN DEED RECORDED JUNE 6, 1975, UNDER AUDITOR'S FILE NO. 2607722;
THENCE NORTH 88°22'53" EAST ALONG SAID NORTH LINE, A DISTANCE OF 188.08 FEET TO THE NORTHEAST CORNER OF SAID PIPER TRACT OF LAND;
THENCE SOUTH 01°58'40" EAST, 125 FEET TO THE NORTH LINE OF SAID DONATION LAND CLAIM;
THENCE NORTH 88°22'53" EAST, 94.00 FEET TO THE POINT OF BEGINNING;

**AND EXCEPT** THAT PORTION DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTH LINE OF THE RIGNEY DONATION LAND CLAIM, LOCATED IN SECTION 23, TOWNSHIP 20 NORTH, RANGE 2 EAST OF THE W.M., AND THE EAST LINE OF SAID SECTION 23, SAID INTERSECTION FOR REFERENCE PURPOSES BEING A POINT 781.02 FEET, MORE OR LESS, SOUTH 01°58'40" EAST FROM THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION;
THENCE SOUTH 88°22'53" WEST ALONG SAID NORTH LINE 94.00 FEET TO THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION;
THENCE NORTH 01°58'40" WEST, 125.00 FEET;
THENCE SOUTH 88°22'53" WEST, 188.08 FEET TO THE EASTERLY LINE OF HANNAH PIERCE RELOCATED COUNTY ROAD AS SHOWN ON SURVEY FILED FOR RECORD JUNE 20, 1974, IN BOOK 4 OF SURVEYS, PAGE 47 UNDER NO. 347;
THENCE SOUTH 33°12'04" WEST, 152.6 FEET ALONG THE EASTERLY LINE OF SAID ROAD TO THE NORTH LINE OF SAID RIGNEY DONATION LAND CLAIM;
THENCE NORTH 88°22'53" EAST, 275.81 FEET TO THE POINT OF BEGINNING;


SITUATE IN THE CITY OF TACOMA, COUNTY OF PIERCE, STATE OF WASHINGTON.

Exhibit 2

PRIUM ORCHARD HILLS, L.L.C.

Financial Forecast

COLUMBUS/523644.6

Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

Partnership Financial Forecast

| Project Summary | | Blue values need to be inputted | | Financing Assumptions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| File Path | | O:\TAX CREDIT UNDERWRITING\Deals In Progress\Orchard Hills\Models-Analysis\Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED.xls\ | | | | | | Tax Exempt | Taxable | | | |
| Partnership Name | | Orchard Hills | | Permanent Loan | | | | 7,070,000 | 205,000 | | | |
| Property Location | | Tacoma, WA | | Interest Rate | Fixed? | ☑Yes ☐No | | 6.3950% | 8.215% | | | |
| | | | | Amortization | | | | 420 | | | | |
| # of Units | | 176 | | Term | | | | 420 | | | | |
| # of Buildings | | 19 | | Commencement Date | | | | 10/1/2007 | | | | |
| | | | | Months in Base Year | | | | 3 | | | | |
| Projected Start Date | | 11/1/2006 | | | | | | | 1,160 | | | |
| Projected Completion Date | | 5/1/2007 | | Base Year Net Operating Income | | | | 680,871 | | | | |
| Base Year (1st date of year of operations commencement) | | 1/1/2008 | | Annual Debt Service Coverage | | | | 592,058 | | | | |
| | | | | Base Year DSC | | Cap Rate | | 1.15 | | | | |
| # of Months of Construction | | 6 | | Base Year LTV | | 6.10% | | 0.71 | | Net Equity | | 4,761,238 |
| | | | | | | | | | | | | |
| Tax Credit Information: | | | | Developer Fee | | | | 1,685,445 | | | | |
| Credit % | Fixed? ☐Yes ☑No | 3.46% New 10 | | Developer Fee Paid | | | | (531,841) -26% | | | | |
| Credit Allocation Amount | | 480,981 | | Deferred Developer Fees | | | | 2,417,286 | | 30-Day LIBOR | | 5.32% |
| Difficult Development Area/QCT | | 100% | | Repayment from Cash Flow | | | | 100.00% | | Investment Rate | | 2.250% |
| Low Income Percentage | | 100.00% | | Interest Rate | | | | 0.00% | | | | |
| | | | | Amortization | | | | 180 | | 2nd Mortgage | | |
| Tax Rate | | 35% | | Term | | | | 180 | | Interest Rate | | 6.37% |
| Depreciation: | | | | Commencement | | | | 5/1/2007 | | Fixed? ☐Yes ☑No | | |
| | Real Property | 27.5 | | | | | | | | Amortization | | 240 |
| | Personal Property | 5 | | | | | | | | Term | | 240 |
| | Site work | 15 | | | | | | | | Deferral of Payments (Months) | | 0 |
| Depreciation Average Start - Improvements | | 5/1/2007 | | | | | | | | Interest & Principal Deferred: | | |
| | Remaining Months in Year: | 8 | | | | | | | | | | |
| Depreciation Average Start - Acquisition | | 11/1/2006 | | | | | | | | | | |
| | Remaining Months in Year: | 2 | | | | | | | | Other Financing (Hard)-Taxable Perm | | 205,000 |
| | | | | | | | | | | Interest Rate on Other Financing (Hard)-Taxable Perm | | 8.215% |
| 1st Building Placed in Service Date | | 5/1/2007 | | | | | | | | Term of Other Financing (Hard)-Taxable Perm | | 420 |
| | Remaining Months in Year: | 8 | | | | | | | | Soft Financing | | |
| | | | | | | | | | | Interest Rate on Soft Financing | | 0.00% |
| | | | | | | | | | | Soft Financing #2 | | |
| | | | | | | | | | | Interest Rate on Soft Financing #2 | | 0.00% |
| | | | | | | | | | | Soft Financing #3 | | |
| | | | | | | | | | | Interest Rate on Soft Financing #3 | | 0.00% |

Orchard Hills 10-30-09 LT CLOSING PROJECTION HARD CODED

## Sources and Uses of Funds

| Sources: | | | | Total Sources | Escalated Expenses | Amortized Expenses | Non-Amortized Expenses |
|---|---|---|---|---|---|---|---|
| Capital Contribution | | 4,751,238 | Absorption Lot 1a | 1,264,587 | | | 1,265,537 |
| Permanent Loan | | 7,873,000 | | 8,624,520 | 5,231,543 | | |
| 2nd Mortgage | | | | | | | |
| Other Financing (Hard) FANNIE HARD DEBT | | 285,000 | | | | | |
| Self Financing | | | | | | | |
| Self Financing #2 | | | 35,000 | 35,653 | 35,653 | | |
| Self Financing #3 | | | | 18,100 | 18,100 | | |
| Carryover of (Surplus) Revenue | | | | | | | |
| GP Loan / Deferral Developer Fee | | | | | | | |
| FAAA Good Faith Deposit | 4,117,264 | | | 1,828,415 | 1,818,415 | | |
| Returns of Reserves | | | | | | | |
| Other | | | | | | | |
| Other | | 756,651 | | 210,624 | 219,624 | | |
| Cash Flow from Operations | | | | 215,706 | 216,228 | | |
| | | 14,119,238 | | | | | |
| | | 18,113,303 | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|

