Exhibit E

Orchard Hills - Exhibit to Notice of Overdue Payment Dated February 26, 2014

**981078164 Monthly Pmts Due**

| | P&I | Late Charges |
|---|---|---|
| 2/1/2014 | $12,219.02 | $237.08 |
| 1/1/2014 | | $239.58 |
| 12/1/2013 | | $242.07 |
| Subtotals | $12,219.02 | $718.73 |
| Total Pmts & LC | $12,937.75 | |

**981078163 Monthly Pmts Due**

| | Total Pmt Outstanding | Interest | Tax | Insurance | Repl Reserve | Late Charges |
|---|---|---|---|---|---|---|
| 2/1/2014 | $106,527.89 | $42,440.25 | $45,545.73 | $14,435.24 | $4,106.67 | $5,326.39 |
| 1/1/2014 | $22,918.60 | | $14,203.32 | $4,608.61 | $4,106.67 | $3,267.94 |
| 12/1/2013 | $9,732.78 | | $1,017.50 | $4,608.61 | $4,106.67 | $3,267.94 |
| Subtotals | $139,179.27 | $42,440.25 | $60,766.55 | $23,652.46 | $12,320.01 | $11,862.27 |
| Total Pmts & LC | $151,041.54 | | | | | |

**Grand Total Both Loans**   $163,979.29

Exhibit F

# PRIUM ORCHARD HILLS, L.L.C.

Guaranty of Obligations
of
Entity Managing Member

For valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the undersigned, Prium Companies, L.L.C., a Washington limited liability company (the "Guarantor"), unconditionally guarantees due payment, performance and fulfillment to Prium Orchard Hills, L.L.C., a Washington limited liability company (the "Company"); Provident Tax Credit Fund IX, LLC, an Ohio limited liability company; and SCDC, LLC, an Ohio limited liability company; including any affiliates, participants, successors and/or assigns of such entities (collectively, the "Obligees"), of those obligations specifically defined below (the "Guaranteed Obligations") of P&U Capital Partners I, L.L.C., a Washington limited liability company (the "Obligor"), whether the Guaranteed Obligations are direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising or acquired. The "Guaranteed Obligations" shall be the payment and performance of each and every obligation of Obligor to each of the Obligees arising under the Amended and Restated Operating Agreement of the Company dated as of November 6, 2006 (the "Operating Agreement") and under the Managing Member Closing Certificate dated November 6, 2006. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Operating Agreement.

This undertaking shall operate as an unconditional, continuing and absolute Guaranty and shall remain in full force and effect until all Guaranteed Obligations of the Obligor have expired or been fully performed. Notice of the acceptance of this Guaranty and notices of transactions entered into in reliance hereof are hereby waived. The Guarantor consents to any renewal, extension or postponement of the time of satisfaction of any of the Guaranteed Obligations or to any other forbearance or indulgence with respect thereto, whether or not notice thereof shall be given to the Guarantor, and the enforcement hereof shall not be affected by the neglect or failure of the Obligees to take any action with respect to any security, right, obligation, endorsement or guaranty which either of them may at any time hold, or by any change with respect to any Obligor in the form or manner of doing business, whether by incorporation, consolidation, merger, formation or change in membership, or otherwise. Upon any default by an Obligor, the liability of the Guarantor hereunder shall be effective immediately and the Guarantor waives all requirements of notice, demand, presentment or protest and any right which the Guarantor might otherwise have to require the Obligees first to proceed against the Obligor or against any other guarantor or any other person or first to realize on any security held by them before proceeding against the Guarantor for the enforcement of this Guaranty. The Guarantor shall not assert any right arising from payment or other performance hereunder by the Guarantor until the Guarantor's liability hereunder shall have been discharged in full and all of the Guaranteed Obligations existing at the time of such discharge shall have been fulfilled.

The Guarantor hereby waives (i) any defense arising by virtue of the lack of authority or the dissolution of the Managing Member or the Company; (ii) notice of the existence or incurring of any Guaranteed Obligation; (vi) any rights to set-offs, recoupments and counterclaims; (iii) any statute of limitations affecting the Guarantor's liability hereunder or the enforcement thereof; (iv)

any defense based upon an election of remedies by Obligees; (v) any and all suretyship defenses or defenses in the nature thereof without in any manner limiting any other provisions of this Agreement or the Operating Agreement; (vi) any defense based upon any requirement of law which provides that the obligation of a surety must be neither larger in amount nor in any other way more burdensome than that of the principal; (vi) any defense based on any absence of an attempt by or on behalf of Obligees to seek to enforce the Guaranteed Obligations or to protect, perfect or to seek recourse from, any other guarantor of, or any collateral security held at any time by Obligees for or with respect to, all or any of the Guaranteed Obligations; (vii) the discharge of all or any of the Guaranteed Obligations in any proceeding under any chapter of the United States Bankruptcy Code or any other federal or state insolvency or debtor relief laws; (viii) the disallowance under Section 502 of the Bankruptcy Code of any claim arising from the Guaranteed Obligations; (ix) any other circumstance which might otherwise constitute a defense available to, or a discharge of the Company, the Guarantor or any other guarantor or Person (other than the Managing Member) with respect to the Guaranteed Obligations.

The Guarantor recognizes that the Company Investor Member's business is to make investments in other partnerships, limited liability companies or other entities (collectively, "Project Partnerships") which develop and own rental residential projects and that from time to time there will be the need to modify, waive or enforce the agreements between the Company and a Project Partnership, the general partner, managing member or comparable controlling person of such Project Partnerships, and with other persons. The Guarantor acknowledges and agrees that such modifications, waivers or enforcement or other actions may affect the Guarantor's liability hereunder, and agrees that its liability to Obligees under this Agreement will not be waived, limited, or impaired thereby, and waives any surety or other defenses which the Guarantor might otherwise be entitled to assert on account thereof.

The Guarantor guarantees to the Obligees the payment of any and all expenses paid or incurred by the Obligees (including reasonable attorneys' fees) in connection with the enforcement of all Guaranteed Obligations guaranteed hereunder, whether such enforcement be from the Obligor or from the Guarantor. If for any reason an Obligor shall be under no legal obligation to discharge any of the Guaranteed Obligations for any reason, or if any amounts included in the Guaranteed Obligations shall become irrecoverable from an Obligor by operation of law or for any other reason, the Guarantor shall nonetheless be and remain bound upon this Guaranty.

