Exhibit G



**STOEL RIVES** LLP
ATTORNEYS AT LAW

600 University Street, Suite 3600
Seattle, Washington 98101
main 206.624.0900
fax 206.386.7500
www.stoel.com

BART W. REED
*Direct (206) 386-7568*
bwreed@stoel.com

August 16, 2013

**BY EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Matthew Sweeney, Esq.
Registered Agent
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
6416 Pacific Highway E
Fife, Washington 98424-1561

Matthew Sweeney, Esq.
PO Box 7935
Tacoma, WA 98417-0935

Re:   Prium Orchard Hills, L.L.C.;
      Orchard Hills Apartments, 501 Orchard Street West
      Tacoma, Pierce County, Washington 98467 (the "Property");
      Third Demand for Compliance with Operating Agreement and Notice of Default

Dear Mr. Sweeney:

The instant letter serves to follow up from our clients' most recent June 21, 2013, to which our clients, Nationwide Affordable Housing Fund 30, LLC and SCDC, LLC (the "Investor Members"), have yet to receive any response from Prium Orchard Hills, LLC ("Prium"). The Investor Members' increasing frustrations emanate not only from Prium's failure or refusal to respond to the June 21, 2013 correspondence, but also, and perhaps more importantly, Prium's failure or refusal to recognize, address and resolve critical issues that continue to impact the profitability and sustainability of the project to the detriment of the Investor Members.

Indeed, these issues, which have been referenced in detail in previous correspondence,[1] persist relative to the Orchard Hills Apartments (the "Property"), as corroborated by recent

---

[1] A copy of the Investor Members' most recent June 21, 2013 correspondence is enclosed herein as Exhibit 1 for Prium's ease of review and reference.

74422767.1 0064625-00001

Alaska   California   Idaho
Minnesota   Oregon   Utah   Washington
and Washington, D.C.


FILE COPY



Matthew Sweeney, Esq.
August 16, 2013
Page 2

---

audit reports and subsequent physical needs assessments and notwithstanding the Investor Members' continued efforts to bring these matters to the attention of Prium in hopes of Prium's understanding, appreciation and resolution of same. These critical issues include the apparent failure on the part of Prium to deposit funds sufficient to replenish the tenant security deposit account and to appropriate the necessary resources (or formulate a workable remediation plan) with respect to the "immediate need" items reflected in the 2012 Physical Needs Assessment (the "2012 PNA") conducted by Consolidated Consulting Group ("CCG").

Insofar as these items linger, particularly with regard to the security deposit issues and "immediate needs" reflected in the 2012 PNA (and reconfirmed in the latest, most recent follow up physical needs assessment (the "2013 PNA")), Prium remains in material breach of the Operating Agreement--to which (as previously conveyed in the June 21, 2013 demand letter) Prium, not the property manager (including either The Allied Group ("Allied") or its purported successor, Hoban & Associates, Inc. d/b/a Coast Real Estate Services ("Coast Services")), remains bound.

### MISAPPROPRIATION OF TENANT SECURITY DEPOSITS

As detailed in both our May 10, 2013 and June 21, 2013 correspondence, Prium remains in violation of the Washington Residential Landlord-Tenant Act (RCW 59.18.270) and, thus, the Operating Agreement (Sections 6.1, 6.5, 6.6 and 7.2) for failing to safeguard and secure the tenant security deposits in a separate account. In fact, the 2012 financial audit indicates that the tenant security deposit account may not even exist. According to the balance sheet[2] reflecting Prium's assets, liabilities and equity, there exists a "bond reserve fund" in the amount of $82,028.00, with the amount of $87,404.00 found to be due and owing for tenant security deposits for the 2012 fiscal year. As of June 30, 2013, there existed an ending balance owed for the security deposits in the amount of $87,679.83. The Partnership's accountants have determined that the bond reserve fund apparently is held in an expense fund (maintained at U.S. Bank) to pay annual trustee fees, with the majority of the funds used to satisfy principal and interest payments on the bonds, with no funding set aside for the tenant security deposits as of December 31, 2012. Prium's failure to establish and maintain the tenant security deposit account is a serious issue that requires immediate and careful attention. Again, Prium's reliance on and deference to Allied for the handling, oversight and control of the account ignores the obligation on the part of Prium, as the General Partner, to

---

[2] A copy of the Prium Balance Sheet is enclosed herein as Exhibit 2 for Prium's convenience.