Hard Cost per Unit   12,614

All Costs per Unit   91,916

| Uses: | Depreciable Term | | Total Sources | Escalated Expenses | Amortized Expenses | Non-Amortized Expenses |
|---|---|---|---|---|---|---|
| Land and Existing Purchase(s) | | | | | | |
| Land Acquisition | | | | | | |
| Building Acq | | | | | | |
| Demolition | | | | | | |
| Off-Site Work: | | | | | | |
| Site Work | | | | | | |
| Sewer and Sewer Improvements (15 yr.) | | 35,000 | 35,653 | 35,653 | | |
| Streets and Roads Improvements (15.5 yr.) | | | 18,100 | 18,100 | | |
| Other Site Work | | | | | | |
| Rehabilitation and New Construction: | | | | | | |
| New Building | | | | | | |
| Rehabilitation | | | | | | |
| Accessory Buildings | | | | | | |
| General Requirements | 1.97% | | | | | |
| Builder's Overhead | 0.00% | | | | | |
| Builder's Profit | 10.50% | | | | | |
| Bond Premium | | | | | | |
| Construction Contingency | 7.27% | | 102,653 | 102,653 | | |
| Other Additional Contingency | | | | | | |
| General Contractor | 1,627,419 | | 57,737 | 57,737 | | |
| Other Construction | | | | | | |
| Architectural and Engineering: | | | | | | |
| Building Permits | 4.00 | | | | | |
| Architectural Fee-Design | | | | | | |
| Architectural Fee-Supervision | | | | | | |
| Real Estate Attorney | | | | | | |
| Landscaping | | | | | | |
| Engineering | | | | | | |
| Interim Costs: | | | | | | |
| Construction Period Insurance | | | 26,333 | 26,333 | | |
| Construction Interest | 1.00% | | 504,525 | 217,433 | | 237,455 |
| Construction Loan Origination | | | | | | |
| Immediate Fees | | | | | | |
| Other | | | | | | |
| Title & Recording | 2.00 | | 7,550 | 7,625 | | |
| Accounting Estimates | | | | | | |
| Legal | 1.00% | | 15,000 | 15,022 | | |
| Estab. Division Loan Origination | 4.70 | | | | | |
| Finance Fees and Expenses: | 6.00 | | 65,000 | | 65,000 | |
| Construction Loan | 4.00 | | 120,000 | | 120,000 | |
| HUD/FHA Insurance | 4.00 | | 25,000 | | 25,000 | |
| Permanent Loan | 4.00 | | 15,000 | | 15,000 | |
| Underwriter Counsel | 4.00 | | 25,000 | | 25,000 | |
| Title & Recording | 4.00 | | 25,000 | | 25,000 | |
| Bond Counsel | 4.00 | | 40,000 | 18,000 | 40,000 | |
| Financial Advisor | 4.00 | | 60,000 | | | |
| FNMA Good Faith Deposit | | | | | | |
| HUD/FHA Volume Per App'l | 0.07% | | 2,521 | | | 2,521 |
| Soft Costs: | | | | | | |
| Survey | | | | | | |
| Market Study | | | 3,000 | 3,000 | | |
| Environmental Study/Soils Report | | | 2,000 | 2,000 | | |
| Tax Credit Fee - Application, Reservation & Carryover | | | 4,350 | | 4,350 | |
| Tax Credit Fee - Tax Credit Allocation | | | | | | |
| Appraisal | | | 6,500 | 6,520 | | |
| Other - Real Estate Taxes | | | | | | |
| Other - Non-Profit/Novice support | | | 30,175 | 28,170 | | |
| Other - Relocation | | | 45,000 | 45,000 | | |
| Other - Accounting/Cost Certification | | | 15,000 | 15,000 | | |
| Other - Legal | | | | | | |
| Organization and Syndication: | | | | | | |
| Legal (Org.) | 40 | | 25,000 | | 25,000 | |
| Land (Syndication) | | | | | | |
| Other (Syndication) | | | | | | |
| Accounting Fees (Org.) | 40 | | | | | |
| Tax Opinion | | | 15,000 | | | 15,000 |
| FCIA Asset Mgmt Fee | | | 2,500 | | 8,500 | |
| Investor Fees: | | | | | | |
| Developer Fees: | | | | | | |
| Developer Fee | | | 1,250,443 | 1,250,443 | | |
| Developer Overhead | | | | | | |
| Developer Profit | | | | | | |
| Financial Advisor | | | | | | |
| Project Reserves & Others: | | | 150,000 | | | 150,000 |
| Operating Reserve | 50 | | | | | |
| Lease Up Reserve | | | | | | |
| Marketing / Lease-up Fees | | | | | | |
| ADR (1st Year Paid) | | | | | | |
| Other - Stars Trust | | | | | | |
| Furniture and Fixtures: | | | | | | |
| Furniture and Fixtures | | | | | | |
| Reserves | | | | | | |

| Grand Total | | | 14,119,233 | 13,616,065 | 323,231 | 1,848,537 |

| Red Total | 16,172,353 | constraint | 14,119,233 | 13,616,065 | 323,231 | 1,848,537 |
| Less Red Calculated Items | (322,423) | | | $3.16% 50 amortized | | |
| | | | | 22.43% 15 amortized | | |

## Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

### Capital Contribution Schedule

| Payment Date | | Net Investor Equity | % of Net Equity |
|---|---|---|---|
| | 11/1/2006 | 1,190,309 | 25.00% |
| | 12/31/2006 | 1,190,309 | 25.00% |
| | 12/1/2006 | - | 0.00% |
| | 5/1/2007 | 1,428,371 | 30.00% |
| | 7/1/2007 | - | 0.00% |
| | 8/1/2007 | 476,124 | 10.00% |
| | 10/1/2007 | 476,124 | 10.00% |
| | 1/1/2008 | - | 0.00% |
| | 4/1/2008 | - | 0.00% |
| | 7/1/2008 | - | 0.00% |
| | | 4,761,236 | 100.00% |

$0.990  net cents per $1.00 of tax credits.          $0.990      4,809,329

| Net Equity | 4,761,236 |
|---|---|
| Cost of Issuance | - |
| Total Investment | 4,761,236 |

| Equity Bridge Loan | - |
|---|---|
| % of Net Equity | 0% |

### Syndication Percentages

| % of Ownership | |
|---|---|
| General Partners | 0.010000% |
| SLP | 0.000000% |
| Investor - Fund | 99.9900000% |
| - Fund GP | 0.0099990% |
| - Fund Investor | 99.9800010% |
| | 100.0000% |

| Cash Flow Distribution: | |
|---|---|
| General Partners | 90.0000% |
| SLP | 0.0000% |
| Investor - Fund | 10.0000% |
| - Fund GP | 0.0010000% |
| - Fund Investor | 9.9990000% |
| | 100.0000% |

| Loss Allocation: | |
|---|---|
| General Partners & SLP | 0.0100% |
| Investor - Fund | 99.9900% |
| - Fund GP | 0.0099990% |
| - Fund Investor | 99.9800010% |
| | 100.0000% |

| LIHTC and Depreciation Allocation: | |
|---|---|
| General Partners & SLP | 0.0100% |
| Investor - Fund | 99.9900% |
| - Fund GP | 0.0099990% |
| - Fund Investor | 99.9800010% |
| | 100.0000% |

| Sales Proceeds Distribution: | |
|---|---|
| % after return of positive capital | |
| General Partners | 80.0000% |
| SLP | 0.0000% |
| Investor - Fund | 20.0000% |
| - Fund GP | 0.00200000% |
| - Fund Investor | 19.99800000% |
| | 100.0000% |

Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## Rental Income

| Type of Unit | # of Units | Gross Rent per Month | Utility Allowance | Net Rent per Month | Net Rent | Total Rent per Month | Sq. Ft. per Unit | Total Sq. Ft. | Rent Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| | | | Maximum | | | Underwritten | | | |
| 10d @ 60% AMI | 74 | 699 | 57 | 642 | 620 | 45,880 | 612 | 45,288 | 1.01 |
| 10d @ 60% AMI | 10 | 699 | 57 | 642 | 624 | 6,240 | 676 | 6,760 | 0.92 |
| 2Gd @ 60% AMI | 16 | 838 | 68 | 770 | 740 | 11,840 | 939 | 15,024 | 0.79 |
| 2Bd @ 60% AMI | 46 | 838 | 68 | 770 | 695 | 31,970 | 847 | 38,962 | 0.82 |
| 2Bd @ 60% AMI | 20 | 838 | 68 | 770 | 740 | 14,800 | 945 | 18,900 | 0.78 |
| 30d @ 60% AMI | 10 | 969 | 83 | 886 | 850 | 8,500 | 1,076 | 10,760 | 0.79 |

| Totals | 176 | | | | 4,269 | 119,230 | | 135,694 | |
| | | | | | Underwritten | | Low Income | | |
| | | | | | Annual Rental | 1,430,760 | Square Ft. | 135,694 | |

Low Income Units            176
% Low Income based on Units           100.00%
% Low Income based on Sq. Ft.         100.00%         AMI:      61,000
                                      4 Person Very Low-Income:   31,950  Tacoma, 2006

## Rent-Up Schedule

| Month | # of Units Rented (Inc.) | # of Units Rented (TC) | Rental Income 677.44 | Other Income 15.00 | Vacancy 8.00% | Operating Expenses | Management Fee 4.00% | Debt Service & RR's | Lease-Up Cash Flow | Fed Tax Credits 227.71 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/2006 | 0 | 0 | | | | | | | | |
| 2/1/2006 | 0 | 0 | | | | | | | | |
| 3/1/2006 | 0 | 0 | | | | | | | | |
| 4/1/2006 | 0 | 0 | | | | | | | | |
| 5/1/2006 | 0 | 0 | | | | | | | | |
| 6/1/2006 | 0 | 0 | | | | | | | | |
| 7/1/2006 | 0 | 0 | | | | | | | | |
| 8/1/2006 | 0 | 0 | | | | | | | | |
| 9/1/2006 | 0 | 0 | | | | | | | | |
| 10/1/2006 | 0 | 0 | | | | | | | | |
| 11/1/2006 | 155 | 35 | 105,004 | 2,325 | | 39,117 | 4,293 | | 63,919 | 7,970 |
| 12/1/2006 | 155 | 35 | 105,004 | 2,325 | | 39,117 | 4,293 | | 63,919 | 7,970 |
| Total/Average | 28 | | 210,007 | 4,650 | | 78,234 | 8,586 | | 127,837 | 15,940 |
| 1/1/2007 | 155 | 102 | 107,104 | 2,372 | | 40,250 | 4,379 | | 64,806 | 23,227 |
| 2/1/2007 | 155 | 109 | 107,104 | 2,372 | | 40,250 | 4,379 | | 64,808 | 24,821 |
| 3/1/2007 | 155 | 116 | 107,104 | 2,372 | | 40,250 | 4,379 | | 64,806 | 26,416 |
| 4/1/2007 | 155 | 123 | 107,104 | 2,372 | | 40,250 | 4,379 | | 64,806 | 28,009 |
| 5/1/2007 | 155 | 130 | 107,104 | 2,372 | | 40,250 | 4,379 | | 64,806 | 29,603 |
| 6/1/2007 | 162 | 137 | 111,941 | 2,479 | | 40,431 | 4,577 | | 69,412 | 31,197 |
| 7/1/2007 | 169 | 144 | 116,778 | 2,586 | | 40,571 | 4,775 | | 74,017 | 32,791 |
| 8/1/2007 | 176 | 151 | 121,615 | 2,693 | 7,458 | 40,712 | 4,874 | | 71,483 | 34,385 |
| 9/1/2007 | 176 | 158 | 121,615 | 2,693 | 7,458 | 40,712 | 4,874 | | 71,483 | 35,979 |
| 10/1/2007 | 176 | 165 | 121,615 | 2,693 | 7,458 | 40,712 | 4,874 | 53,003 | 18,459 | 37,573 |
| 11/1/2007 | 176 | 172 | 121,615 | 2,693 | 7,458 | 40,712 | 4,874 | 53,003 | 18,459 | 39,167 |
| 12/1/2007 | 176 | 176 | 121,615 | 2,693 | 7,458 | 40,712 | 4,874 | 53,003 | 18,459 | 40,078 |
| Total/Average | 186 | 140 | 1,372,310 | 30,386 | 37,292 | 486,013 | 54,616 | 159,014 | 665,761 | 383,243 |