The Guarantor covenants to maintain a minimum net worth of not less than five million dollars and a liquidity of not less than one million dollars, which net worth shall be evidenced by audited financial statements reasonably acceptable to the Special Investor Member.

In addition to all other rights of Obligees to payment or performance of the Guaranteed Obligations, if an event shall occur that (pursuant to the terms of the Operating Agreement or otherwise) would entitle Obligees to payment, distribution or performance of the Guaranteed Obligations, but there shall be filed with respect to the Managing Member or the Company a petition in bankruptcy or for similar relief under the Bankruptcy Code or any similar law, whether federal, state, local or otherwise, and by reason of such filing or as a result of any order of court, Obligees shall be prevented from receiving or accepting payment, distribution or performance of the Guaranteed Obligations, or shall be required to return or refund any or all of the benefits

- 2 -

relating or otherwise attributable to such payment, distribution or performance, then Obligees shall have the right to demand directly and unconditionally from the Guarantor payment or performance in full, and the Guarantor shall immediately pay or perform in full, all of the Guaranteed Obligations (including all costs, fees and charges).

This instrument, and all rights and remedies of the parties, shall be determined as to their validity, construction, effect and enforcement, and in all other respects of the same or different nature, by the laws of the State of Washington. Any legal action or proceeding with respect to this Guaranty shall be brought in the courts of the State of Washington or of the United States of America for the District of Washington, and by execution and delivery of this Guaranty, the Guarantor hereby accepts, generally and unconditionally, the jurisdiction of the aforesaid courts. The Guarantor irrevocably consents to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by certified mail, postage prepaid, to the Guarantor at his address set forth below his signature below, and service so made shall be deemed complete seven (7) days after the same shall have been so mailed.

This is a guaranty of payment and performance and not of collection.

This Guaranty is intended to take effect as a sealed instrument, shall inure to the benefit of the Obligees and their successors and assigns and shall be binding upon the Guarantor and each of his successors and assigns.

The invalidity or unenforceability of any provision of this Guaranty in a particular respect shall not affect the validity and enforceability of any other provisions of this Guaranty or of the same provision in any other respect.

[The remainder of this page is intentionally left blank]

This Guaranty is executed as of November 6, 2006.

PRIUM COMPANIES, L.L.C.,
a Washington limited liability company

By: _____
Hyun J. Um, Management Committee Member

By: _____
Thomas W. Price,
Management Committee Member

Address:

820 A. Street, Suite 300
Tacoma, Washington 98402

- 4 -

Exhibit G



STOEL
RIVES
LLP
ATTORNEYS AT LAW

600 University Street, Suite 3600
Seattle, Washington 98101
main 206.624.0900
fax 206.386.7500
www.stoel.com

BART W. REED
*Direct (206) 386-7568*
bwreed@stoel.com

August 16, 2013

**BY EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Matthew Sweeney, Esq.                    Matthew Sweeney, Esq.
Registered Agent                         PO Box 7935
P&U Capital Partners I, L.L.C.           Tacoma, WA 98417-0935
c/o Prium Companies, L.L.C.
6416 Pacific Highway E
Fife, Washington 98424-1561

Re:    **Prium Orchard Hills, L.L.C.;**
       **Orchard Hills Apartments, 501 Orchard Street West**
       **Tacoma, Pierce County, Washington 98467 (the "Property");**
       **Third Demand for Compliance with Operating Agreement and Notice of Default**

Dear Mr. Sweeney:

The instant letter serves to follow up from our clients' most recent June 21, 2013, to which
our clients, Nationwide Affordable Housing Fund 30, LLC and SCDC, LLC (the "Investor
Members"), have yet to receive any response from Prium Orchard Hills, LLC ("Prium").
The Investor Members' increasing frustrations emanate not only from Prium's failure or
refusal to respond to the June 21, 2013 correspondence, but also, and perhaps more
importantly, Prium's failure or refusal to recognize, address and resolve critical issues that
continue to impact the profitability and sustainability of the project to the detriment of the
Investor Members.

Indeed, these issues, which have been referenced in detail in previous correspondence,[1]
persist relative to the Orchard Hills Apartments (the "Property"), as corroborated by recent

---

[1]   A copy of the Investor Members' most recent June 21, 2013 correspondence is enclosed herein as Exhibit 1
      for Prium's ease of review and reference.

 **FILE COPY**

Alaska   California   Idaho
Minnesota   Oregon   Utah   Washington
and   Washington, D.C.



Matthew Sweeney, Esq.
August 16, 2013
Page 2

audit reports and subsequent physical needs assessments and notwithstanding the Investor
Members' continued efforts to bring these matters to the attention of Prium in hopes of
Prium's understanding, appreciation and resolution of same. These critical issues include the
apparent failure on the part of Prium to deposit funds sufficient to replenish the tenant
security deposit account and to appropriate the necessary resources (or formulate a workable
remediation plan) with respect to the "immediate need" items reflected in the 2012 Physical
Needs Assessment (the "2012 PNA") conducted by Consolidated Consulting Group
("CCG").

Insofar as these items linger, particularly with regard to the security deposit issues and
"immediate needs" reflected in the 2012 PNA (and reconfirmed in the latest, most recent
follow up physical needs assessment (the "2013 PNA")), Prium remains in material breach of
the Operating Agreement--to which (as previously conveyed in the June 21, 2013 demand
letter) Prium, not the property manager (including either The Allied Group ("Allied") or its
purported successor, Hoban & Associates, Inc. d/b/a Coast Real Estate Services ("Coast
Services")), remains bound.