74422767.1 0064625-00001



ensure that the account is properly established and maintained, notwithstanding any delegation of such responsibilities to third parties.

Accordingly, the Investor Members renew their previous demand that Prium exact immediate and all appropriate measures to reconcile the tenant security deposit amounts and supplement the account with funds sufficient to bring the account current and compliant with Washington law. In addition, the Investor Members demand that Prium provides an account summary substantiating that the account complies with any and all legal requirements, and regularly updates the Investor Members with security deposit account information and balances. Again, whether and to what extent the Investor Members, or any predecessor investor member(s), neglected to raise any issue with the security deposit account at a later date (ostensibly beyond the first instance of Prium's mismanagement of the account) has absolutely no bearing on Prium's continuing duty to maintain the account in compliance with the applicable law and the Operating Agreement's terms.

### FAILURE TO MAINTAIN THE PROPERTY

With respect to the property maintenance issues, the Investor Members remain quite concerned and frustrated by the fact that Prium places such little significance on the "immediate needs" identified in the 2012 PNA. As you have been apprised, the "immediate need" items in the 2012 PNA include potentially serious conditions impacting the Property and those individuals residing or working at the Property. Indeed, the defective or deficient items span a broad spectrum of conditions and specifically concern or relate to, among other items, (i) the structure and envelope, (ii) the mechanical, electrical and plumbing systems and components and (iii) the life safety/fire protection elements of the Property.

CCG has most recently confirmed in another physical needs assessment, conducted on July 17, 2013 and memorialized in a July 31, 2013 report,[3] that many of the same "immediate need" issues remain on the property and thus require timely attention by Prium. Prium's continued failure or otherwise refusal to recognize and appreciate these issues—and to rectify them via funds from the replacement reserve and, thereafter, the Operating Deficit Guarantee amounts—constitutes a material breach of the Operating Agreement (namely, Sections 6.5(A), 6.6(5)(6) and (7)).

The "immediate need" items, as identified in the 2013 PNA, require action within the next 60 to 90 days and total an estimated dollar amount of $1,042,030.00. In its 2013 PNA, CCG

---

[3] A copy of the 2013 PNA is enclosed herein as Exhibit 3 for Prium's review and consideration.



Matthew Sweeney, Esq.
August 16, 2013
Page 4

explains that, "[t]ypically, immediate [needs] repairs are deficiencies that require action in the next 60-90 days as a result of: (i) existing or potentially unsafe conditions, (ii) negative conditions significantly impacting marketability or habitability, (iii) material building code violations, (iv) poor or a deteriorated condition of a critical element or system, or (v) a condition that if left 'as is' with an extensive delay in addressing same, would result in or contribute to critical element or system failure within 12 months or a significant escalation in the repair cost." See 2013 PNA, p. 8. As noted in the 2013 PNA, the property management reports that the current occupancy rate is 82.39% for the 176 units (see p. 4), which, together with the aforementioned bases for the "immediate need" items identified on the Property, underscores the need to address the items—with the intent to increase the occupancy rate and to promote the safe and secure use and enjoyment of the facilities for the benefit of the occupants.

Without belaboring the issue, Prium should be well aware of the fact that the same "immediate need" conditions exist on the Property as those uncovered in the 2012 PNA, which include the polybutylene pipes and life safety/fire suppression system needs that comprise the predominate monetary portion of the improvements to be made on the Property. More specifically, of the total estimated sum of $1,042,030.00 in "immediate need" repairs to be made on the Property, the estimated amounts of $880,000.00 and $26,000.00 should be dedicated immediately to address the plumbing and life safety/fire protection issues, respectively. Further explanation of the critical items in need of immediate repair will not be recited herein, but undoubtedly should serve as more than adequate basis for the Investor Members' insistence that the conditions be rectified in a timely and property manner, utilizing funds which should be reserved to address the property issues and not as part of any decision to defer ongoing property maintenance obligations at the continued risk of damage to the Property and possible injury to the occupants.