## Income

| | |
|---|---|
| Year of Operations Commencement | 2006 |
| Base Rental Income | 1,430,760 |
| 1st Year Rental Income | 210,007 |
| 2nd Year Rental Income | 1,372,310 |
| 3rd Year Rental Income | 1,468,563 |
| Inflation Factor | 102.00% |
| Base Other Income          15.00 | 31,680 |
| 1st Year Other Income | 4,650 |
| 2nd Year Other Income | 30,386 |
| 3rd Year Other Income | 32,660 |
| Vacancy Rate | 6.00% |

## Expenses

| | |
|---|---|
| Base Operating Expense | 594,835 |
| 1st Year Operating Expense | 78,234 |
| Additional 1st Year Operating Expense | |
| 2nd Year Operating Expense | 486,013 |
| Additional 2nd Year Operating Expense | |
| Inflation Factor | 103.00% |
| Replacement Reserve / Unit | 250 |
| Base Replacement Reserve | 44,000 |
| 2005 Administration Fee | |
| RCM Administration Fee | 7,500 |
| Inflation Factor | 3% |
| Administration Fee Percentage | 0% |
| Fee Cap | 12.00% |
| Incentive Management Fee | 00.00% |
| Property Management Fee | 4.00% |
| Subordinated Management Fee | 0.00% |

## Base Expenses

| | Per Unit Per Year | Per Sq. Ft. Per Year |
|---|---|---|
| Administration | 55,182 | 313.53 | 0.41 |
| Payroll | 175,000 | 994.32 | 1.29 |
| Utilities | 130,240 | 740.00 | 0.96 |
| Repair & Maintenance | 95,000 | 539.77 | 0.70 |
| Real Estate Taxes | 116,458 | 661.92 | 0.86 |
| Insurance | 22,915 | 130.20 | 0.17 |
| Tenant Service | | | |
| Management Fee | 54,988 | 312.43 | 0.41 |
| Replacement Reserves | 44,000 | 250.00 | 0.32 |
| Total Operating Expense | 693,823 | 3,942.17 | 5.11 |
| | | 57,818.56 | |

| Less: | |
|---|---|
| Management Fee | (54,988) |
| Replacement Reserves | (44,000) |
| Base Operating Expense | 594,835 |

## Base DSC

| | |
|---|---|
| Rental Income | 1,430,760 |
| Other Income | 31,680 |
| Vacancy | (57,748) |
| Operating Expenses | (594,835) |
| Management Fee | (54,988) |
| Replacement Reserve | (44,000) |
| | 680,871 |
| Funds Available | 680,971 |
| Mortgage Debt Service | 592,059 |
| Base DSC | 1.150 |

## Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

### Projected Cash Flow

| Year | Rental Income | Vacancy | Other Income | Operating Expenses | Management Fee | Net Operating Income | Withdrawals from Operating Reserves | Replacement Reserves | First Mortgage Debt Service | 2nd Mortgage Debt Service | Taxable Loan Debt Service | Cash Flow | DSC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 0 | 0 | 0 | - | 0 | - | | | . | - | - | | |
| 2006 | 210,007 | - | 4,650 | 78,234 | 8,586 | 127,837 | | | - | - | - | 127,837 | 1.15 |
| 2007 | 1,372,310 | (37,292) | 30,386 | 488,013 | 54,616 | 824,774 | | 11,000 | 142,243 | - | 5,771 | 665,761 | 5.50 |
| 2008 | 1,488,563 | (91,291) | 32,900 | 631,060 | 57,209 | 741,962 | | 45,320 | 568,971 | - | 23,085 | 104,586 | 1.18 |
| 2009 | 1,518,334 | (93,117) | 33,619 | 649,992 | 58,353 | 750,490 | | 48,680 | 568,971 | . | 23,085 | 111,755 | 1.19 |
| 2010 | 1,548,701 | (94,980) | 34,291 | 669,492 | 59,521 | 759,000 | | 48,080 | 568,971 | - | 23,085 | 118,865 | 1.20 |
| 2011 | 1,579,675 | (96,879) | 34,977 | 689,577 | 60,711 | 767,485 | | 49,522 | 568,971 | - | 23,085 | 125,907 | 1.21 |
| 2012 | 1,611,268 | (98,817) | 35,677 | 710,264 | 61,925 | 775,939 | . | 51,008 | 568,971 | - | 23,085 | 132,875 | 1.22 |
| 2013 | 1,843,494 | (100,793) | 36,390 | 731,572 | 63,164 | 784,355 | | 52,538 | 568,971 | - | 23,085 | 139,761 | 1.24 |
| 2014 | 1,676,363 | (102,809) | 37,118 | 753,519 | 64,427 | 792,727 | | 54,114 | 568,971 | - | 23,085 | 146,557 | 1.25 |
| 2015 | 1,709,891 | (104,865) | 37,861 | 776,125 | 65,715 | 801,046 | . | 55,738 | 568,971 | - | 23,085 | 153,253 | 1.26 |
| 2016 | 1,744,088 | (106,962) | 38,618 | 799,408 | 67,030 | 809,306 | | 57,410 | 568,971 | - | 23,085 | 159,840 | 1.27 |
| 2017 | 1,778,970 | (109,102) | 39,390 | 823,391 | 68,370 | 817,408 | . | 59,132 | 568,971 | - | 23,085 | 166,310 | 1.28 |
| 2018 | 1,814,550 | (111,284) | 40,178 | 848,092 | 69,738 | 825,614 | . | 60,906 | 568,971 | - | 23,085 | 172,652 | 1.29 |
| 2019 | 1,850,841 | (113,509) | 40,981 | 873,535 | 71,133 | 833,645 | - | 62,733 | 568,971 | - | 23,085 | 178,856 | 1.30 |
| 2020 | 1,887,857 | (115,780) | 41,801 | 899,741 | 72,555 | 841,583 | - | 64,615 | 568,971 | - | 23,085 | 184,912 | 1.31 |
| 2021 | 1,925,615 | (118,095) | 42,637 | 928,734 | 74,008 | 849,417 | - | 66,554 | 568,971 | - | 23,085 | 190,807 | 1.32 |
| Totals | 25,360,526 | (1,495,575) | 561,535 | 11,348,750 | 977,059 | 12,102,677 | - | 785,352 | 8,107,836 | - | 328,955 | 2,680,534 | |

| Year | Transfer (to)/from Operations * | Red Capital Asset Mgt Fee | WSHFC Compliance Fee | Cash Flow | Developer Fee | Cash Flow | $5,000 Pshlp Mgmt Fee | Cash Flow | GP Loans | Cash Flow | GP Distribution | Cash Flow to Investor | Upper-Tier Cash Flow to Investor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | - | | | - | . | - | - | | | | | - | - |
| 2006 | (127,837) | - | | - | . | - | - | | | | | - | - |
| 2007 | (628,844) | 7,725 | 7,920 | 21,272 | 21,272 | - | - | - | - | . | - | - | - |
| 2008 | | 7,957 | 7,920 | 88,709 | 88,709 | - | - | - | . | . | - | - | - |
| 2009 | - | 8,195 | 7,920 | 95,640 | 95,640 | - | . | - | - | | - | - | - |
| 2010 | - | 8,441 | 7,920 | 102,503 | 102,503 | - | . | - | - | | - | - | - |
| 2011 | - | 8,695 | 7,920 | 109,293 | 109,293 | - | . | - | - | | - | - | - |
| 2012 | - | 8,955 | 7,920 | 116,000 | 116,000 | - | | - | - | | - | - | - |
| 2013 | - | 9,224 | 7,920 | 122,617 | 122,617 | | - | - | - | - | - | - | - |
| 2014 | - | 9,501 | 7,920 | 129,136 | 129,136 | | - | - | - | - | - | - | - |
| 2015 | - | 9,786 | 7,920 | 135,547 | 135,547 | | - | - | - | - | - | - | - |
| 2016 | - | 10,079 | 7,920 | 141,841 | 141,841 | | - | - | - | - | - | - | - |
| 2017 | | 10,382 | 7,920 | 148,008 | 148,008 | . | - | - | - | - | - | - | - |
| 2018 | | 10,693 | 7,920 | 154,039 | 154,039 | | - | - | - | - | - | - | - |
| 2019 | | 11,014 | 7,920 | 159,922 | 159,922 | - | - | - | - | - | - | - | - |
| 2020 | | 11,344 | 7,920 | 165,647 | 165,647 | - | - | - | - | - | - | - | - |
| 2021 | | 11,685 | 7,920 | 171,203 | 171,203 | - | - | - | - | - | - | - | - |
| Totals | (756,681) | 143,677 | 118,800 | 1,861,376 | 1,861,376 | - | - | - | - | - | - | - | - |

\* Transfer to operations is used to pay construction interest prior to the permanent loan funding.

## Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

**Projected Taxable Income/(Loss)**

| Year | Net Operating Income | Interest Income on Escrow | Interest Income on Reserves | Interest on First Mortgage | Interest on 2nd Mortgage | Interest on All Other Financing | Compliance Fee | Interest on Deferred Developer Fee | GP Distribution as Income | RCM Admin. Fee | Incentive Prop. Mgr. Fee | Depreciation | LT & UT Funded Expenses | Net Income (Loss) | Upper-Tier Net Income (Loss) to Investor | Fund Level Income/(Losses) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | | | | | | 5,318 | | | | - | | - | - | (5,318) | (5,318) | |
| 2006 | 127,837 | | | | | 21,274 | | | · | - | | 54,083 | 10,299 | 33,161 | 33,178 | |
| 2007 | 824,774 | | 1,750 | 126,741 | | 26,714 | 7,725 | | · | 7,920 | | 504,328 | 291,490 | (138,393) | (138,370) | |
| 2008 | 741,982 | | 3,035 | 504,443 | | 42,965 | 7,057 | | - | 7,920 | | 613,186 | 13,071 | (444,544) | (444,500) | |
| 2009 | 750,490 | | 3,096 | 500,214 | | 42,846 | 8,195 | · | | 7,920 | | 566,030 | 13,071 | (384,689) | (384,651) | |
| 2010 | 769,000 | | 3,156 | 495,707 | · | 42,717 | 8,441 | · | | 7,920 | | 537,433 | 13,071 | (343,131) | (343,097) | |
| 2011 | 767,485 | | 3,221 | 450,908 | - | 42,576 | 8,695 | · | | 7,920 | | 566,475 | 13,071 | (358,937) | (358,901) | - |
| 2012 | 775,939 | | 3,285 | 485,769 | · | 42,424 | 8,956 | - | | 7,920 | · | 564,069 | 13,071 | (343,005) | (342,970) | |
| 2013 | 784,355 | | 3,351 | 480,338 | | 42,260 | 9,224 | | | 7,920 | · | 624,338 | 13,071 | (289,442) | (289,413) | |
| 2014 | 792,727 | | 3,418 | 474,528 | | 42,080 | 9,501 | | | 7,920 | · | 511,616 | 13,071 | (262,572) | (262,546) | |
| 2015 | 801,046 | | 3,486 | 468,339 | | 41,886 | 9,760 | | | 7,920 | - | 510,505 | 13,071 | (246,974) | (246,949) | |
| 2016 | 809,306 | | 3,556 | 461,743 | | 41,675 | 10,079 | | | 7,920 | - | 554,383 | 12,905 | (275,934) | (275,906) | |
| 2017 | 817,499 | | 3,627 | 454,716 | | 41,446 | 10,382 | | | 7,920 | | 577,235 | 12,613 | (283,187) | (283,169) | |
| 2018 | 825,614 | | 3,700 | 447,227 | | 41,198 | 10,693 | | | 7,920 | | 543,677 | 12,613 | (233,916) | (233,892) | |
| 2019 | 833,645 | | 3,774 | 439,248 | | 40,928 | 11,014 | | | 7,920 | | 523,389 | 12,613 | (197,694) | (197,674) | |
| 2020 | 841,593 | | 3,849 | 430,746 | | 40,636 | 11,344 | | | 7,920 | | 523,385 | 12,613 | (181,213) | (181,195) | |
| 2021 | 849,417 | | 3,926 | 421,667 | | 40,318 | 11,885 | | - | 7,920 | | 569,204 | 12,613 | (210,084) | (210,063) | |
| Totals | 12,102,677 | | 50,231 | 6,682,372 | | 639,261 | 143,677 | | · | 118,800 | | 8,243,232 | 491,417 | (4,165,050) | (4,165,434) | |

## Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

### Benefits Schedule

| Year | Capital Contributions Date | Capital Contributions Amount | Net Income/ (Loss) | Tax Savings (Expense) | Annual Federal Tax Credits | Total Tax Savings (Expense) | Cash Flow | Annual Benefit from Partnership | Cumulative Benefit | Cumulative Net Investment |
|------|------|------|------|------|------|------|------|------|------|------|
| 2005 | ** | - | (5,318) | 1,861 | | 1,861 | - | 1,861 | 1,861 | (1,861) |
| 2006 | *** | 2,380,618 | 33,181 | (11,614) | 15,940 | 4,326 | - | 4,326 | 6,188 | 2,374,430 |
| 2007 | **** | 2,380,618 | (138,393) | 48,437 | 383,243 | 431,681 | - | 431,681 | 437,869 | 4,323,367 |
| 2008 | ***** | - | (444,544) | 155,590 | 480,933 | 636,523 | - | 636,523 | 1,074,392 | 3,686,844 |
| 2009 | | | (384,689) | 134,641 | 480,933 | 615,574 | - | 615,574 | 1,689,966 | 3,071,269 |
| 2010 | | | (343,131) | 120,096 | 480,933 | 601,029 | - | 601,029 | 2,290,995 | 2,470,241 |
| 2011 | | | (358,937) | 125,628 | 480,933 | 606,561 | - | 606,561 | 2,897,556 | 1,863,680 |
| 2012 | | | (343,005) | 120,052 | 480,933 | 600,984 | - | 600,984 | 3,498,540 | 1,262,695 |
| 2013 | | | (289,442) | 101,305 | 480,933 | 582,238 | - | 582,238 | 4,080,778 | 680,458 |
| 2014 | | | (262,572) | 91,900 | 480,933 | 572,833 | - | 572,833 | 4,653,611 | 107,625 |
| 2015 | | | (246,974) | 86,441 | 480,933 | 567,374 | - | 567,374 | 5,220,985 | (459,749) |
| 2016 | | | (275,934) | 96,577 | 464,993 | 561,570 | - | 561,570 | 5,782,554 | (1,021,319) |
| 2017 | | | (283,187) | 99,115 | 97,689 | 196,805 | - | 196,805 | 5,979,359 | (1,218,124) |
| 2018 | | | (233,916) | 81,870 | | 81,870 | - | 81,870 | 6,061,230 | (1,299,994) |
| 2019 | | | (197,694) | 69,193 | | 69,193 | - | 69,193 | 6,130,423 | (1,369,187) |
| 2020 | | | (181,213) | 63,424 | | 63,424 | - | 63,424 | 6,193,847 | (1,432,611) |
| 2021 | | | (210,084) | 73,529 | | 73,529 | - | 73,529 | 6,267,377 | (1,506,141) |
| Totals | | 4,761,236 | (4,165,850) | 1,458,048 | 4,809,329 | 6,267,377 | - | 6,267,377 | | |

### Capital Account Analysis

| | | |
|---|---|---|
| Total Capital Contributions | $ | 4,761,236 |
| Beginning Capital Bal. | $ | 4,761,236 |
| Less: | | |
| Tax Losses | $ | (4,165,850) |
| Cash Flow | | |
| Ending Capital Account | $ | 595,385 |
| Tax Rate | | 35.0% |
| Assumed Write-off | $ | 208,385 (1) |

### Capital Contribution Schedule

| | | | |
|---|---|---|---|
| ** | 11/1/2006 | $ | 1,190,309 |
| ** | 12/31/2006 | $ | 1,190,309 |
| *** | 12/1/2006 | $ | - |
| *** | 5/1/2007 | $ | 1,428,371 |
| *** | 7/1/2007 | $ | - |
| *** | 8/1/2007 | $ | 476,124 |
| **** | 10/1/2007 | $ | 476,124 |
| **** | 1/1/2008 | $ | - |
| **** | 4/1/2008 | $ | - |
| **** | 7/1/2008 | $ | - |
| | | $ | 4,761,236 |

(1) The Capital Account does not include any positive cash flow to the investors.

10/30/2006   11:08 PM

Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

**Equity Funded Reserves**

| Balance (Constant) | 8/17/2008 10.00 | 9/4/2008 10.00 | 10/14/2008 10.00 | 11/14/2008 10.00 | 12/14/2008 10.00 | 1/14/2009 10.00 | 2/14/2009 10.00 | 3/14/2009 10.00 | 4/14/2009 10.00 | 5/14/2009 10.00 | 6/14/2009 10.00 | 7/14/2009 10.00 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Equity** | | | | | | | | | | | | | | |
| Equity Bridge Loan | | | | | | | | | | | | | 4,791,326 | (531,811) Fee Paid Per Sources and Uses |
| Total Equity Permanent Finance | | | | | | | | | | | | | 4,791,326 | |
| Total Permanent Construction Financing | | | | | | | | | | | | | 7,072,000 | (531,811) Fee Paid Per Monthly Schedule |
| HUD end of Fixed Path Draws | | | | | | | | | | | | | | (0) |
| Taxable Construction Financing | | | | | | | | | | | | | | |
| Taxable Permanent Financing | | | | | | | | | | | | | 235,000 | |
| GFP Funding Reserve | | | | | | | | | | | | | 531,811 | (0) - should be 0 |
| Soft Financing | | | | | | | | | | | | | | |
| Defi Financing #2 | | | | | | | | | | | | | | |
| Deferral of HUD | | | | | | | | | | | | | | |
| Release of Reserves | | | | | | | | | | | | | | |
| Interest Construction Escrows | | | | | | | | | | | | | 700,681 | (531,811) Fee Paid |
| FNMA Escrow Services | | | | | | | | | | | | | 150,031 | 418,250 Deferred Fee |
| Cash Flow from Operations | | | | | | | | | | | | | 4,724,734 | 1,200,445 |
| **Total Sources** | | | | | | | | | | | | | 11,234,734 | 1,651,445   Total Fee |
| Variance to Sources and Uses | 3,243,333 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | (0) - should be 0 |
| | | | | | | | | | | | | | (0) - should be 0 | $ should be 0 |
| **Uses** | | | | | | | | | | | | | | |
| Construction Costs | | | | | | | | | | | | | 3,243,333 | 3,243,333 |
| Accrual Reserve | | | | | | | | | | | | | 150,000 | 150,000 |
| Acquisition Costs | | | | | | | | | | | | | 10,205,500 | |
| Developer Fee | | | | | | | | | | | | | | |
| FNMA Good Faith Deposit | | | | | | | | | | | | | | |
| Perm Construction Costs | | | | | | | | | | | | | | |
| Interest Arbitrage | | | | | | | | | | | | | | |
| Subtotal Profit and Overhead | | | | | | | | | | | | | 504,926 | |
| Construction Interest | | | | | | | | | | | | | 11,234,734 | |