## MISAPPROPRIATION OF TENANT SECURITY DEPOSITS

As detailed in both our May 10, 2013 and June 21, 2013 correspondence, Prium remains in
violation of the Washington Residential Landlord-Tenant Act (RCW 59.18.270) and, thus,
the Operating Agreement (Sections 6.1, 6.5, 6.6 and 7.2) for failing to safeguard and secure
the tenant security deposits in a separate account. In fact, the 2012 financial audit indicates
that the tenant security deposit account may not even exist. According to the balance sheet[2]
reflecting Prium's assets, liabilities and equity, there exists a "bond reserve fund" in the
amount of $82,028.00, with the amount of $87,404.00 found to be due and owing for tenant
security deposits for the 2012 fiscal year. As of June 30, 2013, there existed an ending
balance owed for the security deposits in the amount of $87,679.83. The Partnership's
accountants have determined that the bond reserve fund apparently is held in an expense fund
(maintained at U.S. Bank) to pay annual trustee fees, with the majority of the funds used to
satisfy principal and interest payments on the bonds, with no funding set aside for the tenant
security deposits as of December 31, 2012. Prium's failure to establish and maintain the
tenant security deposit account is a serious issue that requires immediate and careful
attention. Again, Prium's reliance on and deference to Allied for the handling, oversight and
control of the account ignores the obligation on the part of Prium, as the General Partner, to

---

[2]    A copy of the Prium Balance Sheet is enclosed herein as Exhibit 2 for Prium's convenience.



Matthew Sweeney, Esq.
August 16, 2013
Page 3

ensure that the account is properly established and maintained, notwithstanding any delegation of such responsibilities to third parties.

Accordingly, the Investor Members renew their previous demand that Prium exact immediate and all appropriate measures to reconcile the tenant security deposit amounts and supplement the account with funds sufficient to bring the account current and compliant with Washington law.  In addition, the Investor Members demand that Prium provides an account summary substantiating that the account complies with any and all legal requirements, and regularly updates the Investor Members with security deposit account information and balances. Again, whether and to what extent the Investor Members, or any predecessor investor member(s), neglected to raise any issue with the security deposit account at a later date (ostensibly beyond the first instance of Prium's mismanagement of the account) has absolutely no bearing on Prium's continuing duty to maintain the account in compliance with the applicable law and the Operating Agreement's terms.

## FAILURE TO MAINTAIN THE PROPERTY

With respect to the property maintenance issues, the Investor Members remain quite concerned and frustrated by the fact that Prium places such little significance on the "immediate needs" identified in the 2012 PNA. As you have been apprised, the "immediate need" items in the 2012 PNA include potentially serious conditions impacting the Property and those individuals residing or working at the Property.  Indeed, the defective or deficient items span a broad spectrum of conditions and specifically concern or relate to, among other items, (i) the structure and envelope, (ii) the mechanical, electrical and plumbing systems and components and (iii) the life safety/fire protection elements of the Property.

CCG has most recently confirmed in another physical needs assessment, conducted on July 17, 2013 and memorialized in a July 31, 2013 report,[3] that many of the same "immediate need" issues remain on the property and thus require timely attention by Prium.  Prium's continued failure or otherwise refusal to recognize and appreciate these issues—and to rectify them via funds from the replacement reserve and, thereafter, the Operating Deficit Guarantee amounts—constitutes a material breach of the Operating Agreement (namely, Sections 6.5(A), 6.6(5)(6) and (7)).

The "immediate need" items, as identified in the 2013 PNA, require action within the next 60 to 90 days and total an estimated dollar amount of $1,042,030.00.  In its 2013 PNA, CCG

---

[3]   A copy of the 2013 PNA is enclosed herein as Exhibit 3 for Prium's review and consideration.



Matthew Sweeney, Esq.
August 16, 2013
Page 4

explains that, "[t]ypically, immediate [needs] repairs are deficiencies that require action in the next 60-90 days as a result of: (i) existing or potentially unsafe conditions, (ii) negative conditions significantly impacting marketability or habitability, (iii) material building code violations, (iv) poor or a deteriorated condition of a critical element or system, or (v) a condition that if left 'as is' with an extensive delay in addressing same, would result in or contribute to critical element or system failure within 12 months or a significant escalation in the repair cost." See 2013 PNA, p. 8.  As noted in the 2013 PNA, the property management reports that the current occupancy rate is 82.39% for the 176 units (see p. 4), which, together with the aforementioned bases for the "immediate need" items identified on the Property, underscores the need to address the items—with the intent to increase the occupancy rate and to promote the safe and secure use and enjoyment of the facilities for the benefit of the occupants.

Without belaboring the issue, Prium should be well aware of the fact that the same "immediate need" conditions exist on the Property as those uncovered in the 2012 PNA, which include the polybutylene pipes and life safety/fire suppression system needs that comprise the predominate monetary portion of the improvements to be made on the Property. More specifically, of the total estimated sum of $1,042,030.00 in "immediate need" repairs to be made on the Property, the estimated amounts of $880,000.00 and $26,000.00 should be dedicated immediately to address the plumbing and life safety/fire protection issues, respectively.  Further explanation of the critical items in need of immediate repair will not be recited herein, but undoubtedly should serve as more than adequate basis for the Investor Members' insistence that the conditions be rectified in a timely and property manner, utilizing funds which should be reserved to address the property issues and not as part of any decision to defer ongoing property maintenance obligations at the continued risk of damage to the Property and possible injury to the occupants.

Again, Prium has no basis to advance the notion that the Investor Members may have waived any right to demand that Prium address these Property maintenance issues and "immediate need" items purportedly based on some neglect on the part of the Investor Members to account for such items during the acquisition of the predecessor Investor Member.  These same "immediate needs" were identified in the earlier 2006 physical needs assessment performed by f3 Inc. Real Property Consultants (the "2006 PNA"), which are, in large part, precisely the same "immediate need" items that existed as of the investigations and reporting of the Property conditions during the 2012 PNA and, most recently, in the 2013 PNA. Together with the fact that the Investor Members have received very little, if any, reasonable assurances from Prium that the "immediate needs" and other defective or deficient Property conditions will be corrected, the Investor Members maintain every right to make such demands under the Operating Agreement that the items be promptly and properly addressed



Matthew Sweeney, Esq.
August 16, 2013
Page 5

in order to ensure not only the good working order, operation and maintenance of the Property, but also, and perhaps more germane to the Investor Members, its future financial viability and success.