Again, Prium has no basis to advance the notion that the Investor Members may have waived any right to demand that Prium address these Property maintenance issues and "immediate need" items purportedly based on some neglect on the part of the Investor Members to account for such items during the acquisition of the predecessor Investor Member. These same "immediate needs" were identified in the earlier 2006 physical needs assessment performed by f3 Inc. Real Property Consultants (the "2006 PNA"), which are, in large part, precisely the same "immediate need" items that existed as of the investigations and reporting of the Property conditions during the 2012 PNA and, most recently, in the 2013 PNA. Together with the fact that the Investor Members have received very little, if any, reasonable assurances from Prium that the "immediate needs" and other defective or deficient Property conditions will be corrected, the Investor Members maintain every right to make such demands under the Operating Agreement that the items be promptly and properly addressed

74422767.1 0064625-00001



Matthew Sweeney, Esq.
August 16, 2013
Page 5

in order to ensure not only the good working order, operation and maintenance of the Property, but also, and perhaps more germane to the Investor Members, its future financial viability and success.

As is evident from Prium's continued refusal to acknowledge these issues and work with the Investor Members to formulate a reasonable solution to the ongoing property condition issues and impacts to the current and future occupancy and revenues from the property, Prium has exhibited very little interest, if any, to place the property in a favorable position to generate legitimate, ongoing and sustained revenues and profits. This certainly begs the question as to Prium's true motivations for serving as the general partner or its financial capacity to mitigate the risks attendant to the current property conditions. Regardless of whatever property management agencies are employed by Prium, to which we understand Prium inappropriately defers to shirk or evade its contractual obligations, the Investor Members demand that Prium exact seasonable measures and devote the necessary resources sufficient to ensure that these items are addressed and resolved for the benefit of all parties.

Next, with respect to Prium's reliance on any "periodic inspections by the Washington State Housing Finance Commission" (the "WSHFC"), the Investor Members, as conveyed in their last correspondence to Prium's attention, do not believe that the various inspection reports produced by the WSHFC during the 2008 and 2011 time periods have any bearing on the operation, maintenance and construction-related issues impacting the revenue and profitability of the Property and affecting the interests of the Investor Members. Also, it appears that the WSHFC had any desire, much less the available resources and wherewithal, to conduct as comprehensive of physical needs reports as those detailed in the 2006, 2012 and 2013 PNAs. As previously mentioned, the Investor Members cannot locate in any of the WSHFC reports any mention of the systemic "immediate needs" conditions pervading the Property, such as the polybutylene pipe issues.

Regarding the polybutylene pipe issue, Prium contends in its earlier letter that the "plastic pipe is not and has never been an immediate need." Further, Prium asserts that "[t]he issue was recognized by all parties years ago at the inception of [Prium's] involvement" and "[a] reserve fund exists and is funded with dedicated monthly contributions so that funds are available to replace the piping over time on an as needed basis." However, CCG, during its most recent site investigation, found that only piecemeal efforts have been made with respect to units that have experienced recent damage caused by the polybutylene pipes and, to the extent that repair efforts were made at the particular location, the repairs did not involve a proper wholesale replacement of the pipe distribution lines and conveyance system within or for the unit.

74422767.1 0064625-00001



The mere fact that the pipes have not experienced any widespread failure to date provides little, if any, comfort to the Investor Members that such pipes, or the other "immediate need" items, could not impact the Property now or in the near future based on the conditions identified in the 2006 PNA, the 2012 PNA and, most recently, the 2013 PNA. Moreover, simply because the pipes have yet to cause widespread or catastrophic loss or damage to the Property does not relieve Prium from its ongoing responsibility to maintain the Property, which includes addressing and resolving conditions that impinge on the operation and economic sustainability and livelihood of the Property.

## CONCLUSION AND INVITATION FOR SETTLEMENT DISCUSSIONS

Based on the foregoing, the time has come for decisive action to be made by the Investor Members to place the Property in a position of sustained marketability and improved profitability. The Investor Members find the current situation with Prium's operational and managerial control of the Property totally deficient and thus unacceptable. Accordingly, as the Property is not being operated and managed in compliance with the Operating Agreement, the Investor Members have no other choice other than to declare Prium in default under Section 8.6 of the Operating Agreement.