| | | |
|---|---|---|
| **Cumulative Interest Reserve** | | |
| Taxable Construction Loan Balance | | |
| Tax Exempt Construction Loan Balance | | |
| **Total Construction Provision** | | |
| Non-Cash Balance | | |
| **Perm Loan** | | |
| Tax Exempt Construction Loan Interest | | 39,911 |
| Taxable Construction Loan Interest | | 465,016 |
| Interest Expense on Construction Loan | | 504,926 |
| **Total Construction Interest** | | |

| | |
|---|---|
| Net Construction Interest | 504,926 |
| Capitalized | 717,953 |
| Expensed | 217,453 |

# Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## Permanent Loan Amortization

Permanent Loan

| Principal | 7,970,000 |
|---|---|
| Rate | 6.365% |
| Term | 420 |
| Amortization | 420 |
| Start Date | 10/01/07 |
| Months Remaining | 3.00 |
| Monthly Payment | 47,414 |

| | Year | Payment of Principal & Interest | Principal | Interest | Ending Balance | Mortgage Balance at Sale |
|---|---|---|---|---|---|---|
| | 2005 | - | - | - | 7,970,000 | |
| | 2006 | - | - | - | 7,970,000 | |
| | 2007 | 142,243 | 15,502 | (126,741) | 7,954,498 | |
| | 2008 | 568,971 | 64,528 | (504,443) | 7,889,970 | |
| | 2009 | 568,971 | 68,757 | (500,214) | 7,821,213 | |
| | 2010 | 568,971 | 73,264 | (495,707) | 7,747,949 | |
| | 2011 | 568,971 | 78,065 | (490,906) | 7,669,884 | |
| | 2012 | 568,971 | 83,182 | (485,789) | 7,586,702 | |
| | 2013 | 568,971 | 88,633 | (480,338) | 7,498,069 | |
| | 2014 | 568,971 | 94,442 | (474,528) | 7,403,626 | |
| | 2015 | 568,971 | 100,632 | (468,339) | 7,302,994 | |
| | 2016 | 568,971 | 107,228 | (461,743) | 7,195,767 | |
| | 2017 | 568,971 | 114,255 | (454,716) | 7,081,511 | |
| | 2018 | 568,971 | 121,744 | (447,227) | 6,959,768 | |
| | 2019 | 568,971 | 129,723 | (439,248) | 6,830,045 | |
| | 2020 | 568,971 | 138,225 | (430,746) | 6,691,820 | |
| | 2021 | 568,971 | 147,284 | (421,687) | 6,544,536 | 6,544,536 |
| Totals | | 8,107,836 | 1,425,464 | (6,682,372) | | 6,544,536 |

10/30/2006    11:08 PM

# Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## Other Financing (Hard)-TAXABLE HARD DEBT Amortization

Other Financing (Hard)-TAXABLE HARD DEBT

| | |
|---|---|
| Principal | 265,000 |
| Rate | 8.215% |
| Term | 420 |
| Amortization | 420 |
| Start Date | 10/01/07 |
| Deferral | - |
| Monthly Payment | 1,924 |

| Year | Payment of Principal & Interest | Principal | Calculated Interest | Paid Interest | Accrued Interest | Ending Balance |
|---|---|---|---|---|---|---|
| 2005 | - | - | - | - | - | 265,000 |
| 2006 | - | - | - | - | - | 265,000 |
| 2007 | 5,771 | 331 | (5,440) | (5,440) | - | 264,669 |
| 2008 | 23,085 | 1,394 | (21,691) | (21,691) | - | 263,275 |
| 2009 | 23,085 | 1,513 | (21,572) | (21,572) | - | 261,763 |
| 2010 | 23,085 | 1,642 | (21,443) | (21,443) | - | 260,121 |
| 2011 | 23,085 | 1,782 | (21,303) | (21,303) | - | 258,339 |
| 2012 | 23,085 | 1,934 | (21,151) | (21,151) | - | 256,406 |
| 2013 | 23,085 | 2,099 | (20,986) | (20,986) | - | 254,307 |
| 2014 | 23,085 | 2,278 | (20,807) | (20,807) | - | 252,029 |
| 2015 | 23,085 | 2,472 | (20,612) | (20,612) | - | 249,557 |
| 2016 | 23,085 | 2,683 | (20,402) | (20,402) | - | 246,874 |
| 2017 | 23,085 | 2,912 | (20,173) | (20,173) | - | 243,962 |
| 2018 | 23,085 | 3,160 | (19,924) | (19,924) | - | 240,802 |
| 2019 | 23,085 | 3,430 | (19,655) | (19,655) | - | 237,372 |
| 2020 | 23,085 | 3,723 | (19,362) | (19,362) | - | 233,649 |
| 2021 | 23,085 | 4,040 | (19,044) | (19,044) | - | 229,609 |
| Totals | - | 328,955 | 35,391 | (293,564) | (293,564) | - |

10/30/2006    11:08 PM

# Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## GP DEFICIT LOAN

GP DEFICIT LOAN

| | |
|---|---|
| Principal | 531,841 |
| Rate | 4.00%  Simple |
| Start Date | 10/01/07 |
| Months in 1st Year | 3.00 |

| | Year | Available Cash Flow | Principal | Interest | Paid Interest | Accrued Interest | Ending Balance |
|---|---|---|---|---|---|---|---|
| | 2005 | - | - | 5,318 | - | 5,318 | 537,160 |
| | 2006 | - | - | 21,274 | - | 21,274 | 558,433 |
| | 2007 | - | - | 21,274 | - | 21,274 | 579,707 |
| | 2008 | - | - | 21,274 | - | 21,274 | 600,981 |
| | 2009 | - | - | 21,274 | - | 21,274 | 622,254 |
| | 2010 | - | - | 21,274 | - | 21,274 | 643,528 |
| | 2011 | - | - | 21,274 | - | 21,274 | 664,801 |
| | 2012 | - | - | 21,274 | - | 21,274 | 686,075 |
| | 2013 | - | - | 21,274 | - | 21,274 | 707,349 |
| | 2014 | - | - | 21,274 | - | 21,274 | 728,622 |
| | 2015 | - | - | 21,274 | - | 21,274 | 749,896 |
| | 2016 | - | - | 21,274 | - | 21,274 | 771,170 |
| | 2017 | - | - | 21,274 | - | 21,274 | 792,443 |
| | 2018 | - | - | 21,274 | - | 21,274 | 813,717 |
| | 2019 | - | - | 21,274 | - | 21,274 | 834,991 |
| | 2020 | - | - | 21,274 | - | 21,274 | 856,264 |
| | 2021 | - | - | 21,274 | - | 21,274 | 877,538 |
| Total | | - | - | 345,697 | - | 345,697 | |

10/30/2006   11:08 PM

# Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## Deferred Developer Fees Amortization

Deferred Developer Fees

| | |
|---|---|
| Principal | 1,885,445 |
| Rate | 0.00% |
| Amortization | 180 |
| Start Date | 05/01/07 |
| Months in 1st Year | 8 |
| Advance Payment | - |

| | Year | Available Cash Flow | Payment | Principal | Calculated Interest | Paid Interest | Accrued Interest | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| | 2005 | - | - | - | - | - | - | 1,885,445 |
| | 2006 | - | - | - | - | - | - | 1,885,445 |
| | 2007 | 21,272 | 21,272 | 21,272 | - | - | - | 1,864,173 |
| | 2008 | 88,709 | 88,709 | 88,709 | - | - | - | 1,775,464 |
| | 2009 | 95,640 | 95,640 | 95,640 | - | - | - | 1,679,824 |
| | 2010 | 102,503 | 102,503 | 102,503 | - | - | - | 1,577,321 |
| | 2011 | 109,293 | 109,293 | 109,293 | - | - | - | 1,468,028 |
| | 2012 | 116,000 | 116,000 | 116,000 | - | - | - | 1,352,028 |
| | 2013 | 122,617 | 122,617 | 122,617 | - | - | - | 1,229,411 |
| | 2014 | 129,136 | 129,136 | 129,136 | - | - | - | 1,100,275 |
| | 2015 | 135,547 | 135,547 | 135,547 | - | - | - | 964,728 |
| | 2016 | 141,841 | 141,841 | 141,841 | - | - | - | 822,888 |
| | 2017 | 148,008 | 148,008 | 148,008 | - | - | - | 674,880 |
| | 2018 | 154,039 | 154,039 | 154,039 | - | - | - | 520,841 |
| | 2019 | 159,922 | 159,922 | 159,922 | - | - | - | 360,919 |
| | 2020 | 165,647 | 165,647 | 165,647 | - | - | - | 195,272 |
| | 2021 | 171,203 | 171,203 | 171,203 | - | - | - | 24,069 |
| Total | | 1,861,376 | 1,861,376 | 1,861,376 | - | - | - | |