As is evident from Prium's continued refusal to acknowledge these issues and work with the Investor Members to formulate a reasonable solution to the ongoing property condition issues and impacts to the current and future occupancy and revenues from the property, Prium has exhibited very little interest, if any, to place the property in a favorable position to generate legitimate, ongoing and sustained revenues and profits. This certainly begs the question as to Prium's true motivations for serving as the general partner or its financial capacity to mitigate the risks attendant to the current property conditions. Regardless of whatever property management agencies are employed by Prium, to which we understand Prium inappropriately defers to shirk or evade its contractual obligations, the Investor Members demand that Prium exact reasonable measures and devote the necessary resources sufficient to ensure that these items are addressed and resolved for the benefit of all parties.

Next, with respect to Prium's reliance on any "periodic inspections by the Washington State Housing Finance Commission" (the "WSHFC"), the Investor Members, as conveyed in their last correspondence to Prium's attention, do not believe that the various inspection reports produced by the WSHFC during the 2008 and 2011 time periods have any bearing on the operation, maintenance and construction-related issues impacting the revenue and profitability of the Property and affecting the interests of the Investor Members. Also, it appears that the WSHFC had any desire, much less the available resources and wherewithal, to conduct as comprehensive of physical needs reports as those detailed in the 2006, 2012 and 2013 PNAs. As previously mentioned, the Investor Members cannot locate in any of the WSHFC reports any mention of the systemic "immediate needs" conditions pervading the Property, such as the polybutylene pipe issues.

Regarding the polybutylene pipe issue, Prium contends in its earlier letter that the "plastic pipe is not and has never been an immediate need." Further, Prium asserts that "[t]he issue was recognized by all parties years ago at the inception of [Prium's] involvement" and "[a] reserve fund exists and is funded with dedicated monthly contributions so that funds are available to replace the piping over time on an as needed basis." However, CCG, during its most recent site investigation, found that only piecemeal efforts have been made with respect to units that have experienced recent damage caused by the polybutylene pipes and, to the extent that repair efforts were made at the particular location, the repairs did not involve a proper wholesale replacement of the pipe distribution lines and conveyance system within or for the unit.



Matthew Sweeney, Esq.
August 16, 2013
Page 6

The mere fact that the pipes have not experienced any widespread failure to date provides little, if any, comfort to the Investor Members that such pipes, or the other "immediate need" items, could not impact the Property now or in the near future based on the conditions identified in the 2006 PNA, the 2012 PNA and, most recently, the 2013 PNA. Moreover, simply because the pipes have yet to cause widespread or catastrophic loss or damage to the Property does not relieve Prium from its ongoing responsibility to maintain the Property, which includes addressing and resolving conditions that impinge on the operation and economic sustainability and livelihood of the Property.

## CONCLUSION AND INVITATION FOR SETTLEMENT DISCUSSIONS

Based on the foregoing, the time has come for decisive action to be made by the Investor Members to place the Property in a position of sustained marketability and improved profitability. The Investor Members find the current situation with Prium's operational and managerial control of the Property totally deficient and thus unacceptable. Accordingly, as the Property is not being operated and managed in compliance with the Operating Agreement, the Investor Members have no other choice other than to declare Prium in default under Section 8.6 of the Operating Agreement.

In light of this matter, as it concerns Prium's default under the terms of the Operating Agreement, we ask that Prium now avail itself of the opportunity to meet with the Investor Members to discuss the situation and help formulate, if possible, a mutually beneficial (or less questionable or damaging) approach to resolving the plight of the Property. Certainly, litigation may not be in either party's best interests, and the Investor Members are willing, at this stage, to invest some time and effort to work with Prium in a conciliatory fashion to frame a logical plan to improve the Property. If Prium is not amenable to this reasonable approach, then the Investor Members otherwise will be forced to resort to litigate their claims against Prium.

To forestall the possibility of protracted litigation, the Investor Members invite Prium to share its perspective on the issues during a meeting between the various party representatives in the near future. Assuming that Prium is willing to participate in good faith in a meeting with the Investor Members, please provide us with dates during the latter half of September, 2013 in which Prium's principals and its counsel are available for a meeting. If we do not receive any response from you within five (5) days of the date of this letter, we will assume that Prium is both uninterested and not desirous in discussing the matter further, which will likely push the Investor Members to resolve the situation through alternative means.



Matthew Sweeney, Esq.
August 16, 2013
Page 7

Please note that this letter is sent to Prium subject to and without waiving any and all rights and entitlement maintained by the Investor Members under the express and implied terms of the Operating Agreement and applicable law.   Such rights and entitlement may include invoking certain contractual options to safeguard the Property asset, including any appropriate and necessary actions to ensure that reserve funds are maintained and properly expended to address and resolve the Property's "immediate need" items as reflected in the 2013 PNA.

We thank you for your anticipated cooperation and assistance with this matter and look forward to hearing from you soon.

Yours very truly,

Bart W. Reed

BWR/lb
Enclosures

74422767.1 0064625-00001

2. Article Number

|||||||| ||||||| |||||||||| ||||||||

7196 9008 9111 6969 4927

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery
Prium Companies, LLC.          8/9/13
C. Signature
6416 Pacific Hwy E
Fife WA 98424
X
□ Agent
□ Addr.
D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:       □ No

3. Service Type   CERTIFIED MAIL™

4. Restricted Delivery? (Extra Fee)   □ Yes

d. Article Addressed to:

Matthew Sweeney, Esq.
Registered Agent
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
6416 Pacific Highway E
Fife, Washington 98424-1561

Reference Information

0064625-00001

Bart Reed

PS Form 3811, January 2005          Domestic Return Receipt

---

2. Article Number

|||||||| ||||||| |||||||||| ||||||||

7196 9008 9111 6969 4910

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery
Matthew Sweeney          8/9/13
C. Signature
X
□ Agent
☑ Addressee
D. Is delivery address different from item 1?   □ Yes
   If YES, enter delivery address below:       □ No