In light of this matter, as it concerns Prium's default under the terms of the Operating Agreement, we ask that Prium now avail itself of the opportunity to meet with the Investor Members to discuss the situation and help formulate, if possible, a mutually beneficial (or less questionable or damaging) approach to resolving the plight of the Property. Certainly, litigation may not be in either party's best interests, and the Investor Members are willing, at this stage, to invest some time and effort to work with Prium in a conciliatory fashion to frame a logical plan to improve the Property. If Prium is not amenable to this reasonable approach, then the Investor Members otherwise will be forced to resort to litigate their claims against Prium.

To forestall the possibility of protracted litigation, the Investor Members invite Prium to share its perspective on the issues during a meeting between the various party representatives in the near future. Assuming that Prium is willing to participate in good faith in a meeting with the Investor Members, please provide us with dates during the latter half of September, 2013 in which Prium's principals and its counsel are available for a meeting. If we do not receive any response from you within five (5) days of the date of this letter, we will assume that Prium is both uninterested and not desirous in discussing the matter further, which will likely push the Investor Members to resolve the situation through alternative means.



Matthew Sweeney, Esq.
August 16, 2013
Page 7

Please note that this letter is sent to Prium subject to and without waiving any and all rights and entitlement maintained by the Investor Members under the express and implied terms of the Operating Agreement and applicable law. Such rights and entitlement may include invoking certain contractual options to safeguard the Property asset, including any appropriate and necessary actions to ensure that reserve funds are maintained and properly expended to address and resolve the Property's "immediate need" items as reflected in the 2013 PNA.

We thank you for your anticipated cooperation and assistance with this matter and look forward to hearing from you soon.

Yours very truly,

Bart W. Reed

BWR/lb
Enclosures

74422767.1 0064625-00001

**2. Article Number**

7196 9008 9111 6969 4927

**3. Service Type** CERTIFIED MAIL™

**4. Restricted Delivery?** *(Extra Fee)* ☐ Yes

**d. Article Addressed to:**

Matthew Sweeney, Esq.
Registered Agent
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
6416 Pacific Highway E
Fife, Washington 98424-1561

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly): Prium Companies, LLC
   6416 Pacific Hwy E
   Fife WA 98424
B. Date of Delivery: 8/19/13
C. Signature: X
☐ Agent
☐ Addressee
D. Is delivery address different from item 1? ☐ Yes ☐ No

Reference Information

0064625-00001

Bart Reed

PS Form 3811, January 2005    Domestic Return Receipt

---

**2. Article Number**

7196 9008 9111 6969 4910

**3. Service Type** CERTIFIED MAIL™

**4. Restricted Delivery?** *(Extra Fee)* ☐ Yes

**1. Article Addressed to:**

Matthew Sweeney, Esq.
Matthew Sweeney, Esq.
PO Box 7935
Tacoma, WA 98417-0935

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly): Matthew Sween
B. Date of Delivery: 8/19/13
C. Signature: X
☐ Agent
☑ Addressee
D. Is delivery address different from item 1? ☐ Yes ☐ No

Reference Information

0064625-00001

Bart Reed

PS Form 3811, January 2005    Domestic Return Receipt

7196 9008 9111 6969 4910

**TO:** Matthew Sweeney, Esq.
Matthew Sweeney, Esq.
PO Box 7935
Tacoma, WA 98417-0935

**SENDER:** Bart Reed

**REFERENCE:** 0064625-00001

PS Form 3800, January 2005

| RETURN RECEIPT SERVICE | Postage | 5.80 |
|---|---|---|
| | Certified Fee | 3.10 |
| | Return Receipt Fee | 2.55 |
| | Restricted Delivery | |
| | Total Postage & Fees | $1.45 |

**USPS® Receipt for Certified Mail™**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE

---

7196 9008 9111 6969 4927

**TO:** Matthew Sweeney, Esq.
Registered Agent
P&U Capital Partners I, L.L.C.
c/o Prium Companies, L.L.C.
6416 Pacific Highway E
Fife, Washington 98424-1561

**SENDER:** Bart Reed

**REFERENCE:** 0064625-00001

PS Form 3800, January 2005

| RETURN RECEIPT SERVICE | Postage | 5.80 |
|---|---|---|
| | Certified Fee | 3.10 |
| | Return Receipt Fee | 2.55 |
| | Restricted Delivery | |
| | Total Postage & Fees | $1.45 |

**USPS® Receipt for Certified Mail™**
No Insurance Coverage Provided
Do Not Use for International Mail

POSTMARK OR DATE