10/30/2006    11:08 PM

# Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## Reserves Schedule

| | | | |
|---|---|---|---|
| Operating Reserve | 150,000 | | |
| Total Reserves | 150,000 | | |
| Rate | 2.00% | | |
| Initial Deposit Month | 5/31/2007 | | |

| Year | Beginning Balance | Deposits | Transfers | 2.00% Interest | Withdrawals | Ending Balance |
|---|---|---|---|---|---|---|
| 2005 | | | | | | - |
| 2006 | - | 150,000 | | - | | 150,000 |
| 2007 | 150,000 | | | 1,750 | | 151,750 |
| 2008 | 151,750 | - | | 3,035 | | 154,785 |
| 2009 | 154,785 | - | | 3,096 | | 157,881 |
| 2010 | 157,881 | - | | 3,158 | | 161,038 |
| 2011 | 161,038 | - | | 3,221 | | 164,259 |
| 2012 | 164,259 | - | | 3,285 | | 167,544 |
| 2013 | 167,544 | - | | 3,351 | | 170,895 |
| 2014 | 170,895 | - | | 3,418 | | 174,313 |
| 2015 | 174,313 | - | | 3,486 | | 177,799 |
| 2016 | 177,799 | - | | 3,556 | | 181,355 |
| 2017 | 181,355 | - | | 3,627 | | 184,982 |
| 2018 | 184,982 | - | | 3,700 | | 188,682 |
| 2019 | 188,682 | - | | 3,774 | | 192,456 |
| 2020 | 192,456 | - | | 3,849 | | 196,305 |
| 2021 | 196,305 | - | | 3,926 | | 200,231 |
| Totals | | 150,000 | - | 50,231 | - | |

10/30/2006    11:08 PM

# Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## Calculation of Tax Credit

|  | Acquisition | Low-Income Credit |
|---|---|---|
| Depreciable Basis | | 13,915,565 |
| Less: | | |
|     Building Acquisition | | 8,924,563 |
|     Developer Fee Used for Non-Basis Eligible Items | | 94,272 |
| Eligible Basis Before Adjustment | 8,924,563 | 4,896,730 |
| LIH Percentage | 100.00% | 100.00% |
| | 8,924,563 | 4,896,730 |
| Difficult Development Area/QCT | 100% | 100% |
| Basis for LIH Credit | 8,924,563 | 4,896,730 |
| LIH Credit Percentage | 3.48% | 3.48% |
| LIH Credit Calculation | 310,575 | 170,406 |
| Credit Allocation Amount | | 480,981 |
| Minimum of Allocation or Calculation | | 480,981 |
| Percentage of Tax Credits to the Investor | | 99.9900% |
| Annual Tax Credits to the Investor | | 480,933 |
| Tax Credits Per Unit Per Month | | 227.71 |

10/30/2006    11:08 PM

Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

## 704(B) Analysis

| Year | Asset Value | Depreciation | Net Asset Value | Permanent Loan Balance | 2nd Mortgage Balance | Other Financing Balance | Soft Financing Balance | Cash Flow | Minimum Gain | Change in Minimum Gain | Carryover Minimum Gain | Maximum Loss Allowed | Equity Investment | Annual Taxable Loss/(Income) | Lower Tier Capital Account Balance | Potential Reallocation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 15,296,502 | (94,083) | 15,242,419 | 7,970,000 | | 265,000 | | | | | | | 2,380,618 | (33,181) | 2,413,769 | |
| 2007 | 15,307,502 | (558,411) | 14,749,091 | 7,054,498 | | 264,659 | | | | | 2,413,769 | 2,413,769 | 4,285,112 | 138,393 | 4,176,901 | |
| 2008 | 15,352,922 | (1,171,596) | 14,181,225 | 7,686,970 | | 263,275 | | | | | 4,176,901 | 4,176,901 | 4,761,238 | 444,544 | 4,211,480 | |
| 2009 | 15,399,502 | (1,737,625) | 13,661,876 | 7,821,213 | | 261,763 | | | | | 4,211,480 | 4,211,480 | 4,761,238 | 384,689 | 3,826,791 | |
| 2010 | 15,447,582 | (2,275,059) | 13,172,523 | 7,747,949 | | 260,121 | | | | | 3,826,791 | 3,826,791 | 4,761,238 | 343,131 | 3,483,660 | |
| 2011 | 15,497,104 | (2,841,533) | 12,655,571 | 7,669,884 | | 258,339 | | | | | 3,483,660 | 3,483,660 | 4,761,238 | 358,937 | 3,124,723 | |
| 2012 | 15,548,112 | (3,405,602) | 12,142,510 | 7,586,762 | | 256,406 | | | | | 3,124,723 | 3,124,723 | 4,761,238 | 343,005 | 2,781,719 | |
| 2013 | 15,600,650 | (3,929,939) | 11,670,712 | 7,498,069 | | 254,307 | | | | | 2,781,719 | 2,781,719 | 4,761,238 | 289,442 | 2,492,277 | |
| 2014 | 15,654,765 | (4,441,554) | 11,213,210 | 7,403,828 | | 252,029 | | | | | 2,492,277 | 2,492,277 | 4,761,238 | 262,572 | 2,229,705 | |
| 2015 | 15,710,503 | (4,952,058) | 10,758,444 | 7,302,994 | | 240,557 | | | | | 2,229,705 | 2,229,705 | 4,761,238 | 246,974 | 1,982,731 | |
| 2016 | 15,767,913 | (5,506,442) | 10,261,471 | 7,195,767 | | 248,874 | | | | | 1,982,731 | 1,982,731 | 4,761,238 | 275,934 | 1,706,797 | |
| 2017 | 15,827,045 | (6,083,677) | 9,743,368 | 7,081,511 | | 243,592 | | | | | 1,706,797 | 1,706,797 | 4,761,238 | 283,187 | 1,423,610 | |
| 2018 | 15,887,951 | (6,627,254) | 9,260,697 | 6,959,768 | | 240,602 | | | | | 1,423,610 | 1,423,610 | 4,761,238 | 233,916 | 1,189,694 | |
| 2019 | 15,950,685 | (7,150,643) | 8,800,042 | 6,830,045 | | 237,372 | | | | | 1,189,694 | 1,189,694 | 4,761,238 | 197,694 | 992,001 | |
| 2020 | 16,015,300 | (7,674,028) | 8,341,272 | 6,691,820 | | 233,649 | | | | | 992,001 | 992,001 | 4,761,238 | 181,213 | 810,788 | |
| 2021 | 16,081,854 | (8,243,232) | 7,838,622 | 6,544,530 | | 229,699 | | | | | 810,788 | 810,788 | 4,761,238 | 210,084 | 600,704 | |

| Assets | | Debt | | Limited Partner Interest | 93.980001% |
|---|---|---|---|---|---|
| Land | 1,350,937 | Capital Contribution | | | |
| Building | 13,915,565 | Permanent Loan | 7,970,000 | | |
| Other Land Costs | | 2nd Mortgage | | | |
| | | Other Financing (Hard)-TAXABLE HARD D | 265,000 | | |
| Net Assets | 15,296,502 | Soft Financing | | | |
| | | | | | |
| Annual Replacement Re | 44,000 | Total Non-Recourse Debt | 8,235,000 | | |