3. Service Type   CERTIFIED MAIL™

4. Restricted Delivery? (Extra Fee)   □ Yes

1. Article Addressed to:

Matthew Sweeney, Esq.
Matthew Sweeney, Esq.
PO Box 7935
Tacoma, WA 98417-0935

Reference Information

0064625-00001

Bart Reed

PS Form 3811, January 2005          Domestic Return Receipt

7196 9008 9111 6969 4910

**TO:** Matthew Sweeney, Esq.
Matthew Sweeney, Esq.
PO Box 7935
Tacoma, WA 98417-0935

**SENDER:** Bart Reed

**REFERENCE:** 0064625-00001

PS Form 3800, January 2005



| RETURN RECEIPT SERVICE | Postage | 5.80 |
|---|---|---|
| | Certified Fee | 3.10 |
| | Return Receipt Fee | 2.55 |
| | Restricted Delivery | |
| | Total Postage & Fees | $11.45 |

**USPS®**
**Receipt for**
**Certified Mail™**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE

7196 9008 9111 6969 4927

**TO:** Matthew Sweeney, Esq.
Registered Agent
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
6416 Pacific Highway E
Fife, Washington 98424-1561

**SENDER:** Bart Reed

**REFERENCE:** 0064625-00001

PS Form 3800, January 2005



| RETURN RECEIPT SERVICE | Postage | 5.80 |
|---|---|---|
| | Certified Fee | 3.10 |
| | Return Receipt Fee | 2.55 |
| | Restricted Delivery | |
| | Total Postage & Fees | $11.45 |

**USPS®**
**Receipt for**
**Certified Mail™**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE

G-1



STOEL
RIVES
LLP
ATTORNEYS AT LAW

600 University Street, Suite 3600
Seattle, Washington 98101
main 206.624.0900
fax 206.386.7500
www.stoel.com

BART W. REED
*Direct (206) 386-7568*
*bwreed@stoel.com*

June 21, 2013

**BY EMAIL and CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Matthew Sweeney, Esq.
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
820 A Street, Suite 300
Tacoma, Washington 98402

Re:    **Prium Orchard Hills, L.L.C.;**
       **Orchard Hills Apartments, 501 Orchard Street West**
       **Tacoma, Pierce County, Washington  98467 (the "Property");**
       **Demand for Compliance with Operating Agreement, including**
       **Continuing Maintenance Obligations, Site Access and Property Documents**

Dear Mr. Sweeney:

We offer this letter as a reply to your most recent May 28, 2013 correspondence on behalf of
Prium Orchard Hills, LLC ("Prium") and in further support of the previous May 10, 2013
demand letter from our clients, Nationwide Affordable Housing Fund 30, LLC and SCDC, LLC
(the "Investor Members"). While we intend to respond to your client's contentions in greater
detail below, the Investor Members generally find Prium's positions reflected in your recent
correspondence short-sighted, misplaced and unwarranted—particularly regarding Prium's (i)
blanket assertion that the Investor Members allegedly "failed to perform adequate due diligence
prior to assuming the position of the predecessor Investor Member" and (ii) continued reliance
on and deference to The Allied Group ("Allied")[1] relative to the previous and ongoing operation
and maintenance of the Property.  Such positions overlook and remain inconsistent with the
unambiguous terms of the Operating Agreement to which Prium, not Allied (or its successor),
remains bound.

---

[1]    Interestingly, and presumably as a consequence of concerns regarding the propriety of Allied's management of
       the Property, it now appears from recent correspondence received by our client that Prium has chosen to replace
       Allied with another property management company, Hoban & Associates, Inc. d/b/a Coast Real Estate Services
       ("Coast Services").



**FILE COPY**

Alaska   California   Idaho
Minnesota   Oregon   Utah   Washington
and   Washington, D.C.

73994541.1 0064625-00001

**Certified Article Number**
**7160 3901 9845 2895 9877**
**SENDERS RECORD**



Matthew Sweeney
June 21, 2013
Page 2

## MISAPPROPRIATION OF TENANT SECURITY DEPOSITS

First and foremost, and as detailed in our May 10, 2013 correspondence, Prium remains in violation of the Washington Residential Landlord-Tenant Act (RCW 59.18.270) and, thus, the Operating Agreement (Sections 6.1, 6.5, 6.6 and 7.2) for failing to safeguard and secure, in a separate account, tenant security deposits in the approximate amount of $87,000.00. Again, Prium's reliance on and deference to Allied for the handling, oversight and control of the account ignores the obligation on the part of Prium, as the General Partner, to ensure that the account is properly established and maintained, notwithstanding any delegation of such responsibilities to third parties.

Accordingly, the Investor Members demand that, within seven (7) days of the date of this correspondence, Prium exacts all appropriate measures to reconcile the tenant security deposit amounts and supplement the account with funds sufficient to bring the account current and compliant with Washington law. In addition, the Investor Members demand that Prium provide an account summary substantiating that the account complies with any and all legal requirements, and regularly updates the Investor Members with security deposit account information and balances. Whether and to what extent the Investor Members, or any predecessor investor member(s), neglected to raise any issue with the security deposit account until this time has absolutely no bearing on Prium's continuing duty to maintain the account in compliance with the applicable law and the Operating Agreement's terms.

## FAILURE TO MAINTAIN THE PROPERTY

With respect to the property maintenance issues, the Investor Members are quite concerned, if not frustrated, by the fact that Prium places such little significance on the "immediate needs" identified in the 2012 Physical Needs Assessment (the "2012 PNA"). As you have been apprised, the "immediate need" items in the 2012 PNA include potentially serious conditions impacting the Property and those individuals residing or working at the Property. Indeed, the defective or deficient items span a broad array of conditions and specifically concern or relate to, among other items, (i) the structure and envelope, (ii) the mechanical, electrical and plumbing systems and components and (iii) the life safety/fire protection elements of the Property. Prium's continued failure or otherwise refusal to recognize and appreciate these issues—and to rectify them via usage of funds from the replacement reserve and, thereafter, the Operating Deficit Guarantee amounts—constitutes a material breach of the Operating Agreement (namely, Sections 6.5(A), 6.6(5)(6) and (7)).