Orchard Hills 10-30-06 LT CLOSING PROJECTION HARD CODED

| Valuation Analysis | | Inflators: | Income: | 1.03 | Expense: | | 1.03 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Rental Income | Other Income | Vacancy | Management Fee | Operating Expenses | Replacement Reserves | NOI | Cap Rate | Property Value | Sum of All Loan Balances | Project Equity |
| 2005 | | | | | | | | | | | |
| 2006 | 210,007 | 4,650 | (12,879) | (8,071) | (78,234) | - | 115,473 | 6.10% | 1,893,003 | 10,563,618 | (8,670,614) |
| 2007 | 1,372,310 | 30,386 | (84,162) | (52,741) | (486,013) | (11,000) | 768,780 | 6.10% | 12,602,945 | 9,965,010 | 2,637,936 |
| 2008 | 1,517,893 | 33,609 | (93,090) | (58,336) | (631,060) | (45,320) | 723,696 | 6.10% | 11,863,861 | 9,806,564 | 2,057,296 |
| 2009 | 1,563,430 | 34,618 | (95,883) | (60,087) | (649,992) | (46,680) | 745,406 | 6.10% | 12,219,777 | 9,623,228 | 2,596,548 |
| 2010 | 1,610,333 | 35,656 | (98,759) | (61,889) | (669,492) | (48,080) | 767,769 | 6.10% | 12,586,370 | 9,414,108 | 3,172,262 |
| 2011 | 1,658,643 | 36,726 | (101,722) | (63,746) | (689,577) | (49,522) | 790,802 | 6.10% | 12,963,961 | 9,178,270 | 3,785,691 |
| 2012 | 1,708,402 | 37,828 | (104,774) | (65,658) | (710,264) | (51,008) | 814,526 | 6.10% | 13,352,880 | 8,914,747 | 4,438,132 |
| 2013 | 1,759,654 | 38,962 | (107,917) | (67,628) | (731,572) | (52,538) | 838,961 | 6.10% | 13,753,466 | 8,622,528 | 5,130,938 |
| 2014 | 1,812,444 | 40,131 | (111,155) | (69,657) | (753,519) | (54,114) | 864,130 | 6.10% | 14,166,070 | 8,340,559 | 5,825,511 |
| 2015 | 1,866,817 | 41,335 | (114,489) | (71,747) | (776,125) | (55,738) | 890,054 | 6.10% | 14,591,052 | 7,989,558 | 6,601,494 |
| 2016 | 1,922,822 | 42,575 | (117,924) | (73,899) | (799,408) | (57,410) | 916,756 | 6.10% | 15,028,784 | 7,595,427 | 7,433,357 |
| 2017 | 1,980,506 | 43,853 | (121,462) | (76,116) | (823,391) | (59,132) | 944,258 | 6.10% | 15,479,648 | 7,325,473 | 8,154,174 |
| 2018 | 2,039,922 | 45,168 | (125,105) | (78,399) | (848,092) | (60,906) | 972,586 | 6.10% | 15,944,037 | 7,200,569 | 8,743,468 |
| 2019 | 2,101,119 | 46,523 | (128,859) | (80,751) | (873,535) | (62,733) | 1,001,764 | 6.10% | 16,422,358 | 7,067,416 | 9,354,942 |
| 2020 | 2,164,153 | 47,919 | (132,724) | (83,174) | (899,741) | (64,615) | 1,031,817 | 6.10% | 16,915,029 | 6,925,469 | 9,989,560 |
| 2021 | 2,229,077 | 49,356 | (136,706) | (85,669) | (926,734) | (66,554) | 1,062,771 | 6.10% | 17,422,480 | 6,774,145 | 10,648,335 |
| 2022 | 2,295,950 | 50,837 | (140,807) | (88,239) | (954,536) | (68,551) | 1,094,654 | 6.10% | 17,945,154 | 6,612,823 | 11,332,331 |
| 2023 | 2,364,828 | 52,362 | (145,031) | (90,886) | (983,172) | (70,607) | 1,127,494 | 6.10% | 18,483,509 | 6,440,841 | 12,042,667 |
| 2024 | 2,435,773 | 53,933 | (149,382) | (93,613) | (1,012,667) | (72,725) | 1,161,319 | 6.10% | 19,038,014 | 6,257,494 | 12,780,520 |
| 2025 | 2,508,846 | 55,551 | (153,864) | (96,421) | (1,043,047) | (74,907) | 1,196,158 | 6.10% | 19,609,154 | 6,062,028 | 13,547,127 |
| 2026 | 2,584,112 | 57,218 | (158,480) | (99,314) | (1,074,338) | (77,154) | 1,232,043 | 6.10% | 20,197,429 | 5,853,640 | 14,343,789 |
| 2027 | 2,661,635 | 58,934 | (163,234) | (102,293) | (1,106,568) | (79,469) | 1,269,004 | 6.10% | 20,803,352 | 5,631,474 | 15,171,878 |
| 2028 | 2,741,484 | 60,702 | (168,131) | (105,362) | (1,139,765) | (81,853) | 1,307,075 | 6.10% | 21,427,452 | 5,394,616 | 16,032,836 |
| 2029 | 2,823,729 | 62,523 | (173,175) | (108,523) | (1,173,958) | (84,309) | 1,346,287 | 6.10% | 22,070,276 | 5,142,093 | 16,928,183 |
| 2030 | 2,908,440 | 64,399 | (178,370) | (111,779) | (1,209,177) | (86,838) | 1,386,675 | 6.10% | 22,732,384 | 4,872,866 | 17,859,518 |
| 2031 | 2,995,694 | 66,331 | (183,721) | (115,132) | (1,245,452) | (89,443) | 1,428,276 | 6.10% | 23,414,356 | 4,585,828 | 18,828,528 |
| 2032 | 3,085,565 | 68,321 | (189,233) | (118,586) | (1,282,816) | (92,126) | 1,471,124 | 6.10% | 24,116,786 | 4,279,795 | 19,836,992 |
| 2033 | 3,178,131 | 70,370 | (194,910) | (122,144) | (1,321,300) | (94,890) | 1,515,258 | 6.10% | 24,840,290 | 3,953,508 | 20,886,782 |
| 2034 | 3,273,475 | 72,482 | (200,757) | (125,808) | (1,360,939) | (97,737) | 1,560,715 | 6.10% | 25,585,499 | 3,605,623 | 21,979,876 |
| 2035 | 3,371,680 | 74,656 | (206,780) | (129,582) | (1,401,768) | (100,669) | 1,607,537 | 6.10% | 26,353,064 | 2,234,706 | 23,118,358 |
| 2036 | 3,472,830 | 76,896 | (212,984) | (133,470) | (1,443,821) | (103,689) | 1,655,763 | 6.10% | 27,143,656 | 2,839,228 | 24,304,428 |
| 2037 | 3,577,015 | 79,203 | (219,373) | (137,474) | (1,487,135) | (106,800) | 1,705,436 | 6.10% | 27,957,965 | 2,417,557 | 25,540,408 |
| 2038 | 3,684,325 | 81,579 | (225,954) | (141,598) | (1,531,749) | (110,004) | 1,756,599 | 6.10% | 28,796,704 | 1,967,954 | 26,828,750 |
| 2039 | 3,794,855 | 84,026 | (232,733) | (145,846) | (1,577,702) | (113,304) | 1,809,297 | 6.10% | 29,660,605 | 1,488,562 | 28,172,043 |
| 2040 | 3,908,701 | 86,547 | (239,715) | (150,221) | (1,625,033) | (116,703) | 1,863,576 | 6.10% | 30,550,424 | 977,403 | 29,573,021 |
| 2041 | 4,025,962 | 89,143 | (246,906) | (154,728) | (1,673,784) | (120,204) | 1,919,483 | 6.10% | 31,466,936 | 432,363 | 31,034,573 |
| 2042 | 4,146,741 | 91,817 | (254,313) | (159,370) | (1,723,997) | (123,810) | 1,977,068 | 6.10% | 32,410,944 | - | 32,410,944 |
| 2043 | 4,271,143 | 94,572 | (261,943) | (164,151) | (1,775,717) | (127,524) | 2,036,380 | 6.10% | 33,383,273 | - | 33,383,273 |
| 2044 | 4,399,277 | 97,409 | (269,801) | (169,075) | (1,828,989) | (131,350) | 2,097,471 | 6.10% | 34,384,771 | - | 34,384,771 |
| 2045 | 4,531,256 | 100,331 | (277,895) | (174,148) | (1,883,858) | (135,290) | 2,160,395 | 6.10% | 35,416,314 | - | 35,416,314 |

Exhibit 3

PRIUM ORCHARD HILLS, L.L.C.

Project Summary

COLUMBUS/523644.6

Exhibit 3

Prium Orchard Hills, LLC

Project Summary

| | |
|---|---|
| Project Name: | Orchard Hills Apartments ("Project") |
| Owner: | Prium Orchard Hills, LLC ("Operating Company") |
| General Partners: | P & U Capital Partners, LLC |
| Developer: | Prium Companies, LLC |
| Guarantor: | Prium Companies, LLC |
| Contractor: | Prium Construction, LLC – an affiliate of Prium Companies, LLC |
| Property Manager: | Allied Group, Inc. |
| Investor Limited Partner: | Provident Tax Credit Fund IX, LLC ("Fund") |
| Special Limited Partner: | SCDC, LLC – controlled by Red Capital Markets, Inc. |
| Location: | Tacoma, WA |

Project Description: The acquisition and rehabilitation of a 176-unit market rate apartment complex consisting of 19 two and three-story buildings plus a clubhouse, with an adjacent outdoor pool. Following the planned renovation, the Project will operate as a tax-credit property with all units operating rent and income restrictions.

The Project will be comprised of the following unit types and rent restrictions:

| No. of Bedrooms | No. of Baths | Average Unit Size (Sq Ft) | Unit Count | Assistance Program | AMI Restriction | Maximum Tax Credit Rent | Underwritten Rent |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 644 | 84 | Unassisted | 60% | 645 | 620 |
| 2 | 1 | 847 | 46 | Unassisted | 60% | 770 | 695 |
| 2 | 2 | 942 | 36 | Unassisted | 60% | 770 | 740 |
| 3 | 2 | 1,073 | 10 | Unassisted | 60% | 889 | 850 |
| **Total** | | | 176 | | | | |

Amenities:        Unit amenities will include the following:

- Balcony or patio
- Dishwasher
- Garbage disposal
- Washer & dryer Hook-ups
- Washer & dryer
- Some walk-in closets
- Electric oven/range combination
- Microwave
- 2 door frost free refrigerator
- Electric baseboard heat

Project amenities will include the following:

- Clubhouse
- Lounge
- Administrative offices
- Maintenance shed
- Fireplace
- Kitchen
- Indoor racquetball/basketball court
- Exercise room
- Sauna
- Tanning room
- Spa
- Men and women's changing rooms
- Outdoor pool
- Children's play area
- Gazebo
- Barbeque/picnic area

Financing Summary:    The construction and permanent financing will be provided through tax credit equity, a tax-exempt bond, a taxable bond,

and General Partner equity.  The taxable and tax-exempt bonds will be credit enhanced by Capmark through the construction period and FannieMae thereafter.

PRIUM ORCHARD HILLS, L.L.C.