Matthew Sweeney
June 21, 2013
Page 3

In its most recent responsive correspondence, Prium contends that the Investor Members may have waived any right to demand that Prium address these Property maintenance issues and "immediate need" items purportedly based on some neglect on the part of the Investor Members to account for such items during the acquisition of the predecessor Investor Member. However, this notion is belied by the fact that the same "immediate needs" uncovered and noted in an earlier 2006 Physical Needs Assessment (the "2006 PNA") are, in large part, precisely the same "immediate need" items that existed as of the investigations and reporting of the Property conditions during the 2012 PNA. Together with the fact that the Investor Members have received very little, if any, reasonable assurances from Prium that the "immediate needs" and other defective or deficient Property conditions will be corrected, the Investor Members now have every right to make such demands under the Operating Agreement that the items be promptly and properly addressed in order to ensure not only the good working order, operation and maintenance of the Property, but also, and perhaps more germane to the Investor Members, its future financial viability and success.

Rather than stand accountable for its actions or omissions relative to the Property conditions and appropriate clear systematic steps to correct the Property's "immediate needs" in furtherance of its contractual obligations, Prium has chosen a far more dubious path, electing to defer, once again, to Allied for its operation and maintenance responsibilities. Here, Prium states in its letter that "Allied is the on-site manager of the property and we trust them to ensure that the premises are reasonably safe and secure." In this regard, the Investor Members would be quite interested to learn what, if any, requests were made by Prium to Allied to correct all or a portion of the "immediate need" items referenced in the 2006 PNA or 2012 PNA. Now, since Allied apparently has been replaced with Coast Services, the Investors Members are equally interested to know what efforts, if any, are being made to direct or coordinate with Coast Services regarding the remediation of the "immediate need" items. In any event, and regardless of what management company has been retained by Prium, the Investor Members demand that Prium exact measures and devote the necessary resources sufficient to ensure that these items are addressed and resolved in a timely and proper manner.

Next, Prium confirms in its letter that it is "reasonably satisfied" with the "immediate property condition" based on "periodic inspections by the Washington State Housing Finance Commission" (the "WSFHC"). Prium attaches its letter various inspection reports produced by the WSFHC during the 2008 and 2011 time periods. However, after reviewing these inspection reports, it appears that the WSFHC, in its inspections, was merely concerned with general habitability issues and not with the operation, maintenance and construction-related issues impacting the revenue and profitability of the Property and affecting the interests of the Investor Members. Also, we seriously question whether and to what extent the WSHFC had any desire,



Matthew Sweeney
June 21, 2013
Page 4

much less the available resources and wherewithal, to conduct as comprehensive of physical needs reports as those detailed in the 2006 and 2012 PNAs. In fact, the Investor Members cannot locate in any of the WSHFC reports any mention of the systemic "immediate needs" conditions pervading the Property, such as the polybutylene pipe issues.

With respect to the polybutylene pipe issue, Prium contends, quite defiantly, in its letter that the "plastic pipe is not and has never been an immediate need." Further, Prium asserts that "[t]he issue was recognized by all parties years ago at the inception of [Prium's] involvement" and "[a] reserve fund exists and is funded with dedicated monthly contributions so that funds are available to replace the piping over time on an as needed basis." Here, the Investor Members request that Prium immediately furnish information and documents to demonstrate what reserve funds have been established to address the polybutylene pipe concerns, what monthly contributions have been made to the reserve and, of those funds, what monies have been expended to date. Moreover, as Prium has also stated that "Allied has been mostly responsible for performing unit refurbishing, including replacing pipes in units when needed," the Investor Members additionally request that Prium provide information relative to the timing, location, cause, repair process and current status of any pipe replacements made by Allied or any others on the Property.

The mere fact that the pipes have not experienced any widespread failure to date provides little, if any, comfort to the Investor Members that such pipes, or the other "immediate needs," could not impact the Property now or in the near future based on the conditions identified in the 2012 PNA. Moreover, simply because the pipes have yet to cause loss or damage to the Property does not relieve Prium from its ongoing responsibility to maintain the Property, which includes addressing and resolving conditions that impinge on the operation and economic sustainability and livelihood of the Property asset.

Notwithstanding Prium's continuing obligation to operate and maintain the Property in accordance with the terms of the Operating Agreement, which includes the resolution of the "immediate need" items identified in the 2012 PNA, the Investor Members desire to inspect the Property in the near future and to solicit the services of a third party inspection consultant for purposes of rendering another independent review or physical needs assessment to determine what "immediate needs" items remain from the latest 2012 PNA, which should shed light on what, if any, substantive corrective work Prium has performed to address and resolve the ongoing maintenance issues.



Matthew Sweeney
June 21, 2013
Page 5

**RECORDS AVAILABILITY**

In connection with the Investor Member's requests for documents, we ask that you provide, or make available to us, any and all documents responsive or relating to the issues reflected in the instant letter, including the tenant security deposit accounting summaries and information, as well as the Property operation and maintenance concerns. Beyond those documents, the Investor Members seek the production of documents related to Prium's internal correspondence bearing on its decision-making process to address or forego addressing the "immediate need" items contained in the 2012 PNA and all documents and correspondence bearing on its relationship with Allied (and, now, Coast Services) regarding those operation and maintenance responsibilities and concerns. While we would prefer to review these items in advance of any Property site visit, the Investor Members can certainly review the items at the Property upon their site visit, which they intend to make in the coming weeks.

To this end, as it may be purposeful to discuss this matter to coordinate the Investor Members' and any inspector's prospective site visit and document review, please contact me at your earliest convenience. In addition, the Investor Members remain mindful of the present status of the Property and Prium's role and responsibilities relative to same. And, accordingly, the Investor Members will likely seek the opportunity to meet with Prium representatives after the Investor Members have reviewed the matter and assessed the current condition of the Property.

Based on the foregoing, we look forward to hearing back from you soon to discuss a clear and straightforward path that promotes and ensures the future viability and success of the Property.

Yours very truly,

Bart W. Reed

BWR/lb

cc:    Wentwood Capital Advisors, L.P.