Schedule A -- Schedule of Members

| MANAGING MEMBERS | Total Agreed-to Capital Contribution | Paid-in Capital Contribution | Share of Total Member Class Interest |
|---|---|---|---|
| P&U Capital Partners I, L.L.C.<br>c/o Prium Companies, L.L.C.<br>820 A Street, Suite 300<br>Tacoma, WA  98402 | $1,768,159 | $1,768,159 | 100% |

INVESTOR MEMBERS

Special Investor Member

| | | | |
|---|---|---|---|
| SCDC, LLC<br>c/o Red Capital Markets, Inc.<br>Two Miranova Place, 12th Floor<br>Columbus, OH 43215 | $100.00 | $100.00 | 0.001% |

Company Investor Member

| | | | |
|---|---|---|---|
| Provident Tax Credit Fund IX, LLC<br>c/o Red Capital Markets, Inc.<br>Two Miranova Place, 12th Floor<br>Columbus, OH 43215 | $4,761,136.00* | $1,190,209** | 99.999% |

---

** Paid-in Capital Contribution as of the date of this Schedule A.  Future Installments of Capital Contribution are subject from the Company Investor Member at the times and subject to the conditions set forth in this Agreement to which this Schedule A is attached.

1

<u>**FIRST AMENDMENT TO**</u>
<u>**THE AMENDED AND RESTATED**</u>
<u>**OPERATING AGREEMENT**</u>

THIS FIRST AMENDMENT ("*First Amendment*") to the Amended and Restated Operating Agreement of PRIUM ORCHARD HILLS, L.L.C., a Washington limited liability company (the "*Company*"), is made effective September 1, 2008 by and between P&U CAPITAL PARTNERS I, L.L.C., a Washington limited liability company (the "*Managing Member*"), and NATIONWIDE AFFORDABLE HOUSING FUND 30: A RED CAPITAL TAX CREDIT FUND, LLC, an Ohio limited liability company (the "*Company Investor Member*"), and SCDC, LLC, an Ohio limited liability company (the "*Special Investor Member*").

<u>**Recitals**</u>

A.     The Company is presently constituted and governed pursuant to the Amended and Restated Operating Agreement dated as of November 6, 2006 (the "*Operating Agreement*"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Operating Agreement.

B.     The Members desire to execute this First Amendment to amend the Operating Agreement as set forth herein.

C.     This First Amendment is to memorialize the Company Investor Member's agreement to make an additional Capital Contribution as set forth in <u>Section 4.2 A(4)</u>.

<u>**Statement of Agreement**</u>

In consideration of the premises hereof, the covenants contained herein and other good and valuable consideration, the parties agree as follows:

**Section 1**

(a)     Pursuant to <u>Section 4.2 A(4)</u> of the Operating Agreement, the adjustment to the Capital Contribution results in an additional Capital Contribution of $144,249.

(b)     The second sentence in <u>Section 4.1 A.</u> of the Operating Agreement is hereby amended by deleting the amount "$4,761,136" and replacing it with "$4,905,385".

(c)     <u>Section 4.1 A(5)</u> of the Operating Agreement is hereby amended by deleting the amount of "$476,124" and replacing it with "$620,373".

(d)     The table of Projected Credits set forth in <u>Section 4.2 A(5)</u> of the Operating Agreement is hereby deleted in its entirety and is replaced with the following:

| Year | Projected Credit |
|------|------------------|
| 2006 | $15,940 |
| 2007 | $383,243 |
| 2008 and each year thereafter through 2015 | $495,503 |
| 2016 | $479,563 |
| 2017 | $112,260 |

**Section 2    Unamended Terms.**  Except as hereby amended, the remaining terms and conditions of the Operating Agreement are hereby ratified and confirmed in all respects, and the Operating Agreement, as amended hereby, shall constitute the agreement between the Managing Member and the Company Investor Member.

**Section 3    Counterparts.**  This First Amendment may be executed in several counterparts, all of which shall constitute one agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

IN WITNESS WHEREOF, the Members have executed this First Amendment as of the date first set forth at the beginning hereof.

MANAGING MEMBER

**P&U CAPITAL PARTNERS I, L.L.C.**

By: Prium Companies, L.L.C., its sole
member

By: _____
Hyun J. Um, Management
Committee Member

By: _____
Thomas W. Price, Management
Committee Member

COMPANY INVESTOR MEMBER

**NATIONWIDE AFFORDABLE HOUSING FUND 30: A RED CAPITAL TAX CREDIT FUND, LLC**

By: Red Capital Community Development
Company, LLC, its managing member

By: _____
Name: R. Charles Booh
Title: Vice President

SPECIAL INVESTOR MEMBER

**SCDC, LLC**

By: _____
Name: R. Charles Booh
Title: Vice President

- 2 -

Exhibit B

## ASSIGNMENT OF MEMBER INTEREST

This Assignment of Member Interest (the "Assignment") is made and entered into as of the 27 th day of December, 2006, by and between **Provident Tax Credit Fund IX, LLC, an Ohio limited liability company** ("Assignor"), and **Nationwide Affordable Housing Fund 30: A Red Capital Tax Credit Fund, LLC, an Ohio limited liability company** ("Assignee").

1. Assignor hereby assigns, transfers and sets over to Assignee all of Assignor's interests in and to Prium Orchard Hills, L.L.C. (the "Company"), a Washington limited liability company operating pursuant to the terms of an Amended and Restated Operating Agreement dated November 6, 2006 (the "Operating Agreement"), including, but not limited to, all of Assignor's interests, as a partner, in the profits, losses and cash distributions of the Company, subject to the Assignor's share, as an investor member, of the obligations of the Company, pursuant to the Operating Agreement.

2. Assignee hereby accepts the foregoing assignment and agrees to be bound by the Operating Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

ASSIGNOR:

PROVIDENT TAX CREDIT FUND IX, LLC

By: Red Capital Community Development Company, LLC

By_____
Scott M. Laufenberg, President

ASSIGNEE:

NATIONWIDE AFFORDABLE HOUSING FUND 30: A RED CAPITAL TAX CREDIT FUND, LLC

By: Red Capital Community Development Company, LLC

By_____
Scott M. Laufenberg, President

Exhibit C

<u>**FIRST AMENDMENT TO**</u>
<u>**THE AMENDED AND RESTATED**</u>
<u>**OPERATING AGREEMENT**</u>

THIS FIRST AMENDMENT ("*First Amendment*") to the Amended and Restated Operating Agreement of PRIUM ORCHARD HILLS, L.L.C., a Washington limited liability company (the "*Company*"), is made effective September 1, 2008 by and between P&U CAPITAL PARTNERS I, L.L.C., a Washington limited liability company (the "*Managing Member*"), and NATIONWIDE AFFORDABLE HOUSING FUND 30: A RED CAPITAL TAX CREDIT FUND, LLC, an Ohio limited liability company (the "*Company Investor Member*"), and SCDC, LLC, an Ohio limited liability company (the "*Special Investor Member*").

### Recitals

A.     The Company is presently constituted and governed pursuant to the Amended and Restated Operating Agreement dated as of November 6, 2006 (the "*Operating Agreement*"). Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Operating Agreement.

B.     The Members desire to execute this First Amendment to amend the Operating Agreement as set forth herein.

C.     This First Amendment is to memorialize the Company Investor Member's agreement to make an additional Capital Contribution as set forth in <u>Section 4.2 A(4)</u>.

### **Statement of Agreement**

In consideration of the premises hereof, the covenants contained herein and other good and valuable consideration, the parties agree as follows:

**Section 1**

(a)     Pursuant to <u>Section 4.2 A(4)</u> of the Operating Agreement, the adjustment to the Capital Contribution results in an additional Capital Contribution of $144,249.

(b)     The second sentence in <u>Section 4.1 A.</u> of the Operating Agreement is hereby amended by deleting the amount "$4,761,136" and replacing it with "$4,905,385".

(c)     <u>Section 4.1 A(5)</u> of the Operating Agreement is hereby amended by deleting the amount of "$476,124" and replacing it with "$620,373".

(d)     The table of Projected Credits set forth in <u>Section 4.2 A(5)</u> of the Operating Agreement is hereby deleted in its entirety and is replaced with the following:

| Year | Projected Credit |
|------|------------------|
| 2006 | $15,940 |
| 2007 | $383,243 |
| 2008 and each year thereafter through 2015 | $495,503 |
| 2016 | $479,563 |
| 2017 | $112,260 |

**Section 2    Unamended Terms.**  Except as hereby amended, the remaining terms and conditions of the Operating Agreement are hereby ratified and confirmed in all respects, and the Operating Agreement, as amended hereby, shall constitute the agreement between the Managing Member and the Company Investor Member.

**Section 3    Counterparts.**  This First Amendment may be executed in several counterparts, all of which shall constitute one agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

IN WITNESS WHEREOF, the Members have executed this First Amendment as of the date first set forth at the beginning hereof.

MANAGING MEMBER

**P&U CAPITAL PARTNERS I, L.L.C.**

By: Prium Companies, L.L.C., its sole
       member

By: _____
       Hyun J. Um, Management
       Committee Member

By: _____
       Thomas W. Price, Management
       Committee Member

COMPANY INVESTOR MEMBER

**NATIONWIDE AFFORDABLE HOUSING FUND 30: A RED CAPITAL TAX CREDIT FUND, LLC**

By: Red Capital Community Development
       Company, LLC, its managing member

By: _____
Name: _R. Charles Booth_____
Title: _Vice President_____

SPECIAL INVESTOR MEMBER

**SCDC, LLC**

By: _____
Name: _R. Charles Booth_____
Title: _Vice President_____