73994541.1 0064625-00001

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

7160 3901 9845 2895 9877

A. Received by (Please Print Clearly)

B. Date of Delivery 6/28/13

C. Signature

X ☐ Agent ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type   **CERTIFIED MAIL**

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

1. Article Addressed to:

Matthew Sweeney, Esq.
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
820 A Street, Suite 300
Tacoma, Washington 98402

Reference Information

0064625-00001

Bart Reed

PS Form 3811, January 2005          Domestic Return Receipt

CERTIFIED MAIL

7160 3901 9845 2895 9877

RETURN RECEIPT REQUESTED

STOEL
RIVES
LLP
ATTORNEYS AT LAW

Bart Reed

600 University Street, Suite 3600
Seattle, Washington 98101

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Matthew Sweeney, Esq.
P&L Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
820 A Street, Suite 300
Tacoma, Washington 98402

PRIU820  98402025-1512      06/26/13
FORWARD TIME EXP  RTN TO SEND
!PRIUM TACOMA BUILDING
6415 PACIFIC HWY E
FIFE WA 98424-1561

RETURN TO SENDER

RETURN RECEIPT
REQUESTED

RECEIVED
JUN 28 2013
Stoel Rives LLP

RETURN RECEIPT REQUESTED
USPS MAIL CARRIER
DETACH ALONG PERFORATION

Thank you for using Return Receipt Service

c

Thank you for using Return Receipt Service

G-2

PRIUM ORCHARD HILLS, LLC

BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| **ASSETS** | | |
| Investment in Rental Property: | | |
| Buildings and improvements | $ 14,259,053 | $ 14,237,043 |
| Personal property | 94,831 | 94,831 |
| Accumulated depreciation | (2,394,655) | (2,024,133) |
|  | 11,959,229 | 12,307,741 |
| Land | 1,318,260 | 1,318,260 |
| Total rental property and equipment, at cost | 13,277,489 | 13,626,001 |
| Restricted deposits and funded reserves: | | |
| Replacement reserve | 99,203 | 78,623 |
| Bond fund reserve | 82,028 | 82,028 |
| Operating reserve | 12,585 | 27,899 |
| Tax and insurance reserve | 34,190 | 30,313 |
| Total restricted deposits and funded reserves | 228,006 | 218,863 |
| Other assets: | | |
| Cash | 3,407 | 10,315 |
| Rents receivable | 6,191 | 15,997 |
| Prepaid expenses | 43,167 | 23,011 |
| Loan origination fees, net of amortization of $58,230 and $47,642, respectively | 272,545 | 283,133 |
| Total other assets | 325,310 | 332,456 |
| Total assets | $ 13,830,805 | $ 14,177,320 |

Continued on Page 4.

PRIUM ORCHARD HILLS, LLC

BALANCE SHEETS - (CONTINUED)

|  | December 31, | |
|---|---|---|
|  | 2012 | 2011 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| Liabilities: | | |
| Mortgage payable | $ 8,765,212 | $ 8,843,931 |
| Developer note payable | 335,116 | 318,703 |
| Accounts payable | 61,997 | - |
| Accrued interest payable | 48,829 | 48,829 |
| Prepaid rent | 6,019 | 7,491 |
| Tenant security deposits payable | 87,404 | 74,449 |
| Asset management fee payable | 9,518 | - |
| Total liabilities | 9,314,095 | 9,293,403 |
| Members' equity | | |
| Managing member | 1,754,833 | 1,754,870 |
| Investor and special investor members | 2,761,877 | 3,129,047 |
| Total Members' equity | 4,516,710 | 4,883,917 |
| Total liabilities and members' equity | $ 13,830,805 | $ 14,177,320 |

The accompanying notes are an integral part of these financial statements

PRIUM ORCHARD HILLS, LLC

NOTES TO FINANCIAL STATEMENTS

NOTE 5 - RESTRICTED CASH

Replacement reserve
The Company is required to make monthly deposits to a reserve for replacements account for use in funding future maintenance and replacement costs. Monthly payments are required based on budgeted amount of $250 per unit, per year, indexed annually for change in the Consumer Price Index. Per the Operating Agreement, the replacement reserve fund will be funded monthly following funding and closing of permanent loan, which occurred September 2008. A detailed schedule of reserve activity is set forth below:

|  | 2012 | 2011 |
|---|---|---|
| Balance - beginning of year | $   78,623 | $   35,949 |
| Required deposits | 49,281 | 49,279 |
| Withdrawals | (28,701) | (6,605) |
| Balance - end of year | $   99,203 | $   78,623 |

Insurance and Property Tax Reserve
The Amended and Restated Operating Agreement requires the project to establish and maintain certain reserve accounts. The reserve fund is held in escrow and used for property taxes and insurance.

Operating Reserve
The Amended and Restated Operating Agreement required the establishment of an Operating Reserve for $150,000 out of the fourth installment of capital contributions. This amount shall be reduced to $75,000 when the Company and the Managing Member meet certain requirements described in the operating agreement. All interest shall remain in the operating reserve. The operating reserve was established in 2008 as required. The balance of the operating reserve was $12,585 and $27,899 at December 31, 2012 and 2011, respectively.

NOTE 6 - TENANT SECURITY DEPOSITS

The Partnership is required to maintain a tenant security deposit account at least equal to the security deposits collected from tenants. As of December 31, 2012 and 2011, the Partnership has not funded the tenant security deposit account.

# Trial Balance

## Orchard Hills
## Through June 30, 2013.

| Account | | Beginning Balance | Debit | Credit | Ending Balance |
|---|---|---|---|---|---|
| 0400-999 | **Assets:** | | | | |
| 0500-999 | **Cash at Bank** | | | | |
| 1000-000 | Cash-Operating | 1,196.70 | 118,640.03 | 117,125.01 | 2,711.72 |
| 1050-000 | Operating Reserve | 12,861.01 | 0.00 | 0.00 | 12,861.01 |
| 1100-000 | Cash-Savings | 157.93 | 0.03 | 0.00 | 157.96 |
| 1150-000 | Cash-Tenant Trust | 82,027.58 | 0.00 | 0.00 | 82,027.58 |
| 1154-998 | **Total Cash at Bank** | **96,243.22** | **118,640.06** | **117,125.01** | **97,758.27** |
| 1154-999 | **Cash-Investments** | | | | |
| 1299-999 | **Petty Cash** | | | | |
| 1300-000 | Petty Cash-On Site | 500.00 | 0.00 | 0.00 | 500.00 |
| 1349-998 | **Total Petty Cash** | **500.00** | **0.00** | **0.00** | **500.00** |
| 1349-999 | **Deposits** | | | | |
| 1499-999 | **Escrow Accounts** | | | | |
| 1500-000 | Mortgage Escrow | 18,740.16 | 14,203.32 | 0.00 | 32,943.48 |
| 1525-000 | Insurance Escrow | 41,477.49 | 4,608.61 | 0.00 | 46,086.10 |
| 1599-998 | **Total Escrow Accounts** | **60,217.65** | **18,811.93** | **0.00** | **79,029.58** |
| 1599-999 | **Prepaids** | | | | |
| 1700-000 | Prepaid Insurance | 21,246.82 | 0.00 | 4,384.00 | 16,862.82 |
| 1725-000 | Prepaid Real Estate Tax | 15,814.40 | 0.00 | 15,814.40 | 0.00 |
| 1749-998 | **Total Prepaids** | **37,061.22** | **0.00** | **20,198.40** | **16,862.82** |
| 1749-999 | **Receivables** | | | | |
| 1800-000 | Rent Receivable | 10,313.51 | 102,232.82 | 105,822.48 | 6,723.85 |
| 2199-998 | **Total Receivables** | **10,313.51** | **102,232.82** | **105,822.48** | **6,723.85** |
| 2199-999 | **Capital Improvements** | | | | |
| 2280-000 | Improvements-Appliance | 1,135.16 | 0.00 | 0.00 | 1,135.16 |
| 2299-998 | **Total Capital Improvements** | **1,135.16** | **0.00** | **0.00** | **1,135.16** |
| 2299-999 | **Fixed Assets** | | | | |
| 2300-000 | Land | 1,318,260.00 | 0.00 | 0.00 | 1,318,260.00 |
| 2305-000 | Building At Acquisition | 9,112,147.00 | 0.00 | 0.00 | 9,112,147.00 |
| 2308-000 | Improvements | 5,146,906.04 | 0.00 | 0.00 | 5,146,906.04 |
| 2310-000 | Personal Property | 94,831.00 | 0.00 | 0.00 | 94,831.00 |
| 2314-998 | **Total Fixed Assets** | **15,672,144.04** | **0.00** | **0.00** | **15,672,144.04** |
| 2314-999 | **Intangible Assets** | | | | |
| 2320-000 | Loan Fees | 300,943.39 | 0.00 | 0.00 | 300,943.39 |
| 2330-000 | Tax Credit Fees | 29,832.00 | 0.00 | 0.00 | 29,832.00 |
| 2349-998 | **Total Intangible Assets** | **300,943.39** | **0.00** | **0.00** | **300,943.39** |
| 2349-999 | **Accumulated Depreciation** | | | | |
| 2350-000 | Accum Depr-Building | (2,467,399.50) | 0.00 | 0.00 | (2,467,399.50) |
| 2360-000 | Accum Depr-Personal Property | (81,203.00) | 0.00 | 0.00 | (81,203.00) |
| 2369-998 | **Total Accumulated Depreciation** | **(2,548,602.50)** | **0.00** | **0.00** | **(2,548,602.50)** |
| 2369-999 | **Reserves** | | | | |
| 2370-000 | Replacement Reserve | 68,775.60 | 4,106.67 | 0.00 | 72,882.27 |
| 2599-998 | **Total Reserves** | **68,775.60** | **4,106.67** | **0.00** | **72,882.27** |
| 2599-999 | **Rehabilitation** | | | | |
| 2799-999 | **Other Intangibles/Accum Amort** | | | | |
| 2837-000 | Accum Amort-Loan Fees | (62,641.65) | 0.00 | 0.00 | (62,641.65) |
| 2899-998 | **Total Other Intangibles/Accum Amort** | **(62,641.65)** | **0.00** | **0.00** | **(62,641.65)** |
| 2899-999 | **Total Assets** | **13,665,921.64** | **243,791.48** | **243,145.89** | **13,666,567.23** |
| 2999-999 | **Liabilities & Equity:** | | | | |
| 2999-999 | **Security Deposits/LMR** | | | | |
| 3000-000 | Security Deposits | (90,600.00) | 6,320.00 | 1,333.33 | (85,613.33) |
| 3000-001 | Security Deposits Refunded | (199.00) | 1,909.51 | 1,710.51 | 0.00 |
| 3003-000 | Last Month's Rent | (2,066.50) | 0.00 | 0.00 | (2,066.50) |
| 3049-998 | **Total Security Deposits/LMR** | **(92,865.50)** | **8,229.51** | **3,043.84** | **(87,679.83)** |
| 3049-999 | **Accounts Payable** | | | | |
| 3350-000 | Accounts Payable | (97,523.66) | 21,302.78 | 33,386.45 | (109,607.33) |
| 3360-000 | Accrued Liabilities | (660.00) | 0.00 | 0.00 | (660.00) |
| 3370-000 | Retainage Payable | (9,517.79) | 0.00 | 0.00 | (9,517.79) |
| 3389-998 | **Total Accounts Payable** | **(107,701.45)** | **21,302.78** | **33,386.45** | **(119,785.12)** |
| 3389-999 | **Prepaid Rents** | | | | |
| 3390-000 | Prepaid Rent | (3,945.43) | 8,312.51 | 6,533.29 | (2,166.21) |
| 3399-998 | **Total Prepaid Rents** | **(3,945.43)** | **8,312.51** | **6,533.29** | **(2,166.21)** |
| 3399-999 | **Interest Payable** | | | | |
| 3450-000 | Mortgage/Bond Interest Payable | (48,829.43) | 0.00 | 0.00 | (48,829.43) |
| 3454-998 | **Total Interest Payable** | **(48,829.43)** | **0.00** | **0.00** | **(48,829.43)** |
| 3454-999 | **Notes & Other Payables** | | | | |
| 3500-000 | Mortgage/Bond Payable-1 | (8,730,489.27) | 7,085.72 | 0.00 | (8,723,403.55) |
| 3605-000 | Developer Fee Payable | (335,116.43) | 0.00 | 0.00 | (335,116.43) |